**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN**

Derico Thompson, #234651

     Plaintiff,

v.

Corizon, Inc., et al.

     Defendants.

Case No: 2:20-cv-00158
District Judge: Robert J. Jonker
Magistrate Judge: Maarten Vermaat

---

| | |
|---|---|
| DERICO THOMPSON, #234651 | CHAPMAN LAW GROUP |
| Kinross Correctional Facility | Devlin K. Scarber (P64532) |
| 4533 W. Industrial Park Drive | Attorney for Corizon Health, Inc. |
| Kincheloe, MI 49788 | and Wendy Jamros, N.P. |
| *Pro Se Plaintiff* | 1441 West Long Lake Rd., Suite 310 |
| | Troy, MI 48098 |
| | (248) 644-6326 |
| | dscarber@chapmanlawgroup.com |

---

### DEFENDANTS CORIZON HEALTH, INC., AND WENDY JAMROS, N.P.'S MOTION FOR SUMMARY JUDGMENT

### PROOF OF SERVICE

    NOW COME Defendants CORIZON HEALTH, INC., and WENDY JAMROS, N.P., (hereinafter the "Corizon Defendants") by and through their counsel, CHAPMAN LAW GROUP, and for their Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56, state as follows:

1. On August 27, 2020, Plaintiff filed his Complaint in this matter making various allegations against Corizon Health, Inc. (hereinafter "Corizon"), and Wendy Jamros, N.P. (hereinafter "NP Jamros"). (**ECF No. 1, PageID.1**).

2. Specifically, Plaintiff alleges that the Corizon Defendants somehow "violated Plaintiff's Eighth Amendment rights by initially denying and delaying medical examination,

treatment, and surgery," and "by knowing but unnecessarily delaying health care deliberately and wantonly." (**ECF No. 1, PageID.5-6**, ¶28).[1]

3.  Plaintiff has further alleged that he was told that Corizon "must be absolutely certain that an MRI is necessary before allocating funds for any type of treatment," and "this policy or custom resulted in a denial and delay of medical treatment…" (**ECF No. 1, PageID.4, ¶¶14-15**).

4.  "A government contractor cannot be held liable on a '*respondeat superior* theory,' but rather 'for a policy or custom *of that private contractor.*'" *Winkler v. Madison Cty.*, 893 F.3d 877, 904 (6th Cir. 2018).  Here, there is no genuine dispute that Plaintiff has no evidence of an unconstitutional policy not to provide care to inmates with his conditions or similar conditions, nor does he have evidence linking any alleged policy to any specific injury suffered by him.  *Johnson v. Karnes*, 398 F.3d 868, 877 (6th Cir. 2005); *Ellis v Cleveland Mun. Sch. Dist*. 455 F.3d 690, 700 (6th Cir. 2006). Nor does Plaintiff have any admissible evidence that such alleged policy is the "'moving force' behind the alleged violation of the plaintiff's constitutional rights." *Maxwell v. Corr. Med. Servs., Inc.*, 538 F. App'x 682, 691 (6th Cir. 2013).  Such a policy must be the basis of "a clear and persistent pattern of illegal activity." *Thomas v. City of Chattanooga, 398 F.3d 426, 433 (6th Cir. 2005)* (citing *Doe v. Claiborne County*, 103 F.3d 495, 508 (6th Cir. 1996)). Plaintiff has not alleged, much less shown, such a pattern of unconstitutional conduct. "[A]ttempting to

---

[1] Because this is a 42 U.S.C.  § 1983 civil action brought by an incarcerated person, this Court conducted a preliminary screening of the Complaint pursuant to 28 U.S.C.  §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c). (**ECF No. 4, PageID.30**). In its September 8, 2020 screening Opinion, this Honorable Court dismissed Plaintiff's conspiracy claims, along with four prior defendants, finding that Plaintiff failed to state a proper claim. (**ECF No. 4, PageID.40-42**). The only claims that were allowed to proceed were "Plaintiff's Eighth Amendment deliberate indifference claims against Corizon and Jamros.  Therefore, only those claims are addressed in this motion.

infer a municipal-wide policy based solely on one instance of potential misconduct…would result in the collapsing of the municipal liability standard into a simple *respondeat superior* standard." *Id.* at 432-433. This has been clearly forbidden by the Supreme Court. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). "[A] plaintiff 'cannot rely solely on a single instance' to prove the existence of a constitutional custom." *Gregory v. City of Louisville*, 444 F.3d 725, 773 (6th Cir. 2006).  Here, as demonstrated by the medical records the facts, and expert review of Plaintiff's symptoms and conditions, there was no policy of Corizon that was a moving force behind Plaintiff not receiving treatment or surgery.  In fact, as the records demonstrate, all of the treatment that was requested and appropriate for Plaintiff was actually provided to Plaintiff (i.e., physical therapy, medications, pain inhibitor injections, x-rays, and offsite testing and procedures in the form of MRIs, EMGs, and neurosurgical consults).  No Corizon policy prohibited care in any manner. As two (2) neurosurgeons have indicated, Plaintiff's condition was properly managed with conservative treatment and did not require surgical intervention (See **Ex A**, 5/3/21 Neurosurgical Consult of Dr. Amritraj Loganathan, M.D.; **Ex B**, Affidavit of neurosurgeon, Dr. Peter Grain, M.D.). See also **Ex C**, Affidavit of Wendy Jamros, N.P., ¶33, stating:

> There were no Corizon policies or procedures that resulted in denying or delaying any medical treatment that I provided or requested for Mr. Thompson.  He received all of the treatment that I requested for him in a timely manner.  I never told him to "quit faking," or "just deal with it," or that Corizon was not going to pay for something.  All of the records indicate that I consistently addressed his medical needs and that Corizon approved everything…Nothing I did or Corizon did caused any delays.  Mr. Thompson's records indicate that despite the difficulties posed by the Covid-19 pandemic, still he received timely treatment.  His records document that actions were consistently being taken on his behalf to render care to him and he was never ignored, even when

3

other providers were involved in his care after my interaction with
him ended. (**Ex C**, ¶33)

Plaintiff's physical therapy, MRI, EMG, trial of Cymbalta, and two neurosurgical consults
were all approved and paid for.  There is simply no merit to any of Plaintiff's claims. (**Ex
C**, ¶8, 10, 11, 14, 17, 18, 33; **Ex D**, MDOC Records (excerpts), pp. 16-18, 21-24, 25-26,
27-28, 39).

5.  Furthermore, "[i]f no constitutional violation by the individual defendants is established,
    the [entity] defendants (i.e., Corizon) cannot be held liable under § 1983." *Watkins v. City
    of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001).

6.  Here, there is no genuine dispute as to any material fact that Plaintiff has no evidence
    establishing that NP Jamros (i.e., the only named individual defendant in this case) acted
    with deliberate indifference towards Plaintiff, violating his constitutional rights. (**Ex B**,
    Affidavit of neurosurgeon, Dr. Peter Grain, M.D ¶¶ 5, 6, 9, 11, 12, 18, 19, 21, 22; **Ex C**,
    Affidavit of NP Jamros).  Plaintiff's allegations stem from a mere disagreement with
    medical judgment as opposed to deliberate indifference. See *Youngberg v. Romeo*, 457
    U.S. 307, 321 (1982), holding that Federal Courts typically do not intervene in questions
    of medical judgment ("It is not appropriate for the courts to specify which of several
    professionally acceptable choices should have been made.").   (See also **Ex A**, ¶¶4,19; **Ex
    C**, ¶¶2, 32,34).

7.  Moreover, the expert neurosurgery review and the medical evidence in this case is that Mr.
    Thompson did not have a serious medical condition that mandated that he receive medical
    treatment or lumbar surgery.  See also **Ex A**, ¶¶16 19; **Ex C**, ¶32.

8.  An inmate's "sufficiently serious" medical need must be a condition "diagnosed by a
    physician as mandating treatment."  *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 897 (6th

Cir. 2004).  See also *Phillips v. Tangilang*, 14 F.4th 524, 535 (6th Cir. 2021), holding: "For prisoners to prove grossly inadequate care…courts generally require them to introduce medical evidence, typically in the form of expert testimony."  "[A] medical-evidence requirement sits comfortably within society's "decency" standards. And it would be odd if a prisoner could prove an Eighth Amendment claim more easily than an ordinary individual could prove a malpractice claim."

9.  For the reasons set forth in the Brief accompanying this motion, there is no genuine issue of material fact regarding Plaintiff's claims against the Corizon Defendants, and summary judgment is proper.

10. Concurrence in this motion has not been sought because Plaintiff is an incarcerated prisoner proceeding *pro se*.

WHEREFORE, based upon the foregoing reasons, Corizon Defendants respectfully request that this Honorable Court GRANT the Corizon Defendants Motion for Summary Judgment and provide any and all further relief that this Court deems just and equitable.

<div style="margin-left: 40%;">

Respectfully submitted,

CHAPMAN LAW GROUP

</div>

Dated: December 16, 2021          /s/Devlin K. Scarber_____
                                  Devlin Scarber (P64532)
                                  Attorneys for Corizon, Inc., and
                                  Wendy Jamros, N.P.
                                  1441 West Long Lake Rd., Suite 310
                                  Troy, MI 48098
                                  (248) 644-6326
                                  dscarber@chapmanlawgroup.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MICHIGAN**

Derico Thompson, #234651

       Plaintiff,

v.

Corizon, Inc., et al.

       Defendants.

Case No: 2:20-cv-00158
District Judge: Robert J. Jonker
Magistrate Judge: Maarten Vermaat

| | |
|---|---|
| DERICO THOMPSON, #234651 | CHAPMAN LAW GROUP |
| Kinross Correctional Facility | Devlin K. Scarber (P64532) |
| 4533 W. Industrial Park Drive | Attorney for Corizon Health, Inc. |
| Kincheloe, MI 49788 | and Wendy Jamros, N.P. |
| *Pro Se Plaintiff* | 1441 West Long Lake Rd., Suite 310 |
| | Troy, MI 48098 |
| | (248) 644-6326 |
| | dscarber@chapmanlawgroup.com |

**BRIEF IN SUPPORT OF DEFENDANTS CORIZON HEALTH, INC., AND WENDY JAMROS, N.P.'S MOTION FOR SUMMARY JUDGMENT**

**PROOF OF SERVICE**

## <u>TABLE OF CONTENTS</u>

<u>INDEX OF AUTHORITIES</u>........................................................................................iii

<u>STATEMENT OF ISSUES PRESENTED</u>.................................................................. vi

<u>CONTROLLING/APPROPRIATE AUTHORITY FOR RELIEF SOUGHT</u> ........................... vii

<u>I.</u>     <u>STATEMENT OF FACTS</u> ......................................................................... 1

A. Procedural Facts ……………...…………………………………………………...1

B.  Substantive Facts……………………………………………………………...……..…..2

<u>II.</u>     <u>STANDARD OF REVIEW</u> ............................................................................ 14

<u>III.</u>     <u>LEGAL ARGUMENT</u> .................................................................................. 15

A.  There Is No Genuine Dispute That Defendant NP Jamros' Actions Did Not Constitute Deliberate Indifference. ……………………………………………………….……… 15

     1.  Plaintiff Cannot Establish That He Had a Serious Medical Need That Was Diagnosed As Mandating Any Treatment Outside Of What He Was Provided, Nor Mandating Surgery ……………………………………………………………………………17

     2. Plaintiff Cannot Establish Deliberate Indifference Against NP Jamros Where She Provided Medical Treatment, Exercised Her Medical Treatment, And Plaintiff Merely Disagrees With The Treatment Provided…………………………………………19

B.  There is No Genuine Dispute That Plaintiff Has Failed to Establish A *Monell* Claim Against Defendant Corizon…………………………………………………………………...22

<u>IV.</u>     <u>CONCLUSION AND REQUESTED RELIEF</u> ................................................. 26

## <u>INDEX OF AUTHORITIES</u>

**Cases**

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970) .......................................................... vii, 14

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) ..................................................... vii, 14

*Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 897 (6th Cir. 2004) ........................................ 16, 18

*Blaine v. Louisville Metro. Gov't*, 768 Fed. Appx. 515, 526 (6th Cir. 2019) ............................. 17

*Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001) ........................................ vii, 16, 17, 22

*Coogan v. City of Wixom*, 820 F.2d 170, 176 (6th Cir. 1987) ..................................................... 23

*Duchon v. Cajon Co.*, 791 F.2d 43, 46 (6th Cir. 1986) ................................................................ 15

*Dunn v. State of Tenn.*, 697 F.2d 121, 128 (1983) ...................................................................... 22

*Estelle v. Gamble*, 429 U.S. 97 (1976) ................................................................................. vii, 15

*Everson v. Leis*, 556 F.3d 484, 496 (6th Cir. 2009) ................................................................... 15

*Farmer v. Brennan*, 511 U.S. 825, 834 (1994) ................................................................... vii, 16

*Ferrari v. Ford Motor Co.*, 826 F.3d 885, 897-898 (6th Cir. 2016) .............................................. 15

*Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993) ............................................ 23

*Lenz v. Erdmann Corp.*, 773 F.2d 62 (6th Cir. 1985) ........................................................... vii, 15

*Miller v. Sanilac County*, 606 F.3d 240, 254–55 (6th Cir.2010) ................................................ vii

*Monell v. Department of Social Servs.*, 436 U.S. 658, 663(1978 ............................................... 22

*Nouri v. County of Oakland*, 615 Fed. Appx. 291, 296 (6th Cir. 2015) ..................................... 23

*Pearce v. Faurecia Exhaust Systems, Inc.*, 529 Fed. Appx. 454,458 (6th Cir. 2013)) ................. 15

*Phillips v. Tangilang*, 14 F.4th 524, 535 (6th Cir. 2021)………………………………16, 18

*Scott v. Harris*, 550 U.S. 372, 380 (2007) ...................................................................... vii, 15, 24

*Searcy v. City of Dayton*, 38 F.3d 282, 287 (6th Cir. 1994) ...................................................... 23

*Street v. Corrections Corporation of America*, 102 F.3d 810 (6th Cir. 1996)............................. 22

*Waters v. City of Morristown, Tenn.*, 242 F.3d 353 (6th Cir. 2001 ............................................ vii

*Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001)……………………………..23

*Westlake v. Lucas*, 537 F.2d 857, n.5 (6th Cir. 1976)........................................................... 17, 22

*Williams v. Mehra*, 186 F.3rd 685, 691 (6th Cir. 1999) ............................................................ vii

*Wilson v. Seiter*, 501 U.S. 294, 297 (1991)................................................................................ vii

*Youngberg v. Romeo*, 457 U.S. 307, 321 (1982)……………………………………………...22

**Statutes**

42 U.S.C. § 1983.............................................................................................. vii, 1, 16, 23

42 U.S.C. § 1997e(c) …………….....……………………………………………….…..1

28 U.S.C. § 1915(A) …………….……………………………………………….…..1

28 U.S.C. § 1915(e)(2) …………….…………………………………………….....1

**Rules**

Fed. R. Civ. P. 56................................................................................................ vii, 2, 14

## <u>INDEX OF EXHIBITS</u>

**Exhibit A:**     5/3/21 Neurosurgical Consult of Dr. Amritraj Loganathan, M.D.

**Exhibit B:**     Affidavit of neurosurgeon, Dr. Peter Grain, M.D. (with curriculum vitae attached)

**Exhibit C:**     Affidavit of Wendy Jamros, N.P.

**Exhibit D:**     MDOC Medical Records (excerpts)

**Exhibit E:**     War Memorial Hospital

**Exhibit F:**     Schoolcraft Memorial Hospital

**Exhibit G:**     9/22/20 UP Health System Marquette Neurosurgical Consult

## STATEMENT OF ISSUES PRESENTED

I.  SHOULD THE COURT GRANT THE CORIZON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT BECAUSE THERE ARE NO GENUINE ISSUES OF ANY MATERIAL FACT?

**Defendants Answer:**                          **YES.**
**Plaintiff Answers:**                           **NO.**

## CONTROLLING/APPROPRIATE AUTHORITY FOR RELIEF SOUGHT

Summary judgment is appropriate if the moving party shows that there is no genuine issue as to any material fact, such that a reasonable jury could find only for the moving party – even when viewing the evidence in a light most favorable to the non-moving party. Fed. R. Civ. P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); see also *Lenz v. Erdmann Corp.*, 773 F.2d 62 (6th Cir. 1985). Plaintiff must do more than simply show that there is some metaphysical doubt as to the material facts because allegations alone are not sufficient to avoid summary judgment. *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Liberty Lobby*, 477 U.S. at 248. To state a 42 U.S.C. § 1983 claim for a violation of a prisoner's Eighth Amendment right to adequate medical care, a plaintiff must allege facts evidencing deliberate indifference to serious medical needs. *Estelle v. Gamble*, 429 U.S. 97 (1976), and must demonstrate that, objectively, there was a "sufficiently serious" medical need, and must also show that each defendant was subjectively aware of that serious medical need, and consciously disregarded it. See *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Wilson v. Seiter*, 501 U.S. 294, 297 (1991); *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001); *Williams v. Mehra*, 186 F.3rd 685, 691 (6th Cir. 1999).

To survive a summary judgment motion, Plaintiff must demonstrate that (1) his constitutional rights were violated, and (2) a policy or custom of Corizon was the "moving force" behind the deprivation of his rights. *Miller v. Sanilac County*, 606 F.3d 240, 254–55 (6th Cir.2010); *Waters v. City of Morristown, Tenn.*, 242 F.3d 353, 362 (6th Cir. 2001).

# I.   STATEMENT OF FACTS

## A.   Procedural Facts

On August 27, 2020, Plaintiff filed his Complaint in this matter making various allegations against Corizon Health, Inc. (hereinafter "Corizon"), and Wendy Jamros, N.P. (hereinafter "NP Jamros"). (**ECF No. 1, PageID.1**). Specifically, Plaintiff alleges that the Corizon Defendants somehow "violated Plaintiff's Eighth Amendment rights by initially denying and delaying medical examination, treatment, and surgery," and "by knowing but unnecessarily delaying health care deliberately and wantonly." (**ECF No. 1, PageID.5-6, ¶28**). Plaintiff has further alleged that he was told that Corizon "must be absolutely certain that an MRI is necessary before allocating funds for any type of treatment," and "this policy or custom resulted in a denial and delay of medical treatment…" (**ECF No. 1, PageID.4, ¶¶14-15**).

Because this is a 42 U.S.C. § 1983 civil action brought by an incarcerated person; the court conducted a preliminary screening of the Complaint pursuant to 28 U.S.C. §§ 1915(e)(2), 1915(A); 42 U.S.C. § 1997e(c). In its September 8, 2020 screening Opinion, this Honorable Court dismissed Plaintiff's conspiracy claims, along with four (4) prior defendants, finding that Plaintiff failed to state a proper claim. (**ECF No. 4, PageID.40-42**). With regard to conspiracy claims, the court held that the "proposed conspiracy claim is barred by the intercorporate conspiracy doctrine." "Here, all Defendants are members of the same collective entity (Corizon, as the medical contractor for the MDOC) who work at the same divisional location. Plaintiff does not even allege, much less show, that Defendants were acting outside of the scope of their employments." "Plaintiff therefore does not establish the exception to the intercorporate conspiracy doctrine…" (***Id.***) The only claims that were allowed to proceed were "Plaintiff's Eighth Amendment deliberate

indifference claims against Corizon and Jamros.  Therefore, only those claims are addressed in this motion.

This matter has now proceeded through discovery and Defendants have obtained Plaintiff's medical records.  Defendants now file their Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56 because there is no genuine issue of material fact regarding Plaintiff's claims against the Corizon Defendants, and summary judgment is proper.

**B.    <u>Substantive Facts</u>**

The facts are set forth below, as reflected in the affidavit testimony of NP Jamros (**Ex C**) with references to Plaintiff's medical records, along with the affidavit testimony of neurosurgery expert Dr. Grain, who is a board-certified neurosurgeon with nearly forty (40) years of clinical neurosurgery experience.  Dr. Grain's curriculum vitae is attached to his Affidavit.

NP Jamros has been a nurse practitioner since 1999.  At the times pertinent to the dates alleged in Plaintiff's Complaint, she was employed by Corizon as a nurse practitioner in the Michigan Department of Corrections (MDOC) Kinross Correctional Facility in Kincheloe, Michigan, in the Upper Peninsula. (**Ex C, ¶¶1-2**).  **However, NP Jamros was not involved in Plaintiff's lumbar treatment nor any decisions regarding his back pain or lumbar issues after August 6, 2020. (Ex C, ¶¶2, 18, 33**).   NP Jamros' Affidavit states, in pertinent part, as follows:

4.   On or about September 9, 2019, Mr. Thompson complained that he injured his back a few weeks earlier on or about August 27, 2019 while exercising, either when doing toe touches, or using an abdomen machine, or a row lifting machine.  The records are unclear as to the exact mechanism of his injury, but it appears that he did not advise the medical staff of his alleged injuries until a couple of weeks later.  The next day, September 10, 2019, Mr. Thompson was seen by an MDOC nurse, and was given a hot water bottle for his back pain and Ibuprofen.   Within

three days, on September 13, 2019, I ordered medications including Flexeril and a Medrol dose pak, and pain medication for his alleged injuries.  I also performed a chart review of his condition on September 16, 2016.  (**Ex C**, Jamros Affidavit, ¶4; **Ex D**, MDOC record experts, pp. 1-8)

5.  On September 25, 2019, I ordered an x-ray of his lower spine, examined him, and diagnosed him with lumbago.  I further ordered that his medications continue, and ordered additional medications, including ketorolac, and Solu-Medrol injections for his symptoms.  I instructed him regarding the medications, following an exercise program, using the warm compress, reassured the patient, and planned for a follow-up.   (**Ex C**, ¶5; **Ex D**, pp. 9-11)

6.  On September 30, 2019, Mr. Thompson underwent the lumbar spine x-ray that I ordered, which showed mild facet arthritic changes of the lumbar spine and a degenerative disc change at L5/S1 level.  (**Ex C**, ¶6; **Ex D**, p. 12)

7.  On October 3, 2019, I examined Mr. Thompson, and among other things, noted that his back spasm had resolved, but he was still having discomfort in his leg, no bowel or bladder incontinence, and that he had some improvement with the medications I ordered.  I reviewed the x-ray results with the patient and further ordered Naprosyn for his symptoms.  (**Ex C**, ¶7; **Ex D**, pp. 13-15)

8.  On October 3, 2019, I submitted a request for Mr. Thompson to undergo physical therapy, which was approved on October 8, 2019. (**Ex C**, ¶8; **Ex D**, p. 16-18)

9.  On November 21, 2019, I ordered a bottom bunk detail and extra pillows for Mr. Thompson to address his symptoms and make him more comfortable.  I also noted that, if no improvement in 6-8 weeks, I would consider an MRI.  On December 3, 2019, I continued his pain medications. (**Ex C**, ¶9; **Ex D**, p. 19-20)

10. On February 17, 2020, I submitted a request with the utilization management review department for Mr. Thompson to undergo an EMG for his subjective complaints.  Also, on February 21, 2020, I submitted a request with the utilization management review department for an MRI of Mr. Thompson's lumbar spine, which was approved on February 26, 2020 and occurred on March 11, 2020.  (**Ex C**, ¶10; **Ex D**, pp. 21-24; **Ex E**, War Memorial MRI)

11. On March 12, 2020, I submitted a request with the utilization management review department for Mr. Thompson to undergo a neurosurgical consultation for further assessment of his conditions and further potential treatment options.  Also, on March 12, 2020, the EMG that I previously requested for Mr. Thompson was approved.  (**Ex C**, ¶11; **Ex D**, pp. 25-26)

12. In the MDOC, for any offsite procedures and medical consultations that I as a medical provider request for an inmate patient, including MRIs, EMGs, and neurosurgical consultations, the utilization management department's reviewers will exercise their medical judgment in determining if they will allow for a medical provider's request or instead suggest an alternative treatment plan.  But it is the utilization management reviewer, along with MDOC policies, not me, that will ultimately dictate the decision as to whether offsite procedures and offsite medical consultations will be allowed. Here, all of the offsite treatment that I requested for Mr. Thompson was approved by the utilization management reviewers.  (**Ex C**, ¶12)

13. The scheduling for offsite procedures and offsite treatment is based upon the MDOC prison facility's schedule and protocols and upon the schedules of outside medical facilities and outside providers that are utilized by the MDOC.  Neither I nor Corizon have any control over the scheduling process and no influence over how quickly an offsite appointment gets scheduled.  This is done by MDOC staff. (**Ex C**, ¶13)

14. On April 20, 2020, I obtained approval from the Corizon regional medical director for Mr. Thompson to receive a trial of Cymbalta, which would address his complaints of pain.  (**Ex C**, ¶14; **Ex D**, pp. 27-28)

15. Beginning Spring 2020, the Covid-19 pandemic impacted and delayed most nonemergent medical visits and procedures in the MDOC throughout the remainder of 2020 and caused a health and safety lockdown within the MDOC.  However, in June 2020 and July 2020, I continued to treat Mr. Thompson with pain medications, including with Relafen, and a Toradol injection and he was followed by nursing. (**Ex C**, ¶15; **Ex D**, pp.29-35)

16. On July 9, 2020, I received information from the MDOC staff that Mr. Thompson's EMG was able to be scheduled for August 3, 2020 and that the MDOC's Covid restrictions had been lifted for that period.  On July 15, 2020, I communicated with Mr. Thompson to let him know that the Covid restrictions had been lifted.  (**Ex C**, ¶16; **Ex D**, pp. 36-38)

17. On August 3, 2020, Mr. Thompson underwent the EMG that I had previously requested, which was consistent with his prior lumbar symptoms. (**Ex F**, Schoolcraft Memorial EMG).   On August 6, 2020, I noted that Mr. Thompson would be scheduled for a follow-up visit in the next month with Dr. Stallman, another medical provider at the prison.   (**Ex C**, ¶17; **Ex D**, p. 39)

18. On September 8, 2020, after Mr. Thompson had obtained further work-up via an EMG, the neurosurgical consult that I previously requested was approved. (**Ex D**, p.40).  On September 22, 2020, Mr. Thompson appeared for the neurosurgical consult.  This occurred at UP Health System Marquette.  (**Ex G**, UPHSM, 9-22-20). I have reviewed this consultation report in preparation for this case.  In my opinion, the surgical option that was recommended, i.e., a lumbar interbody fusion with placement of instrumentation, appears to be very complex and would involve a significant debilitating and difficult recovery process for Mr. Thompson.  However, I was not involved in any

5

decisions regarding the results of this neurosurgical consult nor in any decisions as to whether he obtained surgery. After August 6, 2020, and prior to his September 22, 2020 neurosurgical consult, I only treated him for his Covid-19 infection occurring in the winter of 2020. (**Ex C**, ¶18)

19. On October 14, 2020, the MDOC records indicate that Dr. Stallman reviewed the September 22, 2020 neurosurgical report and scheduled an appointment with Plaintiff within the next two weeks to discuss a plan with him regarding his back. (**Ex C**, ¶19; **Ex D**, p. 41)

20. On October 23, 2020, according to the MDOC records, Dr. Stallman saw Mr. Thompson and prescribed Toradol for his complaints. The record indicates that Dr. Stallman also discussed the September 22, 2020 neurosurgical report with Mr. Thompson, and that if he were to ultimately undergo the type of surgical option referenced in the September 22, 2020 neurosurgical report there was a high probability that he would need to be inpatient and require inpatient post-surgical physical therapy, and that therefore another neurosurgical consult would be necessary near Duane Waters Hospital (DWH) in Jackson, Michigan. Thereafter, Dr. Stallman requested a second neurosurgical consult. Also, it is generally prudent for medical providers and patients to seek more than one (1) opinion as to whether a surgery is necessary. (**Ex C**, ¶20; **Ex D**, p. 42-44)

21. In my years of experience with the MDOC, in situations where an inmate patient may potentially undergo a procedure that will require significant inpatient post-surgery recovery and post-surgical physical therapy, the typical protocol and MDOC policy is to have the procedure performed near Duane Waters Hospital. Duane Waters (DWH) is the MDOC's designated hospital for its inmates. DWH provides acute medical care, surgical care, and long-term care for inmates. Therefore, any outside surgeon that the MDOC utilizes for such a procedure must be within a reasonable proximity to DWH so that appropriate long-term follow-up care is easily accessible for the patient. Therefore, per MDOC policy, it was clear that the type of surgical option referenced

6

in the September 22, 2020 neurosurgical report would have to take place with a surgeon in the DWH area, not in the Upper Peninsula area near Kinross. (**Ex C**, ¶21)

22. Based upon the records, Mr. Thompson's treatment was followed by the MDOC nursing staff from November 4, 2020 to November 24, 2020 and the records note that he was improving with conservative treatment.  The records document that he had no numbness, tingling, gait abnormality, bowel or bladder dysfunction, nor spasms, and that he sat and rose from a sitting position without incident. He was scheduled for a follow-up visit.  (**Ex C**, ¶22; **Ex D**, pp. 45-47)

23. On November 5, 2020, the records indicate that Mr. Thompson was scheduled for his second neurosurgical consult with Henry Ford Allegiance Hospital (which is near the DWH area) on December 7, 2020. (**Ex C**, ¶23; **Ex D**, p. 48)

24. On or about November 11, 2020, Mr. Thompson was diagnosed with Covid-19. I requested and reviewed all of the labs which confirmed his Covid-19 diagnosis so that he could be treated for the infection.  In my experience with the MDOC, he would have been required to recover from this infection before any outside contact or appointments could occur or be scheduled by the MDOC. (**Ex C**, ¶24; **Ex D**, p. 49-53)

25. On January 8, 2021, the records indicate that Mr. Thompson's second neurosurgical consult had now been rescheduled to January 18, 2021, but that said date needed to be rescheduled due to the unavailability of the consulting surgeon's office.  On or about January 17, 2021, the records indicate that the MDOC rescheduled his neurosurgical consult for February 22, 2021.  On February 12, 2021, the records noted by MDOC staff and Dr. Stallman indicate that due to MDOC scheduling issues, not clinical issues, the neurosurgical consult was scheduled for April 6, 2021.  I was in no way involved in any requests or scheduling for a second neurosurgical consult nor any decisions regarding whether Mr. Thompson underwent surgery. However, I am aware that

scheduling of offsite procedures during this time period was greatly impacted by Covid-19 safety concerns and the availability of the outside providers. (**Ex C**, ¶25; **Ex D**, pp. 54-58)

26. On May 3, 2021, the medical records state that Mr. Thompson underwent a neurosurgical consult with a neurosurgeon from Henry Ford Allegiance Hospital. The May 3, 2021 neurosurgical consult report stated that the neurosurgeon did not recommend surgery for Mr. Thompson at that time.  (**Ex C**, ¶26; **Ex B**, 5/3/21 Neurosurgical Consult of Dr. Amritraj Loganathan, M.D., at HFAF)

27. On June 7, 2021, the records indicate that he saw another medical provider at the MDOC facility, NP Weist, who noted that the recent neurosurgical consult did not recommend surgery. NP Weist offered Mr. Thompson the option of trigger point injections in his lumbar area. (**Ex C**, ¶27; **Ex D**, pp. 59-60)

28.  On June 16, 2021, the records note that Mr. Thompson's shooting pain had resolved since receiving the injection on June 7, 2021. He was also given medications, including Naproxen, Cymbalta, and magnesium for his lumbosacral symptoms. (**Ex C**, ¶28; **Ex D**, pp. 61-62)

29. On September 1, 2021, the records note that the magnesium and prednisone were helping to "improve day-to-day functioning" and decreased his pain.  The importance of routine stretching was discussed with him. (**Ex C**, ¶29; **Ex D**, pp. 63-64)

30. On October 20, 2021, the records note that, in follow up with his MDOC provider, Mr. Thompson reported that his current pain was very low and "right now I'm actually good."  The records further note that "patient reports that pain for the most part is controlled…" (**Ex C**, ¶30; **Ex D**, pp. 65-66)

31. Mr. Thompson's records indicate that from June 2021 to October 20, 2021, he has continued to improve without surgery and with conservative treatment in the form of exercise,

stretching, heat, pain medications, and epidural or pain inhibitor injections.  These are things I had also recommended and utilized during my treatment of his conditions.  (**Ex C**, ¶31; **Ex D**, pp. 59-66)

32. Based upon my review of the records and materials in this case, and my first-hand knowledge of my interactions with Mr. Thompson, I believe that my actions constituted the appropriate treatment for Mr. Thompson's injuries and symptoms.  There is nothing that would demonstrate that Mr. Thompson had any serious medical conditions that mandated treatment nor that I ignored any of his complaints.  In my experience, back-related pain and degenerative conditions of the spine, such as the kind for which Mr. Thompson presented are common conditions complained of by many individuals as they approach the age of their late forties.   In my opinion, Mr. Thompson's condition is not a serious medical condition that mandates that a patient receive medical treatment or back surgery.  Nor is it a condition that poses a substantial health risk to a patient if it is not treated or surgically repaired.   In my nearly twenty years of training and experience as a nurse practitioner, most of these individuals do not require surgery or interbody fusions with lumbar instrumentation, especially at only 47 years old.   In my training and experience, when these individuals do have symptoms of pain or discomfort of the type complained of by Mr. Thompson, they are best treated with conservative treatment in the form of exercise, stretching, heat, physical therapy, pain medications, and epidural or pain inhibitor injections of the kind that Mr. Thompson received. (**Ex C**, ¶32)

33. There were no Corizon policies or procedures that resulted in denying or delaying any medical treatment that I provided or requested for Mr. Thompson.  He received all of the treatment that I requested for him in a timely manner.  I never told him to "quit faking," or "just deal with it," or that Corizon was not going to pay for something.  All of the records indicate that I

consistently addressed his medical needs and that Corizon approved everything. Any time periods that he perceives that something was not happening fast enough would be a result of Covid-19 restrictions and safety precautions and were a necessary result of his own contraction of Covid-19, MDOC policies, the schedules of outside providers, and scheduling difficulties incurred by the MDOC staff who is responsible for scheduling offsite procedures.  Nothing I did or Corizon did caused any delays.  Mr. Thompson's records indicate that despite the difficulties posed by the Covid-19 pandemic, still he received timely treatment.  His records document that actions were consistently being taken on his behalf to render care to him and he was never ignored, even when other providers were involved in his care after my interaction with him ended. (**Ex C**, ¶33)

34. Plaintiff Derico Thompson did not suffer any damages from any alleged actions or inactions by me. (**Ex C**, ¶34)

35. I do not believe that I acted with any deliberate indifference in Plaintiff's care, as I responded to his medical needs, ordered appropriate medical treatment and follow-up care, provided him physical therapy, medications, pain inhibitor injections, x-rays, and requested that he receive offsite testing in the form of MRIs, EMGs, a neurosurgical consult, and monitored his medical status until August 6, 2020, after which I was no longer involved in his lumbar care and treatment.  I treated Plaintiff in a manner that, in my medical judgment, was appropriate.  (**Ex C**, ¶35)

Corizon Defendants have also retained a highly experienced neurosurgeon, Dr. Peter Grain, M.D., to review the Plaintiff's medical records in this mater, including the voluminous testing that Plaintiff underwent while being treated by the Corizon Defendants (e.g., x-ray, EMG studies, MRI films, neurosurgical consults, etc.)  Dr. Grain has opined, in pertinent part, as follows:

1.     My name is Dr. Peter G. Grain. I am a board-certified neurosurgeon. I have served as Chief of Surgery at Pontiac General Hospital and as Clinical Assistant Professor of Neurosurgery at both the Medical College of Virginia and Michigan State University.  My other appointments have included Clinical Instructor of Neurosurgery at Chicago's Northwestern University and Clinical Assistant Professor of Neurosurgery at the University of Illinois College of Medicine. A copy of my curriculum vitae is attached. (**Ex B**, Affidavit of Peter Grain, M.D., ¶1)

2.     I have nearly forty years of experience in the area of neurosurgery.  I have extensive experience in the care and treatment of lumbar spinal stenosis, disc protrusions, lumbosacral radiculopathy, degenerative disc disease, as well as nearly all lumbar injuries and conditions of the spine, including the appropriate treatment options for said conditions.  I am wholly experienced with neurosurgical procedures, including decompressive laminectomies and spinal fusions with instrumentation and interbody fusions. (**Ex B**, ¶2)

3. I have reviewed medical records pertaining to the Plaintiff, Derico Thompson. Specifically, I have reviewed Plaintiff's medical records from the Michigan Department of Corrections (MDOC), Schoolcraft Memorial Hospital, UP Health System Marquette, and Henry Ford Allegiance Hospital, as well as Plaintiff's MRI lumbar spine films from War Memorial Hospital in this matter.  I have extensive experience in the lumbar conditions complained of by Plaintiff, as well as his subjective and objective symptoms which are referenced in his medical records, which primarily include generalized back pain, and intermittent complaints of radiating pain, numbness, tingling, and spasm.  I reviewed Mr. Thompson's records from August 2019 through October 20, 2021, which demonstrate that many of the symptoms complained of by Mr. Thompson have improved with the conservative treatment that has been provided to him.  (**Ex B**, ¶3)

4.  At all times, NP Jamros' actions concerning her treatment and decisions relative to Mr. Thompson's medical conditions and complaints involved the exercise of her medical judgment. (**Ex B**, ¶4)

\* \* \*

11. On February 17, 2020, NP Jamros submitted a request for Mr. Thompson to undergo an EMG for his subjective complaints.  Also, on February 21, 2020, NP Jamros requested an MRI of Mr. Thompson's lumbar spine, which was approved and occurred on March 11, 2020.  Based upon my review of the MRI films, Mr. Thompson's lumbar condition more likely than not predates the exercising injury that he alleges he sustained in late August 2019 and is primarily a condition referred to as "flat back syndrome."  In my opinion, Mr. Thompson's condition is not a serious medical condition that mandates that a patient receive medical treatment.  Nor is it a condition that poses a substantial health risk to a patient if it is not treated.  Where a patient is having subjective complaints as a result of this condition, conservative treatment in the form of exercise, stretching, heat, physical therapy, pain medications, and epidural injections would be appropriate treatment. (**Ex B**, ¶11)

\* \* \*

14. In my experience, beginning in Spring 2020, the Covid-19 pandemic impacted and delayed most nonemergent medical visits and procedures across the State of Michigan throughout the remainder of 2020.  However, the records indicate that in June 2020 and July 2020, NP Jamros continued to treat Mr. Thompson with pain medications, including with Relafen, and a Toradol injection. (**Ex B**, ¶14)

\* \* \*

12

16. On September 22, 2020, Mr. Thompson appeared for the neurosurgical consult with UP Health System Marquette that had previously been requested by NP Jamros.  The neurosurgical consult report did not set forth any emergent or acute issues necessitating that surgery must be done.  Instead, the report sets forth the particular surgeon's recommendations of treatment options and mentions the possibility of performing an overly invasive surgical procedure on Mr. Thompson that would involve a lengthy post-surgical recovery and rehabilitative process and expose him to significant unnecessary health risks.   A neurosurgeon's statement that surgical options are available for a patient and may help a patient does not mean that surgery is necessary or mandated.  In my opinion, training, education, and nearly forty years' experience in the area of neurosurgery, Mr. Thompson's medical records, complaints, and MRI films do not demonstrate any emergent issues necessitating a spinal fusion with lumbar instrumentation.  Also, Mr. Thompson is only 47 years old, and such a procedure would likely be difficult and debilitating requiring sometimes years for recovery. His condition can be best treated with conservative treatment in the form that he is already receiving, and which had been previously implemented by NP Jamros. It would not be best treated with an instrumented fusion. There would be no guarantee of success! (**Ex B**, ¶16)

* * *

19. On May 23, 2021, Plaintiff underwent a second neurological consult with a surgeon from Henry Ford.   This neurosurgical consult report stated that at this time, surgery is not recommended.  It is routine and normal practice that neurosurgeons and any medical providers will have different opinions or disagreements as what treatment options are most appropriate for a patient.  This is because these types of medical decisions involve the exercise of medical judgment. A patient's medical condition is not being ignored merely because medical providers or surgeons

13

do not agree with or follow the approach suggested by another doctor.  As stated, I too am of the opinion that Mr. Thompson's medical condition does not necessitate a spinal fusion with lumbar instrumentation and that it can be treated conservatively in the form that he is already receiving, and which had been previously implemented by NP Jamros. (**Ex B**, ¶19)

20. Mr. Thompson's records indicate that from June 2021 to October 20, 2021, he has continued to improve without surgery and with conservative treatment in the form of exercise, stretching, heat, pain medications, and epidural or pain inhibitor injections.  (**Ex B**, ¶20)

21. Based upon my review of the records and materials in this case, it is my opinion that NP Jamros' actions constituted the appropriate treatment for Mr. Thompson's injuries and symptoms. There is nothing that would demonstrate that Mr. Thompson had any serious medical conditions that mandated surgical treatment or that NP Jamros ignored any of his complaints.   In fact, the records show that NP Jamros delivered appropriate and timely care for her patient. (**Ex B**, ¶21)

22. In my opinion, based upon my review of the records, Plaintiff Derico Thompson did not suffer any damages or injuries from any alleged actions or inactions by NP Jamros.  (**Ex B**, 22)

In light of the documentary evidence in this case, including the Plaintiff's medical records and the affidavit testimony of Defendants and their neurosurgery expert, Dr. Grain, the Corizon Defendants now move for summary judgment.

## II.     <u>STANDARD OF REVIEW</u>

Under Fed. R. Civ. P. 56, summary judgment is to be entered if the moving party demonstrates there is no genuine issue as to any material fact. Per the Supreme Court, summary judgment should be entered if the evidence is such that a reasonable jury could find only for the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The moving party has "the burden of showing the absence of a genuine issue as to any material fact." *Adickes v. S.H.*

14

*Kress & Co.*, 398 U.S. 144, 157 (1970). *See also Lenz v. Erdmann Corp.*, 773 F.2d 62 (6ᵗʰ Cir. 1985).

In resolving a summary judgment motion, the Court must view the evidence in the light most favorable to the non-moving party. *Duchon v. Cajon Co.*, 791 F.2d 43, 46 (6th Cir. 1986). However, a party opposing a motion for summary judgment must do more than simply show that there is some metaphysical doubt as to the material facts. *Scott v. Harris*, 550 U.S. 372, 380 (2007). Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Id.* (quotations and citation omitted). Similarly, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.*

"Rule 56(e)(2) leaves no doubt about the obligation of a summary judgment opponent to make [his] case with a showing of facts that can be established by evidence that will be admissible at trial…" *Everson v. Leis*, 556 F.3d 484, 496 (6th Cir. 2009). Conclusory statements without demonstrated evidentiary support will not defeat a motion for summary judgment. *Ferrari v. Ford Motor Co.*, 826 F.3d 885, 897-898 (6th Cir. 2016) (quoting *Pearce v. Faurecia Exhaust Systems, Inc.*, 529 Fed. Appx. 454, 458 (6ᵗʰ Cir. 2013)).

### III.    LEGAL ARGUMENT

A.    **There Is No Genuine Dispute That Defendant NP Jamros' Actions Did Not Constitute Deliberate Indifference.**

The U.S. Supreme Court holds that deliberate indifference to the serious medical needs of a prisoner constitutes "unnecessary and wanton infliction of pain" and therefore violates the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). However, an action under the Eighth Amendment does not transform medical malpractice claims into constitutional violations "merely

15

because the victim is a prisoner." *Id*. at 106. Rather, "[i]n order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Id*. To prevail on a claim of deliberate indifference, a plaintiff must satisfy objective and subjective components. *Farmer v. Brennen*, 511 U.S. 825, 834 (1994). The objective component requires the existence of a "sufficiently serious" medical need, while the subjective component requires that prison officials had "a sufficiently culpable state of mind in denying medical care." *Blackmore v. Kalamazoo Cty*., 390 F.3d 890, 895 (6th Cir. 2004). To satisfy the objective component, an inmate's "sufficiently serious" medical need must be a condition "diagnosed by a physician as mandating treatment," or "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Blackmore v. Kalamazoo Cty*., 390 F.3d 890, 897 (6th Cir. 2004).

Recently, the Sixth Circuit, in a published opinion, reiterated that a Plaintiff must establish that his § 1983 claim using expert testimony.   In *Phillips v. Tangilang*, 14 F.4th 524, 535 (6th Cir. 2021), holding: "For prisoners to prove grossly inadequate care…courts generally require them to introduce medical evidence, typically in the form of expert testimony."   "[A] medical-evidence requirement sits comfortably within society's "decency" standards. And it would be odd if a prisoner could prove an Eighth Amendment claim more easily than an ordinary individual could prove a malpractice claim."

To satisfy the subjective component, a plaintiff must prove that the Defendants "subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk" by failing to take reasonable measures to abate it. *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001) (citing *Farmer*, 511 U.S. at 837).

16

A healthcare professional exercising medical judgment to determine what treatment is needed for a patient is not unconstitutional or illegal. A deliberate indifference claim is a more "stringent standard" than a traditional medical malpractice claim and the "misdiagnosis of an ailment" is insufficient to establish deliberate indifference. *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001). "Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Westlake v. Lucas*, 537 F.2d 857, n.5 (6th Cir. 1976). The law holds that, so long as a Defendant provided medical treatment, "albeit carelessly or inefficaciously to a prisoner, he has not displayed a deliberate indifference to the prisoner's needs." *Comstock, supra*. The reasoning for the "subjectively perceived" standard and requirement is:

> *Why is it necessary that a medical professional subjectively perceive facts from which to infer a substantial risk of harm, and then also draw that inference*? Because a medical professional who assesses patient's condition and takes steps to provide medical care, based upon the condition the professional has perceived, is not acting with indifference. Even if the professional's assessment is ultimately incorrect, the professional acted to provide medical care.

*Blaine v. Louisville Metro. Gov't*, 768 Fed. Appx. 515, 526 (6th Cir. 2019) (emphasis added)

### (1) <u>Plaintiff Cannot Establish That He Had A Serious Medical Need That Was Diagnosed As Mandating Any Treatment Outside of What He Was Provided, Nor Mandating Surgery.</u>

At best, Plaintiff presented to medical in September 2019 with back pain that appeared to be brought on by an exercise maneuver.  His x-rays and MRI studies revealed degenerative changes, implying that he had a preexisting lumbar condition (**Ex D**, pp. 12; **Ex E**) which may have been triggered during exercise.  Be that as it may, back pain is a fairly common condition experienced by many people.  According to the medical professionals who will testify in this case,

17

this was not a serious condition mandating any more treatment than he has already received, <u>and certainly not surgery</u>.

> In my experience, back-related pain and degenerative conditions of the spine such as the kind for which Mr. Thompson presented are common conditions complained of by many individuals as they approach the age of their late forties. In my opinion, Mr. Thompson's condition is not a serious medical condition that mandates that a patient receive medical treatment or back surgery. Nor is it a condition that poses a substantial health risk to a patient if it is not treated or surgically repaired. In my nearly twenty years of training and experience as a nurse practitioner, most of these individuals do not require surgery or interbody fusions with lumbar instrumentation, especially at only 47 years old. In my training and experience, when these individuals do have symptoms of pain or discomfort of the type complained of by Mr. Thompson, they are best treated with conservative treatment in the form of exercise, stretching, heat, physical therapy, pain medications, and epidural or pain inhibitor injections of the kind that Mr. Thompson received. (**Ex C**, Jamros Affidavit, ¶32)

> * * *

> Based upon my review of the MRI films, Mr. Thompson's lumbar condition more likely than not predates the exercising injury that he alleges he sustained in late August 2019 and is primarily a condition referred to as "flat back syndrome." In my opinion, Mr. Thompson's condition is not a serious medical condition that mandates that a patient receive medical treatment. Nor is it a condition that poses a substantial health risk to a patient if it is not treated. Where a patient is having subjective complaints as a result of this condition, conservative treatment in the form of exercise, stretching, heat, physical therapy, pain medications, and epidural injections would be appropriate treatment. (**Ex B**, Dr. Grain Affidavit, ¶11)

Based upon their training and experience, as well as the Plaintiff's course of treatment and improvement, Plaintiff's condition was not serious enough to require anything more than the conservative treatment that he had already been receiving. (**Ex B**, ¶¶3, 11, 12, 16, 19, 20, 21; **Ex C**, 22, 28, 29, 30, 31). Under the law, Plaintiff is unable to demonstrate that his lumbar condition was sufficiently serious to mandate any further treatment nor surgery. *Blackmore, supra,* 897; *Phillips, supra,* at 535.

**(2)** **Plaintiff Cannot Establish Deliberate Indifference Against NP Jamros Where She Provided Medical Treatment, Exercised Her Medical Treatment, and Plaintiff Merely Disagrees With The Treatment Provided.**

The above-cited facts, which are primarily taken from Plaintiff's medical records, demonstrate that from September 8, 2019 to October 20, 2021, Plaintiff received consistent treatment for his subjective complaints and lumbar condition.  He was never ignored.  He was provided regular office visits with NP Jamros, MDOC nurses, and other medical providers who worked within the MDOC.  The records show Plaintiff being consistently attended to.  He was routinely given medications, heat treatment, physical therapy, stretching and exercise technique counseling, and epidural injections.   He was sent for an x-ray, MRI, EMG, and two (2) neurosurgical consults.   After the first neurosurgical consult, Plaintiff actually showed improvement.  The second neurosurgical consult did not recommend surgery or additional treatment.  Every offsite procedure that NP Jamros requested (i.e., physical therapy, MRI, EMG, a trial of Cymbalta medication, neurosurgical consult) was approved.  There is no merit to the allegations in Plaintiff's Complaint.  See NP Jamros' Affidavit, stating as follows:

> There were no Corizon policies or procedures that resulted in denying or delaying any medical treatment that I provided or requested for Mr. Thompson.  He received all of the treatment that I requested for him in a timely manner.  I never told him to "quit faking," or "just deal with it," or that Corizon was not going to pay for something.  All of the records indicate that I consistently addressed his medical needs and that Corizon approved everything. Any time periods that he perceives that something was not happening fast enough would be a result of Covid-19 restrictions and safety precautions and were a necessary result of his own contraction of Covid-19, MDOC policies, the schedules of outside providers, and scheduling difficulties incurred by the MDOC staff who is responsible for scheduling offsite procedures. Nothing I did or Corizon did caused any delays.  Mr. Thompson's records indicate that despite the difficulties posed by the Covid-19 pandemic, still he received timely treatment.  His records document that actions were consistently being taken on his behalf to render care to him and he was never ignored, even when other providers were involved in his care after my interaction with him ended. (**Ex C**, ¶33)

Plaintiff Derico Thompson did not suffer any damages from any alleged actions or inactions by me. (**Ex C**, ¶34)

I do not believe that I acted with any deliberate indifference in Plaintiff's care, as I responded to his medical needs, ordered appropriate medical treatment and follow-up care, provided him physical therapy, medications, pain inhibitor injections, x-rays, and requested that he receive offsite testing in the form of MRIs, EMGs, a neurosurgical consult, and monitored his medical status until August 6, 2020, after which I was no longer involved in his lumbar care and treatment.  I treated Plaintiff in a manner that, in my medical judgment, was appropriate.   (**Ex C**, ¶35)

As NP Jamros' Affidavit and Plaintiff's MDOC records demonstrate, the scheduling of offsite procedures starting in Spring 2020 and extending through portions of 2021 was greatly impacted by the Covid-19 pandemic and factors that were completely outside of the control of NP Jamros or Corizon, including the Plaintiff himself contracting Covid-19 in the latter part of 2020. Particularly, scheduling offsite procedures is done by the MDOC staff, and involves custody issues and the availability of the outside doctors.  These outside doctors were also impacted by Covid. Neither NP Jamros nor Corizon have anything to do with this scheduling process. (**Ex C**, ¶13, 15, 24, 25, 33; **Ex B**, ¶14).  Moreover, despite Covid-19, still Plaintiff received timely treatment and was never ignored. (**Ex B**, ¶¶14, 21)

To the extent that Plaintiff's argument is that he was *entitled or mandated* to receive lumbar surgery, his argument has no merit.  See again the affidavit testimony of Dr. Grain, (**Ex B**, ¶¶16,19)

On September 22, 2020, Mr. Thompson appeared for the neurosurgical consult with UP Health System Marquette that had previously been requested by NP Jamros.  The neurosurgical consult report did not set forth any emergent or acute issues necessitating that surgery must be done.  Instead, the report sets forth the particular surgeon's recommendations of treatment options and mentions the possibility of performing an overly invasive surgical procedure on Mr. Thompson that would involve a lengthy post-surgical recovery and rehabilitative process and expose him to significant unnecessary health risks.   A neurosurgeon's statement that surgical options are available for a patient and may help a patient does not mean that surgery is necessary or mandated.  In my opinion, training, education, and nearly forty years' experience in the area of neurosurgery, Mr. Thompson's medical records, complaints, and MRI films do not demonstrate any emergent

issues necessitating a spinal fusion with lumbar instrumentation.  Also, Mr. Thompson is only 47 years old, and such a procedure would likely be difficult and debilitating requiring sometimes years for recovery. His condition can be best treated with conservative treatment in the form that he is already receiving, and which had been previously implemented by NP Jamros. It would not be best treated with an instrumented fusion. There would be no guarantee of success! (**Ex B**, ¶16)

* * *

On May 23, 2021, Plaintiff underwent a second neurological consult with a surgeon from Henry Ford.  This neurosurgical consult report stated that at this time, surgery is not recommended.  It is routine and normal practice that neurosurgeons and any medical providers will have different opinions or disagreements as what treatment options are most appropriate for a patient.  This is because these types of medical decisions involve the exercise of medical judgment.  A patient's medical condition is not being ignored merely because medical providers or surgeons do not agree with or follow the approach suggested by another doctor.  As stated, I too am of the opinion that Mr. Thompson's medical condition does not necessitate a spinal fusion with lumbar instrumentation and that it can be treated conservatively in the form that he is already receiving, and which had been previously implemented by NP Jamros. (**Ex B**, ¶19)

Perhaps even more importantly, see also **Ex A**, 5/3/21 Neurosurgical Consult of Dr. Amritraj Loganathan, M.D, stating: **"At this time, I would not recommend surgery for him."**

Based upon the records and the evidence in this case, there is simply no merit to any argument that a lumbar surgery was mandated.  Notwithstanding that NP Jamros was not involved in Plaintiff's lumbar treatment nor any decisions regarding his back pain or lumbar issues after August 6, 2020 (**Ex C**, ¶¶2, 18, 33) and never participated in any actions that were taken based upon either one of Plaintiff's neurosurgical consults, she has now had an opportunity to review both consults. Her opinion is also that Plaintiff does not require surgery:

…In my opinion, the surgical option that was recommended, i.e., a lumbar interbody fusion with placement of instrumentation, appears to be very complex and would involve a significant debilitating and difficult recovery process for Mr. Thompson.  However, I was not involved in any decisions regarding the results of this neurosurgical consult nor in any decisions as to whether he obtained surgery. After August 6, 2020, and prior to his September 22, 2020 neurosurgical consult, I only treated him for his Covid-19 infection occurring in the winter of 2020.  (**Ex C**, ¶18)

21

Therefore, three (3) medical professionals opined that Plaintiff does not require surgery.

Further, there is no merit to any argument that Plaintiff allegedly suffered harm by not having a

surgery or by allegedly not receiving appropriate treatment:

> Plaintiff Derico Thompson did not suffer any damages from any alleged actions or inactions by me. (**Ex C**, ¶34)

<div align="center">* * *</div>

> Based upon my review of the records and materials in this case, it is my opinion that NP Jamros' actions constituted the appropriate treatment for Mr. Thompson's injuries and symptoms.  There is nothing that would demonstrate that Mr. Thompson had any serious medical conditions that mandated surgical treatment or that NP Jamros ignored any of his complaints.   In fact, the records show that NP Jamros delivered appropriate and timely care for her patient. (**Ex B**, ¶21)

Also, the evidence demonstrates that, at best, Plaintiff is merely raising a disagreement

with medical judgment.  He claims that he needs surgery while two (2) other neurosurgeons

disagree. (See **Ex A**, 5/3/21 Neurosurgical Consult of Dr. Amritraj Loganathan, M.D.; **Ex B**,

Affidavit of neurosurgeon Dr. Peter Grain, M.D.  See *Comstock, supra, Westlake, supra*.  See also

*Rhinehart, supra,* at 752, holding: "Neither negligence alone, nor a disagreement over the wisdom

or correctness of a medical judgment is sufficient for the purpose of a deliberate indifference

claim." See *Youngberg v. Romeo*, 457 U.S. 307, 321 (1982), holding that "it is not appropriate for

the courts to specify which of several professionally acceptable choices should have been made.")

B. **There is No Genuine Dispute That Plaintiff Has Failed to Establish A *Monell* Claim Against Defendant Corizon**

Plaintiff's claim of deliberate indifference against Corizon Health, Inc. ("Corizon") fails

because he cannot state a *Monell* claim. Corizon cannot be held liable under the theory of

*respondeat superior*. *Monell v. Department of Social Servs.*, 436 U.S. 658, 663(1978); *Dunn v.*

*State of Tenn.*, 697 F.2d 121, 128 (1983); *Street v. Corrections Corporation of America*, 102 F.3d

810, 817-818 (6th Cir. 1996). To state a claim of deliberate indifference against Corizon, Plaintiff

<div align="center">22</div>

must plead a claim of a policy, practice, or custom by Corizon that is allegedly unconstitutional, and that explanation must be specific, i.e., "to satisfy the *Monell* requirements a plaintiff must 'identify the policy, connect the policy to the city itself and show that the particular injury was incurred because of the execution of that policy.'" *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993) (quoting *Coogan v. City of Wixom*, 820 F.2d 170, 176 (6th Cir. 1987)), cert. denied, U.S., 114 S. Ct. 1219, 127 L.Ed.2d 565(1994) (Emphasis added). See also, *Searcy v. City of Dayton*, 38 F.3d 282, 287 (6th Cir. 1994).

See also *Nouri v. County of Oakland*, 615 Fed. Appx. 291, 296 (6th Cir. 2015), holding that to establish a *Monell* claim, there must be notice of a pattern of conduct: "we have never found notice of a pattern of misconduct (or the pattern itself) solely from the mistreatment of the plaintiff…Nouri provides 'no [allegations] of any similar incidents' involving other inmates or "that any such incidents were ever reported…"

Fundamentally, "[i]f no constitutional violation by the individual defendants is established, the [entity] defendants (i.e., Corizon) cannot be held liable under § 1983." *Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001).  As demonstrated above, NP Jamros' actions did not constitute deliberate indifference.  Therefore, Plaintiff's *Monell* claim should be dismissed without further ado.

Should this Court still wish to consider Plaintiff's *Monell* claim, then the medical records, facts, and neurosurgical expert review of Plaintiff's symptoms and conditions demonstrate that no policy of Corizon was a moving force behind Plaintiff not receiving treatment or surgery.  The basis of Plaintiff's *Monell* argument appears to be that, allegedly, NP Jamros told him, "it is customary that Corizon, Inc. must be absolutely sure that an MRI is necessary before allocating funds for any type of treatment," and "you can stop complaining…Corizon is not going to

authorize surgery on your back, so either stop faking or deal with it."  (**ECF No. 1, PageID.4**). But Plaintiff's allegations are completely inconsistent with the facts.   "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

The documentary evidence shows that Plaintiff's MRI was approved within a week of being requested and that Plaintiff was provided two (2) neurosurgical consults, along with the physical therapy, MRI, and EMG that NP Jamros requested.   Moreover, NP Jamros denies making any such statements to Plaintiff.  When looking at the records, Plaintiff's allegations simply make no sense. <u>Plaintiff has not nor cannot cite to any particular Corizon policy that was allegedly utilized in his case to deny or delay treatment</u>.  See NP Jamros' Affidavit and Plaintiff's medical records, stating as follows:

> On October 3, 2019, I submitted a request for Mr. Thompson to undergo physical therapy, which was approved on October 8, 2019. (**Ex C**, ¶8; **Ex D**, p. 16-18)
>
> * * *
>
> On February 17, 2020, I submitted a request with the utilization management review department for Mr. Thompson to undergo an EMG for his subjective complaints.  Also, on February 21, 2020, I submitted a request with the utilization management review department for an MRI of Mr. Thompson's lumbar spine, which was approved on February 26, 2020 and occurred on March 11, 2020. (**Ex C**, Jamros Affidavit, ¶10; **Ex D,** MDOC records, pp. 21-24; **Ex E**, War Memoria MRI)
>
> On March 12, 2020, I submitted a request with the utilization management review department for Mr. Thompson to undergo a neurosurgical consultation for further assessment of his conditions and further potential treatment options.  Also, on March 12, 2020, the EMG that I previously requested for Mr. Thompson was approved.  (**Ex C**, ¶11; **Ex D**, pp. 25-26)
>
> * * *
>
> On April 20, 2020, I obtained approval from the Corizon regional medical director for Mr. Thompson to receive a trial of Cymbalta, which would address his complaints of pain.  (**Ex C**, ¶14; **Ex D**, pp. 27-28)
>
> * * *

On August 3, 2020, Mr. Thompson underwent the EMG that I had previously requested, which was consistent with his prior lumbar symptoms. (**Ex F**, Schoolcraft Memorial EMG).   On August 6, 2020, I noted that Mr. Thompson would be scheduled for a follow-up visit in the next month with Dr. Stallman, another medical provider at the prison.   (**Ex C**, ¶17; **Ex D**, p. 39)

On September 8, 2020, after Mr. Thompson had obtained further work-up via an EMG, the neurosurgical consult that I previously requested was approved. (**Ex D**, p.40).   On September 22, 2020, Mr. Thompson appeared for the neurosurgical consult.  This occurred at UP Health System Marquette…  (**Ex C**, ¶18 **Ex G**, UPHSM, 9-22-20)

\* \* \*

There were no Corizon policies or procedures that resulted in denying or delaying any medical treatment that I provided or requested for Mr. Thompson.  He received all of the treatment that I requested for him in a timely manner.  I never told him to "quit faking," or "just deal with it," or that Corizon was not going to pay for something.  All of the records indicate that I consistently addressed his medical needs and that Corizon approved everything…Nothing I did or Corizon did caused any delays.  Mr. Thompson's records indicate that despite the difficulties posed by the Covid-19 pandemic, still he received timely treatment.  His records document that actions were consistently being taken on his behalf to render care to him and he was never ignored, even when other providers were involved in his care after my interaction with him ended. (**Ex C**, ¶33)

As the records demonstrate, all of the treatment that was requested and appropriate for Plaintiff was actually provided to Plaintiff (i.e., physical therapy, low bunk detail, extra pillows, medications, pain inhibitor (epidural) injections, x-rays, and offsite testing and procedures in the form of MRIs, EMGs, and neurosurgical consults).   No Corizon policy prohibited care in any manner.   As two (2) outside neurosurgeons have indicated, Plaintiff's condition was properly managed with conservative treatment and did not require surgical intervention.  (**Ex A**, 5/3/21 Neurosurgical Consult of Dr. Amritraj Loganathan, M.D.; **Ex B**, Affidavit of neurosurgeon Dr. Peter Grain, M.D.)   As demonstrated above, there is simply no merit to Plaintiff's *Monell* claims, thereby rendering summary judgment is proper in this case.

## IV.    <u>CONCLUSION AND REQUESTED RELIEF</u>

WHEREFORE, based upon the foregoing reasons, the Corizon Defendants respectfully request that this Honorable Court GRANT the Corizon Defendants Motion for Summary Judgment and provide any and all further relief that this Court deems just and equitable.

Respectfully submitted,

CHAPMAN LAW GROUP

Dated: December 16, 2021

/s/Devlin K. Scarber
Devlin Scarber (P64532)
Attorneys for Corizon, Inc., and
Wendy Jamros, N.P.
1441 West Long Lake Rd., Suite 310
Troy, MI 48098
(248) 644-6326
dscarber@chapmanlawgroup.com

## <u>PROOF OF SERVICE</u>

I hereby certify that on December 16, 2021, I presented the foregoing paper to the Clerk of the Court for filing and uploading to the ECF system, which will send notification of such filing to the attorneys of record listed herein and I hereby certify that I have mailed by US Postal Service the document to the involved nonparticipants.

/s/ Devlin Scarber
Devlin Scarber (P64532)
1441 W. Long Lake Rd., Suite 310
Troy, MI 48098
(248) 644-6326
dscarber@chapmanlawgroup.com