# Exhibit B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

Derico Thompson, #234651

        Plaintiff,

v.

Corizon, Inc., et al.

        Defendants.

Case No: 2:20-cv-00158
District Judge: Robert J. Jonker
Magistrate Judge: Maarten Vermaat

| | |
|---|---|
| DERICO THOMPSON, #234651<br>Kinross Correctional Facility<br>4533 W. Industrial Park Drive<br>Kincheloe, MI 49788<br>*Pro Se Plaintiff* | CHAPMAN LAW GROUP<br>Devlin K. Scarber (P64532)<br>Attorney for Corizon Health, Inc.<br>and Wendy Jamros, N.P.<br>1441 West Long Lake Rd., Suite 310<br>Troy, MI 48098<br>(248) 644-6326<br>dscarber@chapmanlawgroup.com |

## AFFIDAVIT OF PETER G. GRAIN, M.D.

STATE OF MICHIGAN    )
                      ) SS
COUNTY OF _____ )

    I, Peter G. Grain, M.D., being first duly sworn, deposes and states:

1. My name is Dr. Peter G. Grain. I am a board-certified neurosurgeon. I have served as Chief of Surgery at Pontiac General Hospital and as Clinical Assistant Professor of Neurosurgery at both the Medical College of Virginia and Michigan State University. My other appointments have included Clinical Instructor of Neurosurgery at Chicago's Northwestern University and Clinical Assistant Professor of Neurosurgery at the University of Illinois College of Medicine. A copy of my curriculum vitae is attached.

2. I have nearly forty years of experience in the area of neurosurgery. I have extensive experience in the care and treatment of lumbar spinal stenosis, disc protrusions, lumbosacral

1

radiculopathy, degenerative disc disease, as well as nearly all lumbar injuries and conditions of the spine, including the appropriate treatment options for said conditions. I am wholly experienced with neurosurgical procedures, including decompressive laminectomies and spinal fusions with instrumentation and interbody fusions.

3. I have reviewed medical records pertaining to the Plaintiff, Derico Thompson. Specifically, I have reviewed Plaintiff's medical records from the Michigan Department of Corrections (MDOC), Schoolcraft Memorial Hospital, UP Health System Marquette, and Henry Ford Allegiance Hospital, as well and Plaintiff's MRI lumbar spine films from War Memorial Hospital in this matter. I have extensive experience in the lumbar conditions complained of by Plaintiff, as well as his subjective and objective symptoms which are referenced in his medical records, which primarily include generalized back pain, and intermittent complaints of radiating pain, numbness, tingling, and spasm. I reviewed Mr. Thompson's records from August 2019 through October 20, 2021, which demonstrate that many of the symptoms complained of by Mr. Thompson have improved with the conservative treatment that has been provided to him.

4. At all times, N.P. Jamros' actions concerning her treatment and decisions relative to Mr. Thompson's medical conditions and complaints involved the exercise of her medical judgment.

5. Based upon my review of the records, Mr. Thompson complained that he injured his back on August 27, 2019 while exercising, either when doing toe touches, or using an abdomen machine, or a row lifting machine. It appears that he did not advise the medical staff of his alleged injuries until September 9, 2019, or approximately two weeks later. The next day, he was seen by a nurse, was given a hot water bottle for his back pain and Ibuprofen. Within

2

three days, on September 13, 2019, nurse practitioner Wendy Jamros, N.P., ordered medications including Flexeril and a Medrol dose pak, and pain medication for his alleged injuries. She also performed a chart review of his condition on September 16, 2016. N.P. Jamros' actions constituted the appropriate treatment for his injuries and symptoms.

6. On September 25, 2019, N.P. Jamros ordered an x-ray of his lower spine, examined him, and diagnosed him with lumbago. She further ordered that his medications continue, and ordered additional medications, including ketorolac, and Solu-Medrol injections for his symptoms. She instructed the patient regarding the medications, following an exercise program, using the warm compress, reassured the patient, and planned for a follow-up. N.P. Jamros' actions constituted the appropriate treatment for his injuries and symptoms.

7. On September 30, 2019, Mr. Thompson underwent the lumbar spine x-ray ordered by N.P. Jamros, which showed mild facet arthritic changes of the lumbar spine and a degenerative disc change at L5/S1 level.

8. On October 3, 2019, N.P. Jamros examined Mr. Thompson, and among other things, noted that his back spasm had resolved, but was still having discomfort in his leg, no bowel or bladder incontinence, and that he had some improvement the medications she ordered. She reviewed the x-ray results with the patient and further ordered Naprosyn for his symptoms. N.P. Jamros' actions constituted the appropriate treatment for his injuries and symptoms.

9. On October 3, 2019, N.P. Jamros submitted a request for Mr. Thompson to undergo physical therapy, which was approved. N.P. Jamros' actions constituted the appropriate treatment for his injuries and symptoms.

10. On November, 21, 2019, N.P. Jamros ordered a bottom bunk detail and extra pillows for Mr. Thompson to address his symptoms. On December 3, 2019, N.P. Jamros continued his pain medications.

11. On February 17, 2020, N.P. Jamros submitted a request for Mr. Thompson to undergo an EMG for his subjective complaints. Also, on February 21, 2020, N.P. Jamros requested an MRI of Mr. Thompson's lumbar spine, which was approved and occurred on March 11, 2020. Based upon my review of the MRI films, Mr. Thompson's lumbar condition more likely than not predates the exercising injury that he alleges he sustained in late August 2019 and is primarily a condition referred to "flat back syndrome." In my opinion, Mr. Thompson's condition is not a serious medical condition that mandates that a patient receive medical treatment. Nor is it a condition that poses a substantial health risk to a patient if it is not treated. Where a patient is having subjective complaints as a result of this condition, conservative treatment in the form of exercise, stretching, heat, physical therapy, pain medications, and epidural injections would be appropriate treatment.

12. On March 12, 2020, N.P. Jamros also requested that Mr. Thompson have a neurosurgical consultation. A medical provider referring a patient to a specialist for further assessment of the patient's conditions can be helpful in allowing the medical provider to explore a range of options to discuss with the patient and to also determine whether there are emergent or acute issues that might necessitate an immediate surgery. Generally, it is prudent for medical providers and patients to seek more than one opinion as to whether a surgery is necessary. In my opinion, conservative treatment is preferred over surgery and is the best option for a patient absent emergent or acute issues immediately necessitating surgery. Also, on March 12, 2021, the EMG that N.P. Jamros previously requested was approved.

13. On April 20, 2020, N.P. Jamros obtained approval for Mr. Thompson to receive Cymbalta, which would address his complaints of pain.

14. In my experience, beginning in Spring 2020, the Covid-19 pandemic impacted and delayed most nonemergent medical visits and procedures across the State of Michigan throughout the remainder of 2020. However, the records indicate that in June 2020 and July 2020, N.P. Jamros continued to treat Mr. Thompson with pain medications, including with Relafen, and a Toradol injection.

15. On August 3, 2020, Mr. Thompson underwent the EMG that had previously been requested by N.P. Jamros. I have reviewed the EMG results, commenting on a Left L5 radiculopathy.

16. On September 22, 2020, Mr. Thompson appeared for the neurosurgical consult with UP Health System Marquette that had previously been requested by N.P. Jamros. The neurosurgical consult report did not set forth any emergent or acute issues necessitating that surgery must be done. Instead, the report sets forth the particular surgeon's recommendations of treatment options and mentions the possibility of performing an overly invasive surgical procedure on Mr. Thompson that would involve a lengthy post-surgical recovery and rehabilitative process and expose him to significant unnecessary health risks. A neurosurgeon's statement that surgical options are available for a patient and may help a patient does not mean that surgery is necessary or mandated. In my opinion, training, education, and nearly forty years' experience in the area of neurosurgery, Mr. Thompson's medical records, complaints, and MRI films do not demonstrate any emergent issues necessitating a spinal fusion with lumbar instrumentation. Also, Mr. Thompson is only 47 years old, and such a procedure would likely be difficult and debilitating requiring sometimes years for recovery. His condition can be best treated with conservative treatment in the form that he is already receiving, and which had

5

been previously implemented by N.P. Jamros. It would not be best treated with an instrumented fusion. There would be no guarantee of success!

17. On October 23, 2020, another medical provider with whom Plaintiff treated in the MDOC saw him, discussed the September 22, 2020 neurosurgical consult with him and the implications of possible surgical options.  The medical provider also requested a second neurosurgical consult with Henry Ford Allegiance Hospital.  Seeking a second neurosurgical consult is normal procedure and is prudent for any medical provider or patient to do.

18. On November 4, 2020, the MDOC records indicate that Plaintiff's symptoms were improving with conservative treatment.  Also, the MDOC records indicate that later in November 2020, Plaintiff was diagnosed with Covid-19.  The records indicate that Plaintiff's Covid-19 diagnosis, along with conflicts with the schedule of the Henry Ford neurosurgeon, and scheduling difficulties by the MDOC delayed the scheduling of Plaintiff's second neurosurgical consult.  Nothing was delayed by N.P. Jamros' actions.

19. On May 23, 2021, Plaintiff underwent a second neurological consult with a surgeon from Henry Ford.   This neurosurgical consult report stated that at this time, surgery is not recommended.  It is routine and normal practice that neurosurgeons and any medical providers will have different opinions or disagreements as what treatment options are most appropriate for a patient.  This is because these types of medical decisions involve the exercise of medical judgment.   A patient's medical condition is not being ignored merely because medical providers or surgeons do not agree with or follow the approach suggested by another doctor. As stated, I too am of the opinion that Mr. Thompson's medical condition does not necessitate a spinal fusion with lumbar instrumentation and that it can be treated conservatively in the form that he is already receiving, and which had been previously implemented by N.P. Jamros.

6

20. Mr. Thompson's records indicate that from June 2021 to October 20, 2021, he has continued to improve without surgery and with conservative treatment in the form of exercise, stretching, heat, pain medications, and epidural or pain inhibitor injections.

21. Based upon my review of the records and materials in this case, it is my opinion that N.P. Jamros' actions constituted the appropriate treatment for Mr. Thompson's injuries and symptoms. There is nothing that would demonstrate that Mr. Thompson had any serious medical conditions that mandated surgical treatment or that N.P. Jamros ignored any of his complaints. In fact, the records show that N.P. Jamros delivered appropriate and timely care for her patient.

22. In my opinion, based upon my review of the records, Plaintiff Derico Thompson did not suffer any damages or injuries from any alleged actions or inactions by N.P. Jamros.

23. The statements made in this affidavit are true and accurate to the best of my current knowledge, information, and belief.

Dated: 12/14, 2021

Peter G. Grain, M.D.

Subscribed and sworn to before me this
14 day of December, 2021.

_____, Notary Public
County of St. Clair
Acting in St. Clair
My Commission Expires: 2/4/2023

ANTHONY GEDVICK
NOTARY PUBLIC - MICHIGAN
ST. CLAIR COUNTY
MY COMMISSION EXPIRES 02/04/2023
ACTING IN ST. CLAIR COUNTY

ANTHONY GEDVICK
NOTARY PUBLIC - MICHIGAN
ST. CLAIR COUNTY
MY COMMISSION EXPIRES 02/04/2023
ACTING IN ST. CLAIR COUNTY

7