**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN**

Derico Thompson, #234651

    Plaintiff,

v.

Corizon, Inc., et al.

    Defendants.

Case No: 2:20-cv-00158
District Judge: Robert J. Jonker
Magistrate Judge: Maarten Vermaat

| | |
|---|---|
| DERICO THOMPSON, #234651<br>Kinross Correctional Facility<br>4533 W. Industrial Park Drive<br>Kincheloe, MI 49788<br>*Pro Se Plaintiff* | CHAPMAN LAW GROUP<br>Devlin K. Scarber (P64532)<br>Attorney for Corizon Health, Inc.<br>and Wendy Jamros, N.P.<br>1441 West Long Lake Rd., Suite 310<br>Troy, MI 48098<br>(248) 644-6326<br>dscarber@chapmanlawgroup.com |

## **AFFIDAVIT OF WENDY JAMROS, N.P.**

STATE OF MICHIGAN   )
                           ) SS
COUNTY OF _____)

    I, Wendy Jamros, N.P., being first duly sworn, deposes and states:

1. My name is Wendy Jamros, N.P.  I have been a licensed nurse practitioner since 1999.  During the time periods pertinent to the dates set forth in the Plaintiff's Complaint, I was employed by Corizon as a nurse practitioner in the Michigan Department of Corrections (MDOC) Kinross Correctional Facility in Kincheloe, Michigan, in the Upper Peninsula.

2. I was one of the medical providers at the Kinross Facility who provided care and treatment to the Plaintiff, Derico Thompson.  After August 6, 2020, I was no longer involved in his lumbar care and treatment.   At all times, I believe that my actions in treating and caring for Mr.

Thompson were proper. Also, my actions and decision-making in treating Mr. Thompson always involved the exercise of my medical judgment, which I believe was proper at all times.

3. In preparing this Affidavit, I have reviewed Mr. Thompson's Complaint, medical records from the Michigan Department of Corrections (MDOC), Schoolcraft Memorial Hospital, War Memoria Hospital, UP Health System Marquette, and Henry Ford Allegiance Hospital.

4. On or about September 9, 2019, Mr. Thompson complained that he injured his back a few weeks earlier or on or about August 27, 2019 while exercising, either when doing toe touches, or using an abdomen machine, or a row lifting machine. The records are unclear as to the exact mechanism of his injury, but it appears that he did not advise the medical staff of his alleged injuries until a couple of weeks later. The next day, September 10, 2019, Mr. Thompson was seen by an MDOC nurse, and was given a hot water bottle for his back pain and Ibuprofen. Within three days, on September 13, 2019, I ordered medications including Flexeril and a Medrol dose pak, and pain medication for his alleged injuries. I also performed a chart review of his condition on September 16, 2016.

5. On September 25, 2019, I ordered an x-ray of his lower spine, examined him, and diagnosed him with lumbago. I further ordered that his medications continue, and ordered additional medications, including ketorolac, and Solu-Medrol injections for his symptoms. I instructed him regarding the medications, following an exercise program, using the warm compress, reassured the patient, and planned for a follow-up.

6. On September 30, 2019, Mr. Thompson underwent the lumbar spine x-ray that I ordered, which showed mild facet arthritic changes of the lumbar spine and a degenerative disc change at L5/S1 level.

7. On October 3, 2019, I examined Mr. Thompson, and among other things, noted that his back spasm had resolved, but he was still having discomfort in his leg, no bowel or bladder incontinence, and that he had some improvement with the medications I ordered. I reviewed the x-ray results with the patient and further ordered Naprosyn for his symptoms.

8. On October 3, 2019, I submitted a request for Mr. Thompson to undergo physical therapy, which was approved on October 8, 2019.

9. On November, 21, 2019, I ordered a bottom bunk detail and extra pillows for Mr. Thompson to address his symptoms and make him more comfortable. I also noted that, if no improvement in 6-8 weeks, I would consider an MRI. On December 3, 2019, I continued his pain medications.

10. On February 17, 2020, I submitted a request with the utilization management review department for Mr. Thompson to undergo an EMG for his subjective complaints. Also, on February 21, 2020, I submitted a request with the utilization management review department for an MRI of Mr. Thompson's lumbar spine, which was approved and occurred on March 11, 2020.

11. On March 12, 2020, I submitted a request with the utilization management review department for Mr. Thompson to undergo a neurosurgical consultation for further assessment of his conditions and further potential treatment options. Also, on March 12, 2020, the EMG that I previously requested for Mr. Thompson was approved.

12. In the MDOC, for any offsite procedures and medical consultations that I as a medical provider request for an inmate patient, including MRIs, EMGs, and neurosurgical consultations, the utilization management department's reviewers will exercise their medical judgment in determining if they will allow for a medical provider's request or instead suggest an alternative treatment plan. But it is the utilization management reviewer, along with MDOC policies, not me, that will ultimately dictate the decision as to whether offsite procedures and offsite medical

consultations will be allowed. Here, all of the offsite treatment that I requested for Mr. Thompson was approved by the utilization management reviewers.

13. The scheduling for offsite procedures and offsite treatment is based upon the MDOC prison facility's schedule and protocols and upon the schedules of outside medical facilities and outside providers that are utilized by the MDOC. Neither I nor Corizon have any control over the scheduling process and no influence over how quickly an offsite appointment gets scheduled. This is done by MDOC staff.

14. On April 20, 2020, I obtained approval from the Corizon regional medical director for Mr. Thompson to receive a trial of Cymbalta, which would address his complaints of pain.

15. Beginning Spring 2020, the Covid-19 pandemic impacted and delayed most nonemergent medical visits and procedures in the MDOC throughout the remainder of 2020 and caused a health and safety lockdown within the MDOC. However, in June 2020 and July 2020, I continued to treat Mr. Thompson with pain medications, including with Relafen, and a Toradol injection and he was followed by nursing.

16. On July 9, 2020, I received information from the MDOC staff that Mr. Thompson's EMG was able to be scheduled for August 3, 2020 and that the MDOC's Covid restrictions had been lifted for that period. On July 15, 2020, I communicated with Mr. Thompson to let him know that the Covid restrictions had been lifted.

17. On August 3, 2020, Mr. Thompson underwent the EMG that I had previously requested, which was consistent with his prior lumbar symptoms. On August 6, 2020, I noted that Mr. Thompson would be scheduled for a follow-up visit in the next month with Dr. Stallman, another medical provider at the prison.

18. On September 8, 2020, after Mr. Thompson had obtained further work-up via an EMG, the neurosurgical consult that I previously requested was approved. On September 22, 2020, Mr. Thompson appeared for the neurosurgical consult. This occurred at UP Health System Marquette. I have reviewed this consultation report in preparation for this case. In my opinion, the surgical option that was recommended, i.e., a lumbar interbody fusion with placement of instrumentation, appears to be very complex and would involve a significant debilitating and difficult recovery process for Mr. Thompson. However, I was not involved in any decisions regarding the results of this neurosurgical consult nor in any decisions as to whether he obtained surgery. After August 6, 2020, and prior to his September 22, 2020 neurosurgical consult, I only treated him for his Covid-19 infection occurring in the winter for 2020.

19. On October 14, 2020, the MDOC records indicate that Dr. Stallman reviewed the September 22, 2020 neurosurgical report and scheduled an appointment with Plaintiff within the next two weeks to discuss a plan with him regarding his back.

20. On October 23, 2020, according to the MDOC records, Dr. Stallman saw Mr. Thompson and prescribed Toradol for his complaints. The record indicates that Dr. Stallman also discussed the September 22, 2020 neurosurgical report with Mr. Thompson, and that if he were to ultimately undergo the type of surgical option referenced in the September 22, 2020 neurosurgical report there was a high probability that he would need to be inpatient and require inpatient post-surgical physical therapy, and that therefore another neurosurgical consult would be necessary near Duane Waters Hospital (DWH) in Jackson, Michigan. Thereafter, Dr. Stallman requested a second neurosurgical consult. Also, it is generally prudent for medical providers and patients to seek more than one opinion as to whether a surgery is necessary.

21. In my years of experience with the MDOC, in situations where an inmate patient may potentially undergo a procedure that will require significant inpatient post-surgery recovery and post-surgical physical therapy, the typical protocol and MDOC policy is to have the procedure performed near Duane Waters Hospital. Duane Waters (DWH) is the MDOC's designated hospital for its inmates. DWH provides acute medical care, surgical care, and long-term care for inmates. Therefore, any outside surgeon that the MDOC utilizes for such a procedure must be within a reasonable proximity to DWH so that appropriate long-term follow-up care is easily accessible for the patient. Therefore, per MDOC policy, it was clear that the type of surgical option referenced in the September 22, 2020 neurosurgical report would have to take place with a surgeon in the DWH area, not in the Upper Peninsula area near Kinross.

22. Based upon the records, Mr. Thompson's treatment was followed by the MDOC nursing staff from November 4, 2020 to November 24, 2020 and the records note that he was improving with conservative treatment. The records document that he had no numbness, tingling, gait abnormality, bowel or bladder dysfunction, nor spasms, and that he sat and rose from a sitting position without incident. He was scheduled for a follow-up visit.

23. On November 5, 2020, the records indicate that Mr. Thompson was scheduled for his second neurosurgical consult with Henry Ford Allegiance Hospital (which is near the DWH area) on December 7, 2020.

24. On or about November 11, 2020, Mr. Thompson was diagnosed with Covid-19. I requested and reviewed all of the labs which confirmed his Covid-19 diagnosis so that he could be treated for the infection. In my experience with the MDOC, he would have been required to recover from this infection before any outside contact or appointments could occur or be scheduled by the MDOC.

25. On January 8, 2021, the records indicate that Mr. Thompson's second neurosurgical consult had now been rescheduled to January 18, 2021, but that said date needed to be rescheduled due to the unavailability or the consulting surgeon's office. On or about January 17, 2021, the records indicate that the MDOC rescheduled his neurosurgical consult for February 22, 2021. On February 12, 2021, the records noted by MDOC staff and Dr. Stallman indicate that due to MDOC scheduling issues, not clinical issues, the neurosurgical consult was scheduled for April 6, 2021. I was in no way involved in any requests or scheduling for a second neurosurgical consult nor any decisions regarding whether Mr. Thompson underwent surgery. However, I am aware that scheduling of offsite procedures during this time period was greatly impacted by Covid-19 safety concerns and the availability of the outside providers.

26. On May 3, 2021, the medical records state that Mr. Thompson underwent a neurosurgical consult with a neurosurgeon from Henry Ford Allegiance Hospital. The May 3, 2021 neurosurgical consult report stated that the neurosurgeon did not recommend surgery for Mr. Thompson at that time.

27. On June 7, 2021, the records indicate that he saw another medical provider at the MDOC facility, N.P. Weist, who noted that the recent neurosurgical consult did not recommend surgery. N.P Weist offered Mr. Thompson the option of trigger point injections in his lumbar area.

28. On June 16, 2021, the records note that Mr. Thompson's shooting pain had resolved since receiving the injection on June 7, 2021. He was also given medications, including Naproxen, Cymbalta, and magnesium for his lumbosacral symptoms.

29. On September 1, 2021, the records note that the magnesium and prednisone were helping to "improve day-to-day functioning" and decreased his pain. The importance of routine stretching was discussed with him.

30. On October 20, 2021, the records note that, in follow up with his MDOC provider, Mr. Thompson reported that his current pain was very low and "right now I'm actually good." The records further note that "patient reports that pain for the most part is controlled…"

31. Mr. Thompson's records indicate that from June 2021 to October 20, 2021, he has continued to improve without surgery and with conservative treatment in the form of exercise, stretching, heat, pain medications, and epidural or pain inhibitor injections. These are things I had also recommended and utilized during my treatment of his conditions.

32. Based upon my review of the records and materials in this case, and my first-hand knowledge of my interactions with Mr. Thompson, I believe that my actions constituted the appropriate treatment for Mr. Thompson's injuries and symptoms. There is nothing that would demonstrate that Mr. Thompson had any serious medical conditions that mandated treatment nor that I ignored any of his complaints. In my experience, back-related pain and degenerative conditions of the spine such as the kind for which Mr. Thompson presented are common conditions complained of by many individuals as they approach the age of their late forties. In my opinion, Mr. Thompson's condition is not a serious medical condition that mandates that a patient receive medical treatment or back surgery. Nor is it a condition that poses a substantial health risk to a patient if it is not treated or surgically repaired. In my nearly twenty years of training and experience as a nurse practitioner, most of these individuals do not require surgery or interbody fusions with lumbar instrumentation, especially at only 47 years old. In my training and experience, when these individuals do have symptoms of pain or discomfort of the type complained of by Mr. Thompson, they are best treated with conservative treatment in the form of exercise, stretching, heat, physical therapy, pain medications, and epidural or pain inhibitor injections of the kind that Mr. Thompson received.

33. There were no Corizon policies or procedures that resulted in denying or delaying any medical treatment that I provided or requested for Mr. Thompson. He received all of the treatment that I requested for him in a timely manner. I never told him to "quit faking," or "just deal with it," or that Corizon was not going to pay for something. All of the records indicate that I consistently addressed his medical needs and that Corizon approved everything. Any time periods that he perceives that something was not happening fast enough would be a result of Covid-19 restrictions and safety precautions and were a necessary result of his own contraction of Covid-19, MDOC policies, the schedules of outside providers, and scheduling difficulties incurred by the MDOC staff who is responsible for scheduling offsite procedures. Nothing I did or Corizon did caused any delays. Mr. Thompson's records indicate that despite the difficulties posed by the Covid-19 pandemic, still he received timely treatment. His records document that actions were consistently being taken on his behalf to render care to him and he was never ignored, even when other providers were involved in his care after my interaction with him ended.

34. Plaintiff Derico Thompson did not suffer any damages from any alleged actions or inactions by me.

35. I do not believe that I acted with any deliberate indifference in Plaintiff's care, as I responded to his medical needs, ordered appropriate medical treatment and follow-up care, provided him physical therapy, medications, pain inhibitor injections, x-rays, and requested that he receive offsite testing in the form of MRIs, EMGs, a neurosurgical consult, and monitored his medical status until August 6, 2020, after which I was no longer involved in his lumbar care and treatment. I treated Plaintiff in a manner that, in my medical judgment, was appropriate.

36. The statements made in this affidavit are true and accurate to the best of my current knowledge, information, and belief.

Dated: 12/14/2021        _____
                         Wendy Jamros, N.P.

                         *Walter H Maclean Jr*  12/14/21
                         Wallace H Maclean Jr
                         Notary Public-State of Michigan
Subscribed and sworn to before me this         County of Chippewa
____ day of _____ 2021.   My Commission Expires 10/25/2023
                                     Acting in the County of Chippewa

_____, Notary Public
County of _____
Acting in _____
My Commission Expires: _____

10