# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

**DERICO THOMPSON**,
 Plaintiff,

v.

**CORIZON HEALTH, Inc.,**, et al,
Defendants.

Case No.: 2:20-cv-00158
Hon.: Robert J. Jonker
Mag.: Maarten Vermaat

Ian T. Cross (P83367)
*Margolis & Cross*
Attorneys for Plaintiff
214 S. Main St., Suite 200
Ann Arbor, MI 48104
Phone: (734) 994-9590
Email: larry@lawinannarbor.com
Email: ian@lawinannarbor.com

Delvin Scarber (P64532)
*Chapman Law Group*
Attorneys for Defendants Corizon Health, Inc.
and Wendy Jamros, NP
1441 West Long Lake Rd., Suite 310
Troy, MI 48098
Phone: (248) 644-6326
Email: dscarber@chapmanlawgroup.com

## PLAINTIFF'S RESPONSE TO DEFENDANTS CORIZON HEALTH, INC. AND WENDY JAMROS, N.P.'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

**SECTION NO.**                                                    **PAGE**

**Table of Contents**…………………………………...…………          ii.

**Index of Exhibits** ……………………………………………          iii.

**Statement of Issues Presented**……...……………………………          iv.

**Controlling or Most Appropriate Authorities**………….…………          v.


## <u>Argument</u>

**I) Counterstatement of Facts**………..……………………………...          **1**

**II)  Plaintiff's Condition Constitutes an Objectively
Serious Medical Need**……………..…………………………..…          **5**

**III)  *Monell* requires that the Plaintiff first establish
*<u>a violation of a federal right</u>*, not *<u>the liability of an
individual defendant</u>*.…………………..…………………………...…          **18**

**IV) Assertions made on "information and belief"
 are insufficient to support or oppose a motion for
summary judgment**……………………………………………………          **21**

**Conclusion**…………………………………………………………..          **21**

INDEX OF EXHIBITS

**Exhibit A**: *Declaration of Dr. Susan Lawrence, M.D.*

**Exhibit B:** *Selected Medical Records of Derico Thompson*

**Exhibit C**:  *Declaration of Derico Thompson*

**Exhibit D**: *Corizon Bid Protest Letter, March 2021*

**Exhibit E**: *Excerpts from Deposition of Corizon Regional Medical Director Dr. Robert Lacy in Spiller v. Stieve, March 14, 2019*

**Exhibit F:**  *Excerpts from Deposition of Corizon UMMD Dr. Keith Papendick in Wright v. Corizon Health*

**Exhibit G**:  *Excerpts from Deposition of Corizon UMMD Dr. Keith Papendick in Lashuay v. Deline*

**Exhibit H**: *Selected Papendick emails re: ATP Cancellations*

**Exhibit I**: *ATP of Request for Hearing Aide*

**Exhibit J:**  *Declaration of Dr. Harriet Squier*

**Exhibit K**:  *Declaration of Dr. Erin Orlebeke*

**Exhibit L**: *Corizon Emergency Motion to Disqualify Expert in Sildack v. Corizon Health, Inc.*

**Exhibit M**: *Excerpt from Corizon Bid Packet for Missouri DOC Contract, March 2021*

**Exhibit N:**  *Deposition of Dr. Keith Papendick in Spiller v. Stieve*

**Exhibit O**:   *Excerpt from Corizon Bid Packet for Michigan DOC Contract Renewal*

## STATEMENT OF ISSUES PRESENTED

1. Does Mr. Thompson's intractable, severe neuropathic pain, weakness, and loss of bowel control due to compression of nerves in his central spinal canal constitute an objectively-serious medical need?

Plaintiff Answers: **YES**

Defendant Answers: **NO**


2. Did Defendant Jamros know of, and disregard, a substantial risk of serious harm in her treatment of the Plaintff?

Plaintiff Answers: **YES**

Defendant Answers: **NO**


3. Was there any causal relationship between a Corizon custom or policy and a delay or denial of adequate treatment for Mr. Thompson's medical condition?

Plaintiff Answers: **YES**

Defendant Answers: **NO**

## <u>CONTROLLING OR MOST APPROPRIATE AUTHORITIES</u>

1. *Blackmore v. Kalamazoo Cty.*, 390 F. 3d 890 (6th Cir. 2004)

2. *Winkler v. Madison County*, 893 F.3d 877 (6th Cir. 2018)

3. *Ondo v. City of Cleveland*, 795 F.3d 597 (6th Cir. 2015)

## I. Counterstatement of Material Facts

Plaintiff Derico Thompson is incarcerated. As a result, he must rely on medical professionals provided by the healthcare contractor for the Michigan Department of Corrections ("MDOC") for his medical needs. Until September 30, 2021, the MDOC healthcare contractor was Defendant Corizon Health, Inc., and from September of 2019 until August of 2020, Mr. Thompson's primary-care provider was Nurse Practitioner Wendy Jamros.

The details of Plaintiff's medical condition and the treatment that he did, and did not, receive are set forth in the declaration of Plaintiff's expert, Dr. Susan Lawrence, M.D. (**Ex. A**). In short, Plaintiff does not have "flatback syndrome." (**Ex. A**, ¶¶ 4-5; **Ex. B**, *Selected Medical Records*, pp. 7-8; ECF No. 56-4, PageID.330). He has bowel incontinence, progressive neurologic disability, and intractable pain and weakness in his lower extremities due to mechanical compression of the nerves in his central spinal canal and in his L5-S1 neural foramina. (**Ex. A**, ¶¶ 3, 16, 21, 26, 32). Nor have his symptoms been improving over the years with conservative treatment. (**Ex. A**, ¶ 13, 21, 27, 32; Ex. C, ¶ 18). A note from a clinical encounter on 06/07/21 reads: "ROM [range of motion] very limited. He is able to stand up from wheel chair and uses exam table to guide self. He was able to stand while getting injection . . ." (ECF No. 56-4, PageID.349).

1

With respect to her own (and Corizon's) actions in treating Mr. Thompson, NP Jamros testified in this matter as follows:

> "**Corizon approved everything.** Any time periods that he perceives that something was not happening fast enough would be a result of Covid-19 restrictions . . . **Nothing I did or Corizon did caused any delays.**"
>
> (ECF No. 56-3, PageID.288). (emphasis added).

This testimony is false, or at the very least, misleading. The medical records filed by Defendants show that on February 17, 2020, NP Jamros requested an EMG for Mr. Thompson. (ECF No. 56-4, PageID.310). Three days later, Corizon Utilization Management denied her request. (ECF No. 56-4, PageID.311).[1] The rationale given for the denial was, "[b]oth history and exam support radiculopathy. EMG would be unlikely to reveal new diagnosis or alter management." *Id*.

On March 12, 2020, NP Jamros requested a neurosurgery consult for Mr. Thompson. (ECF No. 56-4, PageID.314). On or about March 19, 2020, Corizon Utilization Management also denied NP Jamros' request for a neurosurgery consult, reasoning that a referral for a neurosurgery consult was not appropriate because Mr. Thompson had not undergone an EMG (which Utilization Management had just denied three weeks before). (ECF No. 56-4, PageID.315). In

---

[1] "ATP" stands for "Alternative Treatment Plan." (*See* ECF No. 56-3, PageID.282)

2

fact, Corizon Utilization Management did not approve the neurosurgery consult until September 8, 2020, the very day this Court issued its screening Opinion permitting Mr. Thompson's claims against Corizon and NP Jamros to proceed. (ECF No. 4, PageID.44; ECF No. 56-3, PageID.284, ¶ 18). Once Utilization Management approved the neurosurgery consult, it was scheduled relatively quickly, occurring less than two weeks later on September 22nd, 2020. (ECF No. 56-3, PageID.284, ¶ 18).

## Utilization Management

Corizon's primary care providers, such as NP Jamros, are not allowed to refer a patient to a specialist without obtaining approval from Utilization Management. (ECF No. 56-3, PageID.282-83, ¶ 12).    In a Bid Protest Letter that Corizon submitted to the State in March 2021 after it lost the MDOC prisoner health services contract to a competitor,[2] Corizon explained that its utilization management activities in Michigan "do not constitute medical services." (**Ex. D**, pg. 6). It described the purpose and nature of its utilization management activities as follows:

_____

2   The factual assertions of a party's attorney in another proceeding are admissible under F.R.E. 802(d)(2). *Williams v. Union Carbide Corp.*, 790 F.2d 552, 555-56 (6th Cir. 1986)

3

**1. Utilization review of outside medical care:** These services do not require a medical license and are typically provided by insurance companies, hospitals, and other utilization review organizations. Utilization review does not involve providing clinical medical care but rather assessing the necessity and cost of the care and approving it for payment.

(**Ex. D**, Corizon Bid Protest Letter, pg. 6).

Corizon's Utilization Management process begins when a primary-care provider who works in a prison, such as NP Jamros, submits a request to refer a patient to a specialist. The request is initially screened by a secretary, who compares the request to a protocol, or list, of services that can be automatically approved. (**Ex. E**, *Deposition of Corizon Regional Medical Director Dr. Robert Lacy in Spiller v. Stieve*, 3/14/2019, pp. 13-14). If the request is not on the list of services subject to automatic approval, it is forwarded to a Utilization-Management physician. (**Ex. E**, pp. 14-15). The primary Utilization Management physician who processed these requests in Michigan is Dr. Keith Papendick. (**Ex. E**, pp. 15, 135). When Dr. Papendick received a request for a referral to a specialist, he had two options: approve it, or issue "an alternative treatment plan, that's what we call deferred." (**Ex. F**, *Deposition of Dr. Keith Papendick in Wright v. Corizon Health*, 6/25/18, pg. 009).

According to Dr. Papendick, "medical necessity" is a guiding principle in this decisionmaking process. (**Ex. G**, *Deposition of Dr. Keith Papendick in Lahuay*

4

*v. Deline*, pg. 67-68). A specialty service is "medically necessary" if failure to immediately perform the service presents a "risk to life or limb, or deficit in ADLs, activities of daily living." (**Ex. G**, pg. 58; **Ex. F**, pg. 0014). According to Dr. Papendick, a procedure that is necessary to prevent a risk of permanent disability, which would limit the patient's future ability to earn a living, would "probably not" be medically necessary. (**Ex. G**, pg. 58). Corizon's proprietary 'medical necessity' standards are significantly more restrictive than those employed in the rest of the healthcare industry. For example, Corizon does not consider replacing a lost or broken hearing aide to be medically-necessary if the inmate still has some hearing in one of his ears. (**Ex. I**; **Ex. J**, ¶ 11;  **Ex. K**, ¶¶ 4, 13). Corizon closely guards the methods and standards that its UM staff use to determine whether a request meets 'medical-necessity' criteria, considering this information to be highly confidential, proprietary, and a trade secret. (**Ex. L**, pg. 4-6;[3] **Ex. M**, pg. 1).

Utilization review departments are a common feature of the American healthcare industry. "Most 'managed care' health plans use prospective and concurrent utilization review as a strategy to control costs." *Andrews-Clarke v. Travelers Ins. Co.*, 984 F.Supp. 49, n.9 (D. Mass. 1997). But outside the context of privatized prison healthcare, utilization-review methods and criteria are not

---

[3] The factual assertions of a party's attorney in another proceeding are admissible under F.R.E. 802(d)(2). *Williams v. Union Carbide Corp.*, 790 F.2d 552, 555-56 (6th Cir. 1986)

typically commerically-valuable trade secrets. For example, ERISA plans are required under 29 U.S.C. § 1024(b)(4) to disclose their utilization review methods and standards to plan beneficiaries upon request. *See Hernandez v. Prudential Ins. Co. of Am.*, 2001 U.S. Dist. LEXIS 15231 at *17-*19, *21 (D. Utah 2001); *Teen Help v. Operating Eng'Rs Health & Welfare Trust Fund*, 1999 U.S. Dist. LEXIS 21989 at *10-*11 (N.D. Cal. 1999). Utilization management criteria are commerically-valuable in the context of the prison-healthcare-contractor industry because the competitive environment in which this industry operates differs from the environment in which other managed care organizations operate, in one important respect: "[i]n the private market place, consumers are protected by competitive pressures and choice." *Hadix v. Caruso*, 465 F.Supp. 2d. 776, 809 (W.D. Mich. 2006).

A typical consumer who does not like the coverage provided under his health insurance plan can purchase a different one. But prisoners, obviously, cannot. When they do not receive care, their only recourse is litigation. *See Hadix,* 465 F.Supp. 2d. at 809. So rather than worrying at all about customer satisfaction, or the plan's reputation among consumers, as a normal HMO would, prison healthcare contractors like Corizon try to find the optimal balance between the cost of providing care, and the cost of litigation resulting from not providing care. This

6

is the 'secret sauce' that must not be revealed to competitors. Dr. Papendick

understood this tradeoff and it's relationship to Utilization Management. He

previously testified:

> 21     Q.     Has your cost per thousand patients gone up or down since
> 22     you've been there?
>
> 23     A.     It originally went up and malpractice cases went down.
> 24     The number of malpractice cases filed went down and they
> 25     attributed the end -- the number of admissions were down
> 1      and the number of ER runs went down and they attributed
> 2      that to the fact that things were being done as an
> 3      outpatient, rather than an inpatient.

**Ex. N:** Deposition of Keith Papendick, M.D. in *Spiller v. Stieve*, pp. 106-07.

Dr. Papendick knew that keeping his "cost per thousand patients" low was

important. Regarding his cost per thousand, he testified, "I'm not the highest. I'm

not the worst." *Id*. Not only did Dr. Papendick know his *own* cost per thousand

patients, he was also aware of the value of this metric for *other* Utilization

Management physicians who worked for Corizon, and how he compared to them.

### Corizon Encouraged Primary Care Providers to Minimize Specialty-Care Referrals and ER Runs

Utilization Management physicians were not the only Corizon staff members

whose performance was monitored using cost-related metrics. Corizon used a data

7

analytics tool, "ImpactPro," for its Michigan DOC contract to continuously monitor performance. (**Ex. O**, *Corizon Bid Packet for 2020 MDOC Contract Renewal*, pg. 199). Per Corizon, ImpactPro contains "[e]asy-to-use strategic dashboards and opportunity reports, with data displayed to highlight key opportunities to . . . reduce unnecessary costs[.]" *Id*.

Corizon's bid packet for the 2020 MDOC contract renewal includes some screenshots of ImpactPro, showing a few of the 'strategic dashboards' that Corizon management used for reducing unnecessary costs. (**Ex. O**, pg. 198-199). Among these dashboards is a leaderboard of "top ten referring providers," listing the identities the ten primary-care providers who made the most referrals to specialists. It also lists the actual number of specialist referrals made by each of those top-ten providers. (**Ex. O**, pg. 199).  Besides referrals to specialists, another major focus of Corizon's cost-containment efforts was emergency-room utilization. Dr. Robert Lacy, one of Corizon's Regional Medical Directors for Michigan, testified, "I spend a whole lot of my time doing kind of quality assurance studies. We look at different things like the ER runs to see if we think that the ER runs were -- to see if there are an unusual number of unnecessary ER runs." (**Ex. E**, pg. 16). The ImpactPro screenshots similarly show that Corizon was tracking and monitoring

8

ER Runs, Inpatient Days, and, for hospital admissions, <u>the identities of the "Top 10 Admitting Providers."</u> (**Ex. O**, pg. 198).

In addition to tracking the gross number of specialist referrals made by each primary-care provider, and the number of hospital admissions ordered by each primary-care provider, Corizon also tracked *the percentage of specialty referral requests that were approved by Utilization Management* for each primary-care provider. (**Ex. E**, pg. 62). As Corizon Regional Medical Director Dr. Robert Lacy testified:

> we track to see -- we track to see what percentages people are getting of approvals and denials, because we want people to achieve something like a 90 -- 90 percent approval rate, so **if they are getting, like, a 50 percent approval rate, then they are not doing something right.** Either they are not filling it out right with the information that we need or **<u>they are asking for too many things that are just, you know, unnecessary</u>**, they are not doing the steps that could be done in the right order, so in that case, **we would go back and try to retrain that person.**

(**Ex. E**, pg. 62-63)

Dr. Papendick's email correspondence with primary-care providers at the prisons shows him giving them opportunities, on occasion, to *withdraw* their referral requests rather than receiving ATPs. (**Ex. H,** *selected Papendick emails*). This behavior further demonstrates that receiving a high number of ATPs *<u>reflects poorly on the provider's job performance</u>*. A reasonable inference can be drawn that

9

Corizon's primary-care providers do not want to come to management's attention because they make a high number of specialty referral requests, initiate a high number of hospital admissions,  or because a high percentage of their specialty referral requests are denied by Utilization Management. Just as Utilization Management physicians are motivated by Corizon to keep their cost-per-thousand-patients low, primary-care providers are motivated not to make too many specialist referrals, and <u>especially not to make specialist referrals for services that they know Utilization Management will not approve.</u> A specialist referral that is denied by Utilization Management reflects poorly on the provider's job performance, *and* does not provide her patient with any medical benefit. It is in the context of these incentives, created by Corizon, that NP Jamros' behavior should be examined in this case.

### The Care Provided by NP Jamros

Initially, NP Jamros treated Mr. Thompson appropriately. (Ex. A, ¶¶ 7, 8, 11). By mid-November of 2019, NP Jamros suspected that Mr. Thompson's symptoms were caused by mechanical compression of the nerve roots at L5-S1. (Ex. A ¶¶ 9-10). She also knew that if his symptoms did not respond to conservative treatment in 6-8 weeks, the mechanical compression of the nerves in Mr. Thompson's spine

10

would need to be relieved surgically. *Id.* She wrote "if no improvement in 6-8 weeks consider MRI." (ECF No. 56-4, PageID.308). MRIs are expensive, and there is no reason to do one if the patient is not a potential candidate for surgery, because the results of an MRI would not affect the course of conservative treatment. (**Ex. A**, ¶11).

Approximately seven weeks later, in early January 2020, NP Jamros saw Mr. Thompson again. (**Ex. B**, pp. 1-2). She recognized that he was not improving with conservative treatment. (**Ex. A**, ¶ 12). Yet she did not submit a request to Utilization Management for an MRI. She wrote that she was considering submitting a request for a cheaper and less specific test, an EMG, but did not request an EMG at that time either.  (**Ex. B**, pg. 2). It was not until mid-February of 2020, after Mr. Thompson had suffered from intractable neuropathic pain for over five months, that NP Jamros placed a referral request for an EMG to confirm her diagnosis. (ECF No. 56-4, PageID.310). She waited, not because she believed waiting was medically appropriate, but because she did not want her referral request to be denied. She knew that Corizon must be absolutely certain that diagnostic testing is necessary before approving it. (**Ex. C**, ¶ 6). She also chose to request the cheaper and less specific test, an EMG, rather than an MRI. (**Ex. A**, ¶ 18).

11

After her EMG request was denied on the basis that it would not contribute substantially to the diagnosis, NP Jamros appropriately requested an MRI. The MRI was approved and performed on March 11, 2020. (ECF No. 56-3, PageID.282 ¶10). It showed not only bilateral neural foraminal stenosis at L5-S1, as NP Jamros had suspected, but also central canal stenosis at L4-L5 secondary to ligamentum flavum and flacet hypertrophy, that Mr. Thompson has a congenitally-narrow spinal canal, and the presence of disc herniation. (**Ex. A**, ¶ 16). Based on the MRI findings, surgery was clearly indicated. *Id*. So NP Jamros submitted a request for a referral to a neurosurgeon the very next day. (**Ex. A**, ¶ 17).

This request for a referral to a neurosurgeon was denied by Utilization Management. Utilization Management's justification for this decision makes no sense from a medical perspective. (**Ex. A**, ¶18, 20). It blatantly contradicts the "Alternative Treatment Plan" that Utilization Management issued for Mr. Thompson just a month before, when Utilization Management reasoned that "EMG would be unlikely to reveal new diagnosis or alter management." (ECF No. 56-4, PageID.311). A factfinder could conclude that this decision was made not because of a bona-fide a medical judgment that an EMG was actually necessary now, but rather for the purpose of delaying or avoiding an expensive surgical procedure. (**Ex. A**, ¶ 18).

12

After receiving an ATP of her neurosurgery consult request because she had not previously obtained an EMG, NP Jamros may have been understandably frustrated. She submitted a new request for an EMG the following day, writing at the bottom of the request, in all caps, "RECOMMENDATION PER UM 3/18/20." (ECF No. 56-4, PageID.315). This request was approved. (**Ex. A** ¶ 20).

In June of 2020, while Mr. Thompson was waiting for his unnecessary EMG, he developed bowel incontinence. He reported it on 7/2/20, and again on 7/6/20.  (**Ex. B,** pp. 3-5). Any medical provider would know that incontinence in combination with neurologic symptoms associated with the lumbar spinal stenosis is a potential medical emergency. (**Ex. A**, ¶ 21). And in fact, the records demonstrate that Mr. Thompson's providers knew this, because his providers specifically record the absence of this symptom in their notes from prior encounters. When NP Jamros examined Mr. Thompson on September 25, 2019, she specifically noted that he did not have bowel or bladder incontinence at the time. (**Ex. A**, ¶ 7; ECF No. 56-4, PageID.298). Even the nurses at the prison knew to look out for this combination of symptoms: in a nursing note from 9/13/19, "loss of bowel or bladder control with back pain? No" is the first thing the nurse takes note of. (ECF No. 56-4, PageID.294). Yet NP Jamros did not send Mr. Thompson to the ER. She took no action whatsoever in response to the onset of fecal

13

incontinence. (**Ex. A**, ¶ 21). Instead, she yelled at him, telling him to stop faking, to stop visiting healthcare, and that Corizon would not authorize surgery on his back. (**Ex. C**, ¶ 12).

## ARGUMENT

### II. Plaintiff's Condition Constitutes an Objectively-Serious Medical Need

Defendants cite *Blackmore v. Kalamazoo Cty.*, 390 F. 3d 890, 897 (6th Cir. 2004) and *Phillips v. Tangilang*, 14 F. 4th 524, 535 (6th Cir. 2021) for the proposition that there is no question of material fact as to whether or not Plaintiff has an objectively serious medical need. (ECF No. 56, PageID.261). In *Phillips,* the Plaintiff could not present evidence from which he could establish the objective prong of an Eighth Amendment claim because he failed "to present expert medical evidence describing what a competent doctor would have done and why the chosen course was not just incompetent but grossly so." *Phillips v. Tangilang,* 14 F. 4th at 536. But that is not the case in this matter. (**Ex. A**, ¶¶ 1-6, 23-32). In addition to the testimony of Plaintiff's expert, "evidence in a prisoner's medical records can suffice" to meet the verifying-medical-evidence requirement. *Estate of Majors v. Gerlach,* 821 Fed. Appx. 533, 540 (6th Cir. 2020). Here, the Plaintiff's medical records show that 1) upon receiving his MRI results, Defendant Jamros

14

immediately referred Plaintiff for a neurosurgery consult, (ECF No. 56-4, PageID.314), and 2) when that consult finally took place, the surgeon recommended lumbar laminectomy with fusion rather than simple decompression, out of "concern that subsequent disc herniations at L4-L5, L5-S1 may cause significant problems." (ECF No. 56-4, PageID.330).

Courts in the Sixth Circuit have found symptoms similar to the Plaintiff's to be sufficiently serious to satisfy the objective component of an Eighth Amendment claim. In *Adkins v. Morgan County,* 798 Fed. Appx. 858 (6th Cir. 2020), "severe back and stomach pain, inability to walk, and incontinence" were held to be sufficiently serious. *Id*. at 862. In *Sildack v. Corizon Health, Inc.*, 2013 U.S. Dist. LEXIS 141870 (E.D. Mich. 2013), the Court held that "[p]laintiff's allegations of pain from lumbar disc herniations, numbness, and permanent nerve damage are sufficiently serious to establish the first prong of an Eighth Amendment claim." *Id*. at *11. Defendants have not demonstrated the absence of any issue of material fact as to the objective prong.

### III. There is sufficient evidence for a jury to find that Defendant Jamros was aware of, and disregarded, a substantial risk of serious harm.

The subjective component of the deliberate-indifference test is satisfied when a defendant "knows of and disregards an excessive risk to inmate health or

15

safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Since most defendants "do not readily admit the subjective component of this test, it may be demonstrated in the usual ways, including inference from circumstantial evidence . . . a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 550 (6th Cir. 2009).

A prisoner "is not required to show that he was literally ignored by the staff to prove an Eighth Amendment violation, only that his serious medical needs were consciously disregarded." *Rouster v. County of Saginaw*, 749 F.3d 437, 448 (6th Cir. 2014). The relevant subjective-component inquiry is whether a defendant **knew of and disregarded a substantial risk of serious harm**, not whether the defendant exercised "medical judgment,"[4] or provided ***some*** treatment rather than no treatment for the prisoner's ailment. *See Lemarbe v. Wisneski*, 266 F.3d 429,

_____

[4]Defendants cite *Youngberg v. Romeo*, 457 U.S. 307 (1982), for the proposition that "it is not appropriate for the courts to specify which of several professionally acceptable choices should have been made." (ECF No. 56, PageID.265). This case is inapposite. *Youngberg* does not concern the Eighth-Amendment deliberate-indifference standard at all, but rather a substantive Due Process right possessed by mentally-retarded, civilly-committed persons to "minimally adequate habilitation," meaning a program of "training and development of needed skills." *Youngberg*, 457 U.S. at 316-17.

16

439 (6th Cir. 2001). As explained in *Comstock v. McCrary*, 273 F.3d 693 (6th Cir. 2001):

> Although defendants strenuously argue that "if medical treatment is given it is not a courts [sic] job to second guess the treatment given," Appellant's Reply Br. at 1, the issue is not whether McCrary provided some medical attention to Montgomery, but rather whether McCrary's conduct evinced deliberate indifference to Montgomery's serious medical needs. Defendants' position is, apparently, that if a prison doctor offers some treatment, no matter how insignificant, he cannot be found deliberately indifferent. This is not the law: as the Supreme Court noted in *Estelle*, 429 U.S. at 104-05 & n.10, a prison doctor's medical response to an inmate's serious need may constitute deliberate indifference just as readily as the intentional denial or delay of treatment.

*Comstock*,  273 F.3d at 707 n.5 (6th Cir. 2001).

Defendant Jamros initially provided appropriate medical treatment for Mr. Thompson's condition. (**Ex. A**, ¶¶ 8, 11). But in the summer of 2020, when he informed her that he had bowel incontinence, and his medical records showed that he had reported incontinence twice in the previous week, she did nothing. (**Ex. C**, ¶ 12; **Ex. A**, ¶ 21). Mr. Thompson's medical records show that NP Jamros, and even the nursing staff, knew that it was important to watch for bowel incontinence in a patient, such as Mr. Thompson, who is exhibiting neuropathic back pain. (ECF No. 56-4, PageID.294, 298). But NP Jamros did not send Mr. Thompson on an ER run upon becoming aware of this symptom. Instead, she chastised him for continuing to come to healthcare. (**Ex. C**,  ¶ 12).

17

### III. *Monell* requires that the Plaintiff first establish <u>*a violation of a federal right*</u>, not <u>*the liability of an individual defendant.*</u>

There are three requirements to make out a *Monell* claim under § 1983: "a plaintiff must show '(1) that a violation of a federal right took place, (2) that the defendants acted under color of state law, and (3) that a municipality's policy or custom caused that violation to happen.'" *Kellom v. Quinn*, 2021 U.S. App. LEXIS 26749 at *10 (6th Cir. 2021) (quoting *Bright v. Gallia Cnty.*, 753 F.3d 639, 660 (6th Cir. 2014).

Defendants cite *Watkins v. City of Battle Creek*, 273 F.3d 682 (6th Cir. 2001), for the proposition that if "no constitutional violation by the individual defendants is established," the entity defendant cannot be liable. (ECF No. 56, PageID.266). But subsequent cases strongly suggest this principle has a narrower application. *See Graham v. County of Washtenaw*, 358 F.3d 377, 382 n.4 (6th Cir. 2004). While a plaintiff must show that he has suffered a violation of a federal right due to a custom or policy of the municipal defendant to make out a claim under *Monell*, *Watkins* does not clearly stand for the broad propositions that 1) the constitutional violation must also be attributable to an individual employee, and 2) that the relevant employee must be named as a defendant in the lawsuit. *Winkler v. Madison County*, 893 F.3d 877 (6th Cir. 2018) is instructive on this point:

18

> When no constitutional harm has been inflicted upon a victim, damages may not be awarded against a municipality. <u>But a finding that the individual government actor has not committed a constitutional violation does not require a finding that no constitutional harm has been inflicted upon the victim</u>, nor that the municipality is not responsible for that constitutional harm. . . . A given constitutional violation may be attributable to a municipality's acts alone and not to those of its employees—as when a government actor in good faith follows a faulty municipal policy. A municipality also may be liable even when the individual government actor is exonerated, **including where municipal liability is based on the actions of individual government actors other than those who are named as parties.**

> *Winkler*, 893 F.3d at 900 (6th Cir. 2018) (quoting *Epps v. Lauderdale County*, 45 Fed. Appx. 332 (6th Cir. 2002)) (emphasis added).

Thus, if Mr. Thompson's constitutional right to minimally-adequate medical care in prison was violated by Corizon officials who are not defendants in this matter, for example, the Utilization Management personnel who denied NP Jamros' requests for an EMG in February 2020 and her request to send him to a neurosurgeon in March of 2020, Mr. Thompson can still make out a claim against Corizon, if he can show that Corizon's "policy or custom caused that violation to happen." *See Bright v. Gallia Cnty.*, 753 F.3d 639, 660 (6th Cir. 2014).

The policy, practice, or custom that forms the basis of *Monell* liability does not need to be unconstitutional or illegal. *Monell* liability can be premised on a policy that "is itself facially lawful" if the plaintiff demonstrates "that the

19

municipal action was taken with 'deliberate indifference' to its known or obvious consequences." *Gregory v. City of Louisville,* 444 F.3d 725, 752 (6th Cir. 2006). One such policy that may be sufficient is a policy of denying healthcare to prisoners to save money. "Federal district courts in Michigan have expressly found that a complaint identifying a policy of denying care to save costs may be sufficient to state a Monell claim.'" *Dittmer v. Corizon Health, Inc.,* 2021 U.S. Dist. LEXIS 13068 at *28 (E.D. Mich. 2021) (citing *Ferguson v. Corizon,* 2013 U.S. Dist. LEXIS 126206 at *26 (E.D. Mich. 2013) (collecting cases)).

By early January of 2020, it was known that Mr. Thompson's symptoms were not responding to conservative treatment. (**Ex. A**, ¶ 13). But Mr. Thompson never received surgery, or even epidural injections,[5] at any time before Corizon lost the MDOC healthcare contract in September 2021. "When prison officials are aware of a prisoner's obvious and serious need for medical treatment and delay medical treatment of that condition for non-medical reasons, their conduct in causing the delay creates the constitutional infirmity." *Blackmore v. Kalamazoo County*, 390 F.3d 890, 899 (6th Cir. 2004). A substantial portion of the delay in Mr. Thompson's, at least prior to the time that he filed suit in August of 2020, was caused by "non-treating, non-examining supervisors" in Corizon's Utilization

---

5  The injections Mr. Thompson received were intramuscular and trigger-point, not epidural. (Ex. A, ¶ 27)

Management department. *See Sildack v. Corizon Health, Inc.*, 2014 U.S. Dist. LEXIS 121801 at *18-*19 (E.D. Mich. 2014). Such persons cannot escape liability for their interference by claiming that their decision to deny care represents a mere "difference of opinion regarding medical treatment." *Id.*

## IV.  Assertions made on "information and belief" are insufficient to support or oppose a motion for summary judgment.

Defendants' Motion relies heavily on the affidavits of Defendant Jamros and their retained expert, Dr. Grain. Both affidavits are made "to the best of my current knowledge, information, and belief." (ECF No. 56-3, PageID.288; ECF No. 56-2, PageID.279). However, "statements made on belief or on 'information and belief' cannot be utilized on a summary judgment motion." *Ondo v. City of Cleveland*, 795 F.3d 597, 605 (6th Cir. 2015). If the Court wishes to consider Defendants' affidavits, it should "admit the parts based solely upon personal knowledge, while striking the parts based upon belief." *Id.* However, the Court also has discretion to disregard the affidavits in their entirety. *Id.*

## <u>Conclusion</u>

For all the foregoing reasons, Defendants' Motion should be denied.

*/s/ Ian T. Cross*
Ian T. Cross (P83367)
Attorney for Plaintiff
734-994-9590

21