# Declaration of Susan Lawrence, M.D.

1. My name is Susan Lawrence, M.D. I am double board-certified in Internal Medicine and Medical Oncology. I have practiced medicine since 1978, and am licensed in the States of California and Indiana. I have served as a Staff Physician and Medical Director at the Adelanto Detention Facility in San Bernadino County, California. In that capacity I have had extensive experience treating patients in a correctional environment, and am very familiar with the medical condition from which Mr. Thompson suffers as well as its standard of care.

2. I have reviewed Mr. Thompson's medical records filed in this matter, including those from the Michigan Department of Corrections (MDOC), lumbar spine MRI report, EMG report, and both neurosurgical consultation reports. Additionally, I have read the declarations of Peter G. Grain, M.D., Wendy Jamros, N.P., and Mr. Derico Thompson. Based upon my personal knowledge, education, and experience in correctional medicine treating patients with similar conditions, I am prepared to testify in this matter as to the following. (All opinions are stated to a reasonable degree of medical certainty.)

3. Mr. Thompson suffers from chronic, debilitating pain and neurologic disability as a result of neurogenic claudication from lumbar spinal stenosis in the context of a congenitally-narrow canal. He has central canal stenosis and bilateral neural foraminal stenosis at L5-S1. This is not run-of-the-mill back pain that many people experience as they age: less than 5% of patients presenting with lower back pain have neurologic symptoms caused by central canal stenosis, as

Mr. Thompson does. This is a serious medical condition which can profoundly affect a patient's quality of life and can result in progressive and potentially irreversible disability.

4. Dr. Grain's diagnosis of "flatback syndrome" is blatantly contradicted by Mr. Thompson's medical records. A normal human spine exhibits curvature in the sagittal plane. The sagittal plane is a vertical plane running from front to back, dividing the human body into symmetric right and left sides. In other words, if you cut a human body in half along a plane running from between the eyes down to the belly button, such that you are making a vertical cut down the center of the entire spine, and then looked at one of the resulting halves of the spine from the side, you would see curvature in a normal individual. The spine curves slightly backwards where it joins the pelvis. This curve is called lordosis. At chest level where the ribs join the spine, it curves slightly forward. This curve is called kyphosis. "Flatback syndrome" refers to a condition where there is a loss either of lordosis or kyphosis or both, making the spine straight. Literally, the back is flat.

5. Mr. Thompson's medical records show that the neurosurgeon who saw Mr. Thompson in Marquette in September of 2020, Dr. Paul LaHaye, also noted that the patient had "mild lordosis." Another exam performed on 7/15/20 by a primary-care physician at the prison, Dr. Timothy Stallman, reports that the patient had "normal thoracic AP curve, slightly accentuated lumbar lordosis[sway back]." 'Normal thoracic AP curve' means that he had a normal level of kyphosis. "Slightly accentuated lumbar lordosis" or "mild lordosis" means there is slightly more curvature in the lumbar spine than is present in a normal individual. This is called "sway back." Sway back is the opposite of flatback syndrome. Rather than having less lumbar spinal curvature

than normal, the records demonstrate that Mr. Thompson has *slightly accentuated* curvature in his lumbar spine.

6. Mr. Thompson's complaints demonstrate progressive neurologic disability and the impact of severe chronic pain on the quality of his life. On 9/24/19, he noted that he could not sit upright on the toilet and could not shower as he was unable to bend over to reach his legs. On 11/15/19, he complained that the pain now radiated down both legs and was associated with leg numbness. On 1/16/2020, Mr. Thompson indicated that he was no longer able to stand while talking on the phone and using the microwave because of severe pain. On 7/2/2020 and again on 7/6/2020, he complained of fecal incontinence, noting its relation to the pain in his back. On 6/7/21, he fell in his cell when severe pain caused his legs to give out. At that point, he was provided with a wheelchair. In addition, despite a trigger point injection administered that same day, he has continued to experience fecal incontinence 1-2 times per week, as well as progressive, severe back pain radiating to both legs, associated with numbness in both legs.

7. Per his medical records, the onset of Mr. Thompson's symptoms occurred in September 2019 and he was initially seen by nursing staff (RNs). He then had an encounter with NP Jamros on 9/25/19. She checked his deep tendon reflexes, and noted that they were preserved and symmetric, and that at the time, the patient did not have bowel or bladder incontinence or saddle anesthesia. Given those findings, her initial decision to continue conservative treatment was reasonable. She prescribed a course of oral prednisone, a corticosteroid, administered an injection of ketorolac, a non-steroidal anti-inflammatory (NSAID), and an injection of solu-medrol, which is another corticosteroid.

8. On 10/03/19, Mr. Thompson's symptoms had not resolved. NP Jamros prescribed Naproxen, another NSAID, and submitted a referral request for one appointment with a physical therapist to develop a home-exercise program ("HEP"). In correctional medicine, home exercise programs are commonly employed as an alternative to a course of regularly-scheduled physical therapy. HEPs are considered to be the equivalent of a course of physical therapy. For security reasons, prisoners should not know in advance when they will be transported off of prison grounds. A series of off-site appointments with a physical therapist occurring at regular intervals, for example, on the same day every week, would pose a security risk. Attempting a course of HEP physical therapy in early October of 2019, when the onset of Mr. Thompson's symptoms was recent and he had not yet developed incontinence, was reasonable. It is reasonable to attempt conservative measures such as physical therapy before referring a patient for surgery.

9. However, if a patient's symptoms do not respond to physical therapy, invasive treatment is indicated. From the medical records, it is clear that NP Jamros knew this. In an 11/21/19 chart update, she writes that Mr. Thompson has "radicular symptoms in L5-S1 dermatome . . .if no improvement in 6-8 weeks consider MRI (EMG)?"

10. "Radicular symptoms in L5-S1 dermatome" means Mr. Thompson has symptoms associated with mechanical compression of nerves that exit the spinal column at the L5-S1 junction. This is the point at which the last vertebra connects to the sacrum. A 'dermatome' is an area of skin that is mainly supplied by afferent nerve fibers from the dorsal root of any given spinal nerve. An 'afferent nerve fiber' is a nerve fiber that conducts information, like sensations of touch, hot,

cold, and pain, from a part of the body to the brain (these are not to be confused with *efferent* nerve fibers, which transmit "commands" from the brain that cause muscles to contract). When there is a mechanical problem with the patient's spine that results in compression and damage to a spinal nerve, the patient will often perceive sensations, like pain, in the parts of the body that are supplied by that nerve. Based on the location of the otherwise-unexplained pain, medical professionals can deduce where in the spine the nerve root compression is likely occurring. That is what NP Jamros did in this case: she deduced that Mr. Thompson's otherwise-unexplained pain throughout the L5-S1 dermatome, which began while he was using a rowing machine, was caused by mechanical compression of the nerves that exit the spine at L5-S1.

11. Compression of a spinal nerve can be caused by soft-tissue inflammation (swelling) due to an injury. Often with time, or with anti-inflammatory medications, that swelling will go down. If the compression is caused by inflammation, it will be relieved when the inflammation goes down, and as a result the patient's symptoms will go away. That is why it was reasonable for NP Jamros to initially attempt treatment with oral and injected anti-inflammatory medications and with physical therapy. Physical therapy can sometimes help reduce inflammation by doing things like correcting the patient's posture, and the purpose of the steroids NP Jamros injected into Mr. Thompson's back was to reduce inflammation. But as her statement "if no improvement in 6-8 weeks consider MRI (EMG)?" indicates, NP Jamros knew that if these treatments failed, the mechanical compression of the nerves in Mr. Thompson's spine would need to be relieved surgically. An MRI would be necessary for surgical planning purposes, but it would not affect the course of conservative treatment that would be attempted first in this patient.

12. Approximately seven weeks later, on 01/06/20, NP Jamros places a note in Mr. Thompson's medical record concerning a visit that occurred four days before, on 01/02/20. During that visit she prescribed another course of oral prednisone and administered more injections of ketorolac and solu-medrol. She indicates that "Patient has completed his HEP and has had no improvement. He has to sit to use the phone, microwave, etc. Otherwise his back will spasm." She also writes, "Consider EMG request," but she did not actually request an EMG for another six weeks.

13. By early January of 2020, the need for invasive treatment was clear. Frequent, long-term use of corticosteroids can cause serious side effects, including diabetes, osteoporosis, cataracts, hypertension, and cognitive changes. Any medical professional would know this. Mr. Thompson received oral steroids on 9/13/19; oral and IM steroids on 9/25/19, and more oral and IM steroids on 1/2/2020. The fact that steroids were being regularly used to treat Mr. Thompson (for the purpose of "improving his day to day functioning," as NP Jamros stated in her declaration) is evidence that his symptoms were not responding to less risky measures. If a patient with suspected spinal stenosis needs frequent administration of oral and injected steroids for "day to day functioning," then exploration of surgical treatment options is clearly indicated.

14. A month and a half later, on 2/17/20, NP Jamros requests an EMG. EMG may have been useful in confirming what NP Jamros already suspected was causing Mr. Thompson's symptoms since mid-November: mechanical compression of nerves at L5-S1. It is unclear why she waited six weeks to make this request, given that by January 2nd, she knew Mr. Thompson's symptoms were not responsive to physical therapy, NSAIDs, and even steroids.

15. Per Mr. Thompson's medical records, on 2/20/20, the Utilization Management department denied the request for an EMG. The reasoning given for the denial was, "[b]oth history and exam support radiculopathy. EMG would be unlikely to reveal new diagnosis or alter management. Consider ongoing management based on workup that has already been completed."

16. On February 21, the day after her EMG request is denied, NP Jamros appropriately requests an MRI, as she should have done in January. The MRI is approved and occurs on March 11, 2020. The MRI revealed not only bilateral neural foraminal stenosis at L5-S1, as NP Jamros had suspected, but also central canal stenosis at L4-L5 secondary to ligamentum flavum and facet hypertrophy, that Mr. Thompson has a congenitally-narrow spinal canal, and the presence of disc herniation. At this point, not only had Mr. Thompson's symptoms been unresponsive to conservative treatment for six months, but the mechanism of the nerve compression causing his symptoms was known. It was clear that non-invasive treatments focused on reducing inflammation could not relieve the pressure on either the central spinal canal at L4-L5 or the neural foramina at L5-S1. Surgery was indicated.

17. On 3/12/20, the day after receiving the MRI results, NP Jamros appropriately requests a neurosurgery consult.

18. For reasons that are baffling, on March 18, 2020, Utilization Management denied this request, reasoning that a neurosurgery consult was premature as there had not been an EMG. Since Utilization Management had previously denied the EMG as not medically necessary,

reasoning that it would not contribute substantially to the diagnosis, it is incomprehensible why they would suggest it is necessary now, when a recent MRI is available, aside from attempting to delay the neurosurgery consultation. EMG in this context is less specific than MRI and would not be necessary for surgical planning purposes.

18. The day after Utilization Management denied NP Jamros' neurosurgery consult request on the basis that the patient had not undergone EMG (after previously denying her request for an EMG in February) NP Jamros submitted another request for an EMG. In this request, she wrote in all caps: "RECOMMENDATION PER UM 3/18/20."

20. Utilization Management approved NP Jamros' EMG request. But the EMG was not necessary once a definitive diagnosis had been made via MRI, and it was not done until August 3, 2020, pointlessly delaying Mr. Thompson's neurosurgery consultation. In my opinion, this delay caused by Utilization Management was unwarranted, not medically justifiable, and subjected Mr. Thompson to months of unnecessary pain and suffering.

21. In July 2020, Mr. Thompson reported fecal incontinence. The medical records show NP Jamros was aware of both a finding of spinal stenosis and the complaint of fecal incontinence. Any medical provider in NP Jamros' position would have found the presentation of this ominous symptom in a patient with existing neurologic symptoms associated with the lumbar spinal stenosis (which can indicate cauda equina syndrome, a condition that can cause permanent paralysis and incontinence) worthy of investigation. Mr. Thompson's medical records demonstrate that NP Jamros and other providers were aware of the need to watch for fecal

incontinence, as her prior clinical notes make repeated reference to the absence of saddle anesthesia or bowel or bladder incontinence in the patient. Yet NP Jamros took no action whatsoever in response to the onset of fecal incontinence. She did not send him to the ER where he would have been immediately evaluated by a neurosurgeon and had a repeat MRI to ascertain whether emergent surgery was necessary. She performed no physical examination of Mr. Thompson at this time, nor did she direct anyone else to examine him.

22. Mr. Thompson underwent EMG on August 3, 2020, and it reconfirmed findings of nerve compression at L5-S1 that had been suspected since November of 2019 and definitively diagnosed via MRI in March of 2020.

23. On September 8, 2020, Utilization Management finally approved a neurosurgery referral. Mr. Thompson was seen later in September 2020 by Dr. Paul LaHaye, who recommended lumbar decompressive laminectomy at L4-L5-S1 with fusion from L4-S1. This procedure involves removing some of the bone in certain vertebrae in order to decompress the nerves in the foramina and in the central canal. Mr. Thompson is a good candidate for this procedure, and it would have alleviated his symptoms with minimal post-operative risk.

24. Mr. Thompson should have undergone this procedure or a similar spinal decompression procedure after conservative treatment had failed. By September of 2020, Mr. Thompson had already failed most of the first-line therapies used to treat the symptoms of his condition, including multiple NSAIDS, a course of physical therapy, Toradol injections, muscle relaxants, and, troublingly, steroid injections. The only remaining non-surgical treatment options that had

not been tried are epidural spinal injections, and medications for neuropathic pain (Gabapentin and Lyrica). But Mr. Thompson was not offered either of these, and neither is usually a viable treatment option in a correctional environment. Epidural injections must be performed at regular intervals by an outside pain management specialist and are expensive. Gabapentin and Lyrica are typically severely restricted in correctional institutions, because they are viewed as potential drugs of abuse among inmates and targets of medication diversion.

25. Epidural injections and medications for neuropathic pain are aimed at providing symptomatic relief of spinal stenosis symptoms until definitive surgery can be performed. They do not serve the same purpose as surgery. Spinal stenosis is a mechanical problem, wherein pain and neurologic disability is caused by physical pressure placed on the nerves in the central canal (or exiting at the foramina) by disc herniation or arthritic bony or ligamentous overgrowth. Surgery is needed to relieve the compression of the nerves and the symptoms resulting from this. Mr. Thompson's stenosis occurs in the context of a congenitally-narrow spinal canal, rendering the nerve compression more severe in his case than that experienced by most patients with his condition.

26. Mr. Thompson's condition absolutely poses substantial health risks if not treated. Chronic, agonizing, unremitting pain and neurologic disability from spinal stenosis causing mobility issues and impairment in activities of daily living is a serious condition that requires treatment and, if untreated, results in a substantial health risks of permanent nerve damage, incontinence, and poor quality of life.

27. Mr. Thompson's medical records demonstrate that his symptoms have not improved or responded to conservative therapy between August 2019 and October 2021 or specifically between June 2021 through October 2021. Mr. Thompson had been treated with application of heat (hot water bottle), multiple oral NSAIDs, Toradol injections, corticosteroids (oral, IM, and a trigger point injection), muscle relaxants, an antidepressant, a home exercise program (which is considered a course of physical therapy), and a 5-day course of Tramadol (which he reported as helpful, but was not prescribed again). Tramadol is a narcotic and is not advised for chronic pain when other options are available because of the risk of addiction. The prescribing of narcotic pain medication is typically extremely restricted in correctional medicine due to the high risks of abuse and diversion. The fact that Tramadol was prescribed (especially in a prison setting) for even a short period of time reflects the severity and intractability of Mr. Thompson's symptoms, which had not responded to other measures.

28. Dr. Grain states that the first neurosurgery consultation by Dr. La Haye on 9/22/2020 did not set out emergent or acute issues necessitating surgery. Emergent or acute issues are not required to make a decision to treat spinal stenosis surgically. If a patient has exhausted all conservative measures and still has a poor quality of life due to chronic pain and neurologic disability, surgery is indicated.

29. Surgery for Mr. Thompson (age 47) would not require a lengthy post op recovery and would not expose him to unnecessary health risks. L4-S1 spinal decompression, instrumented fusion, and discectomy are commonly performed for patients in Mr. Thompson's age group. The vast majority of patients recover well with, at most, a few inpatient post-op days followed by

outpatient physical therapy. Mr. Thompson had no serious co-morbid conditions that would have increased his operative risk. Continuing to suffer with unremitting pain and progressive disability also exposes Mr. Thompson to health risks far in excess of the risks he would face from an L4-S1 spinal decompression, instrumented fusion, and discectomy.

30. Dr. Grain mentions that surgery does not hold any guarantee of success. No treatment or procedure holds a guarantee of success. Given the severity and progressive nature of Mr. Thompson's symptoms and his now over two-year history of failing conservative therapy, he is clearly a candidate for invasive treatment options.

31. Dr. Grain states that Dr. Armitraj Loganathan, who saw Mr. Thompson for a second neurosurgical consultation on 5/23/21, opined that surgery was not necessary. However, Dr. Loganathan did not provide a rationale for his opinion. The records of the visit indicate that Dr. Loganathan did not even perform a complete physical examination of the patient at that visit, and he apparently relied on an MRI that was over a year old and taken before the onset of Mr. Thompson's bowel incontinence. He also did not discuss the MRI findings of central canal stenosis and L5-S1 foraminal stenosis; instead, he only mentioned "disc bulges at L4/L5 in the setting of a congenitally narrow spinal canal." He recommended no specific treatment at all for this patient, despite the patient's nearly two-year history of intractable neuropathic pain, bilateral lower-extremity weakness, and loss of bowel control.

32. On June 7, 2021, Mr. Thompson's legs gave out due to shooting pain and he fell in his cell. His records show that he was brought to healthcare in a wheelchair and thereafter given a

wheelchair detail. The medical records show Mr. Thompson's symptoms becoming progressively worse over time, not improving. In my opinion, the defendants have shown a conscious and continuous disregard for Mr. Thompson's health and well-being in their refusal to provide treatment that meets the standard of care for his condition. This is demonstrated by the fact that Mr. Thompson's condition has deteriorated to a point at which he requires a wheelchair for ambulation as well as for safety to prevent falls; recommended surgery has not been carried out; and his chronic intractable pain has not been managed appropriately. While attempting conservative treatment approaches was reasonable in late 2019, at the time of symptom onset, it is not reasonable now. His over two-year history of failing conservative treatment has made it abundantly clear that Mr. Thompson's progressive neurologic symptoms cannot be relieved without a surgical procedure.

I declare under penalty of perjury that the foregoing is true and correct.

January 11, 2022
Date

Dr. Susan Lawrence, M.D.