Transcript of the Testimony of

# Dr. Robert Lacy

**Date:**

March 14, 2019

**Eddie Spiller v. Jeffrey Stieve**

American Reporting, Inc.
Phone:248-559-6750
Fax:248-559-9919
Email:scheduling@american-reporting.com
Internet: american-reporting.com

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN


EDDIE SPILLER,

                         Case No.:

    Plaintiff,              18-cv-00692

vs

                       Honorable Janet T. Neff

                       Magistrate Ellen S. Carmody

JEFFREY STIEVE, WILLIAM BORGERDING,

CORIZON OF MICHIGAN a/k/a

CORIZON HEALTH, INC., KEITH PAPENDICK,

ROBERT LACY, and JEFFREY BOMBER,

    Defendants.

_____/


DEPOSITION OF:   DR. ROBERT LACY

LOCATION:       1441 West Long Lake, Troy, Michigan

DATE:           March 14, 2019

TIME:           9:30 a.m.

Taken in the above-entitled cause, before James A. Hengstebeck,

Certified Electronic Recorder, CER #4623, and Notary Public for

the County of Oakland.

1

Dr. Robert Lacy                    Eddie Spiller v. Jeffrey Stieve

```
 1        don't know if I can answer your question any better,
 2        because --
 3   Q.   All right.  Sorry.
 4   A.   -- I'm not -- okay.
 5   Q.   Let's talk about your role within Corizon as I understand
 6        it, tell me if I'm wrong.  There are the feet on the
 7        ground healthcare professionals that are in the prisons
 8        who are actually laying their hands on the patients,
 9        right?  That would be -- it might be a PA, it might be
10        a -- is it a --
11   A.   A nurse practitioner.
12   Q.   -- a nurse practitioner.  Those are the people who
13        physically touch the patients, correct?
14   A.   And the doctors, yes, yes.
15   Q.   Now, if they wanted treatment that goes beyond the
16        standard, they have to fill out a form, a 407 form and it
17        goes up the chain, correct?
18             MS. VAN THOMME:  Object to form.
19             THE WITNESS:  That's correct.
20   Q.   (By Mr. Altman)  Okay.  Who do they go to first?
21   A.   Currently, it is emailed to the Utilization Management
22        Department, there is a secretary or -- well, essentially a
23        secretary who looks at them and sees if they can be, oh,
24        treated by a protocol.  So, for instance, if somebody's
25        hemoglobin is less than six and they are asking for a
```

Dr. Robert Lacy                          Eddie Spiller v. Jeffrey Stieve

```
 1          transfusion, you know, we are not -- there's not a likely
 2          circumstance where we are going to say no to that, and so
 3          those things, you know, that's an example of what they
 4          might have a protocol for to just approve it.
 5     Q.   And that's being done by a secretary?
 6     A.   That's using a -- she uses a template or, like, a list.  I
 7          personally have never seen it, but there are -- there are
 8          certain things where if it's something that we will
 9          probably never say no to and, like, oncology follow-ups
10          and, you know, transfusing a hemoglobin below six and
11          things like that, you know, physical therapy after a knee
12          replacement surgery, you know, things like that just get
13          approved, you know.  I think it's automatic.  I've never
14          worked in the UM department, but I understand that there
15          is a lot of -- lots of things that are just approved by
16          protocol.
17     Q.   So --
18     A.   I think maybe the physical therapy after a knee
19          replacement might actually be a better example of that.
20     Q.   So you say basically things that are essentially going to
21          be approved, that is something that can be handled by that
22          person, if stuff that would require -- that might not get
23          approved is something they would not handle?
24               MS. VAN THOMME:  Object to form and foundation.
25               THE WITNESS:  I believe -- I believe the things that
```

14

Dr. Robert Lacy                          Eddie Spiller v. Jeffrey Stieve

```
 1        aren't approved by protocol go on to a doctor in the
 2        utilization management to look at.
 3   Q.   (By Mr. Altman)  Okay.  Now, these doctors -- and who are
 4        these doctors?
 5   A.   Well, in Michigan, the main one currently is
 6        Dr. Papendick.
 7   Q.   Dr. Coleman, is he also a utilization doctor?
 8   A.   He is not.  He -- he approves -- he does the approvals for
 9        things like durable medical equipment and non-formulary
10        medications, which he just took over that role with the
11        departure of Dr. Borgerding.
12   Q.   And when was that?
13   A.   I think that was a couple years ago.  I think Borg left in
14        I want to say maybe the late -- like August or September
15        of 2016, but you know, it could have been 2017.  I'm not
16        really sure.
17   Q.   Where do you fit in this whole structure?
18             MS. VAN THOMME:  Object to form.
19             THE WITNESS:  As far as where do I fit into the
20        approvals and --
21   Q.   (By Mr. Altman)  Just generally into Corizon in Michigan,
22        where do you fit?
23   A.   Well, currently, I am a regional medical director, so my
24        region is the Adrian Correctional Facilities,
25        Duane Waters, the reception center in C Unit in Jackson,
```

Dr. Robert Lacy                    Eddie Spiller v. Jeffrey Stieve

```
 1        Women's Huron Valley, Woodlands Correctional Facility in
 2        Ypsilanti and the Detroit Reentry and Ryan Correctional
 3        Facility and at times, you know, I was -- for a little
 4        bit, I was also over the Thumb and Macomb, and the Macomb,
 5        I may be over that again.  They talked about -- they
 6        talked about trading me and Dr. Schmidt for Macomb for
 7        Woodland, but I don't think they were going to follow
 8        through with that, so I don't really know.
 9   Q.   So what do you do?
10   A.   Well, I interview new people to hire them.  When we hire
11        somebody I do a little bit of the training where we -- I
12        go over some policies and that sort of thing.  I go around
13        to the sites and do visits to see if there's any issues or
14        anything that I can help out with, if the health unit
15        managers are, you know, having any issue with our people
16        that I would maybe need to resolve or if our people are
17        having a problem with anything like not getting support
18        for, you know, not getting the nursing support that they
19        need and other issues.  Just like people have questions on
20        how to do things or what should they do in a certain
21        situation.  I'm available to help them out with that.
22            I spend a whole lot of my time doing kind of quality
23        assurance studies.  We look at different things like the
24        ER runs to see if we think that the ER runs were -- to see
25        if there are an unusual number of unnecessary ER runs.  We
```

16

```
 1        that should all go on the 407 and, you know, in one case
 2        it may be that I think somebody has an ACL tear and their
 3        anterior drawer test is, you know, I can push the knee and
 4        it's unstable, you know, that we would actually probably
 5        want them to get an MRI first and then go see the
 6        specialist because the specialist most of the times
 7        will -- they'll do the visit and they'll ask for an MRI,
 8        then we'll get the MRI and have to send the visit -- the
 9        person back.  So, you know, depending on -- it depends on
10        what it is.
11   Q.   (By Mr. Altman)  I understand that, but I am not talking
12        about the details.  You still train these doctors to
13        properly -- I think you said fill out a 407 request,
14        right?
15   A.   We tell them what we are looking for in a 407 request,
16        yes.
17   Q.   And isn't your presumption that your doctors listen to
18        you?
19   A.   It is.
20   Q.   And that if a doctor fills out a 407 that because you
21        trained them, they know the criteria to put on a 407?
22             MS. VAN THOMME:  Object to form and foundation.
23             THE WITNESS:  It is and we track to see -- we track
24        to see what percentages people are getting of approvals
25        and denials, because we want people to achieve something
```

Dr. Robert Lacy                    Eddie Spiller v. Jeffrey Stieve

```
 1        like a 90 -- 90 percent approval rate, so if they are
 2        getting, like, a 50 percent approval rate, then they are
 3        not doing something right.  Either they are not filling it
 4        out right with the information that we need or they are
 5        asking for too many things that are just, you know,
 6        unnecessary, they are not doing the steps that could be
 7        done in the right order, so in that case, we would go back
 8        and try to retrain that person.
 9   Q.   (By Mr. Altman)  Is it also possible that Corizon has been
10        unreasonably denying 407s?
11             MS. VAN THOMME:  Object to form.
12             THE WITNESS:  I don't think so.
13   Q.   (By Mr. Altman)  How do you know?
14   A.   Because the alternative treatment plans that I've seen
15        most of the time, I agree with them.
16   Q.   Do you think it's appropriate to send a -- to send a
17        person for physical therapy, for a non-orthopedist to
18        decide to send a person for physical therapy without an
19        orthopedist approving that physical therapy?
20             MS. VAN THOMME:  Object to form and foundation.
21   Q.   (By Mr. Altman)  Let me take a step back.
22   A.   I think --
23   Q.   Hold on.  Hold on.  There's a big difference --
24   A.   I'd like to answer that question.
25   Q.   No, I'm withdrawing that.  There's a big difference
```

American Reporting, Inc.
248-559-6750

Dr. Robert Lacy                    Eddie Spiller v. Jeffrey Stieve

```
 1   A.   Okay, sure.
 2   Q.   He's the utilization manager for everybody in the state of
 3        Michigan, right?
 4   A.   He's the utilization manager.
 5   Q.   Every nonstandard treatment for a prisoner in the state of
 6        Michigan flows through his hands, right?
 7   A.   It does.
 8             MS. VAN THOMME:  Object to form and foundation.
 9   Q.   (By Mr. Altman)  Right?
10   A.   In a general course of things, yes.
11   Q.   Any orthopedic surgery to be done on a prisoner in the
12        state of Michigan would flow through his hands, right?
13             MS. VAN THOMME:  Object to form and foundation.
14             THE WITNESS:  Yes.
15   Q.   (By Mr. Altman)  Do you see where it says -- and by the
16        way, looking at this document, this is dated January 26,
17        2015.  Do you see that?  Do you see that up at the top?
18   A.   Yes.
19   Q.   And you see at the bottom it's talking about
20        Eddie Spiller, right?
21   A.   Yes.
22   Q.   Eddie Spiller is the plaintiff in this case, right?
23   A.   Yes.
24   Q.   Do you see in the middle of this thing, this says Reviewer
25        Comments?
```

American Reporting, Inc.
248-559-6750