# *In The Matter Of:*

## David Lashuay v. Aimee DeLine

## Keith Papendick, M.D.

## November 19, 2018



**Page 57**

1 A   And I did not receive that request.
2       MS. VAN THOMME: For the record, you were going
3   through all of the 407s. We didn't get through them all.
4   Did you want to?
5       MS. HEENAN: Oh, yes, please. Thank you. Were
6   there more?
7       MS. VAN THOMME: Before we forget about that.
8       MS. HEENAN: Thanks. I appreciate that.
9 Q   We had the two podiatry, right? The second one was a
10   duplicate?
11 A   What was the date on the second one?
12 Q   The first one was 8/17.
13 A   Okay. Here's another one, 9/17, podiatry consult.
14 Q   And that was the duplicate?
15 A   No. That one was approved.
16 Q   Oh, that's another one. Okay.
17 A   9/28, the same. It was ATP'd for duplicate.
18 Q   Do you have another there?
19 A   Physical therapy.
20 Q   What was the date of that?
21 A   2/4/16. We only have -- at that time we were only doing
22   60 days.
23 Q   On the physical therapy?
24 A   (Nodding).
25 Q   And then it had to come back for renewal?

**Page 58**

1 A   (Nodding).
2 Q   And you're nodding your head yes, correct?
3 A   Yeah. That's correct. It's now six months. So -- and that
4   had nothing to do with the provider. That had totally to do
5   with the billing. It had all to do with how the billing
6   system worked.
7 Q   What had all to do with how the billing system worked?
8 A   The 60 days physical therapy.
9 Q   Oh, I see. And you've used term "medically necessary" a
10   couple of times today. And I believe you indicated that you
11   would even have sent Mr. Lashuay to Hurley for 30 days if
12   that was medically necessary; is that correct?
13 A   If it was medically necessary.
14 Q   And how do you define "medically necessary"?
15 A   Risk to loss of life or limb or deficit in ADLs, activities
16   of daily living.
17 Q   Would medically necessary also include the risk of permanent
18   disability limiting, for example, the ability to earn a
19   living?
20 A   I -- probably not. I guess there could be a situation where
21   that would be the case.
22 Q   Then how do you determine the medical necessity of a
23   procedure if it's outside your area of experience or
24   expertise?
25 A   UpToDate.

**Page 59**

1 Q   That's it?
2 A   Well, there are a few exceptions, but UpToDate.
3 Q   Did you look to anything other than UpToDate with regard to
4   Mr. Lashuay?
5 A   No. I would have had no reason to. We had specialists in
6   the areas that could take care of him.
7 Q   What specialists did you have in the area of burn wound
8   treatment?
9 A   There's burn treatment at Allegiance all the time.
10 Q   You had specialists not at Duane Waters or in Corizon, you
11   mean at --
12 A   Locally.
13 Q   -- Allegiance or McLaren?
14 A   Right, where there is a secure unit.
15 Q   Do McLaren or Allegiance have burn units?
16 A   I believe Allegiance does, but I'm not certain.
17 Q   Do you think it did while Mr. Lashuay was a patient?
18 A   Okay --
19       MS. VAN THOMME: Object to foundation.
20 Q   If you --
21 A   I asked them to find out if there was a surgeon locally who
22   could care for the patient. I never received any
23   information that said no.
24 Q   Did you ever receive any information that said yes?
25 A   I had a consult.

**Page 60**

1 Q   Beyond that?
2 A   What do I need beyond that? That's not my job.
3 Q   It wasn't your job.
4       Okay. Do you have an understanding of what the
5   contracture release procedure involves or consists of?
6 A   Some, but I don't know that it makes a difference in my
7   determination.
8 Q   What is your understanding of that procedure?
9 A   Contracture release is they go in and they release
10   contractures that cause it so that the burn does not inhibit
11   flexion or extension.
12 Q   And do you have an understanding of when that is done in
13   relationship to other treatment, such as skin grafts?
14 A   It tends to be after the skin graft is healed.
15 Q   And were you aware in this case that Dr. Morris had
16   recommended the contracture release surgery after the -- all
17   of the open wounds had healed?
18       MS. VAN THOMME: Object to foundation.
19       MR. O'DOWD: Yeah, and possibly assumes facts not
20   in evidence.
21       MS. VAN THOMME: Join.
22 Q   You can go ahead and answer if you know.
23 A   The reason Dr. Morris was -- or the request that was placed
24   to have him sent to Dr. Morris to have the contracture
25   releases done had nothing to do with that. It had to do

Page 65

1  A   Correct.  Now the reason that was put that way was if they
2      couldn't get him in to see Pfeifer in an expedient amount of
3      time they could get him in to one of the other surgeons
4      that's in that same group.
5  Q   And was Dr. Pfeifer a general surgeon at Allegiance?
6  A   In Allegiance general surgery, yes.
7  Q   He was?  You knew that personally?
8  A   Yes, I knew that.
9  Q   Okay.  Since I made a mistake there let me go back to the
10     6/9/15 407 by NP Hill.  Was that for a procedure or for a
11     consultation?
12 A   It's on the bottom of that pile.
13            MS. VAN THOMME:  Oh.  It's all out of order now.
14 A   6/9/15.  That was for a procedure.
15 Q   That was surgery by Dr. Morris, correct?
16 A   The provider would have been Dr. Morris in Flint for
17     30 days.  And it's amazing, it says right on here "once all
18     the open wounds are healed."
19 Q   Why is that of interest?
20 A   "It has been recommended that once all of the open wounds
21     are healed he could or should have contracture release."  So
22     obviously they weren't all healed at the time.
23 Q   You believe that that record indicates that they were not
24     all healed at the time the 407 was requested?
25 A   It says when -- "once all open wounds are healed."  My

Page 66

1      assumption is they weren't healed.
2  Q   Can I see that?  That's referring to what Hurley had
3      recommended, right?
4  A   That's referring to what Morris had recommended.
5  Q   Who is the doctor from Hurley?
6  A   Correct.
7  Q   And Morris saw him in December of 2014?
8  A   It was one of the ones that I did approve.
9  Q   Which you had approved.  December 29, 2014.  And Dr. Morris
10     hadn't seen him since then to your knowledge, had he?
11 A   Not that I know of.  If he got outside he shouldn't have.
12 Q   So this was based on what was observed by Hurley at the time
13     they saw him, wasn't it?
14 A   Correct.
15 Q   It's not a report of the condition of his wounds at the time
16     the 407 was submitted?
17 A   And that very well may be.
18            MS. VAN THOMME:  Object to foundation.
19 A   Those are assumptions or things that have to be dealt with.
20     I can't tell you if he was healed or not.
21 Q   When those 407s came to you did you look at any other part
22     of Mr. Lashuay's medical record?
23 A   I typically do, but I can't tell you what I looked at or
24     didn't look at.
25 Q   You had access --

Page 67

1  A   It's too long ago.
2  Q   You had access to his entire electronic medical record,
3      correct?
4  A   Correct.  At that time I did, yes.  Now I don't.
5  Q   Did you ever make any attempt or direct Mr. Lashuay's
6      medical providers to attempt to clarify why Hurley Hospital
7      would need Mr. Lashuay to stay for up to 30 days?
8  A   I know why.
9  Q   Why is that?
10 A   Because they were going to do massive surgery on him.
11 Q   And did you have reason to think that his stay would be any
12     different at Allegiance or McLaren?
13 A   Didn't matter.  I have a secure unit at Allegiance and
14     McLaren.
15 Q   Do you have any expertise or training in assessing the risk
16     of prisoners absconding?
17 A   No.  That's not my job.  It has nothing to do with medical.
18 Q   And you don't have any experience or expertise in assessing
19     whether or not inmates are -- the risk that an inmate will
20     harm other individuals, correct?
21 A   No, I don't.  That's not my job.  That's someone else's job.
22 Q   And we talked earlier about medical necessity as a guiding
23     principle in your decision making; is that correct?
24 A   (Nodding).
25 Q   Yes?  That's a yes?

Page 68

1  A   Yes, it is.  I'm sorry.
2  Q   Thank you.
3            And is that the same criteria, as far as you know,
4      that was employed by Mr. Lashuay's other medical providers
5      in submitting 407s?
6            MS. VAN THOMME:  Object to foundation.
7            MR. O'DOWD:  Join.
8  A   I think it's clear that he could have gotten his care
9      locally and used a secure unit for public safety.  Now
10     whether they had thought about that or not I have no way of
11     knowing.  I have what they gave me and that's it.
12 Q   Well, I'm not -- that's not quite my question.  I'm not
13     asking about whether or not the other providers assessed the
14     public safety issue.  I'm asking whether or not the other
15     providers would have based their request on medical
16     necessity just as you based your evaluation on medical
17     necessity?
18 A   I have no clue what they assess.
19 Q   Would you agree that with regard to either contracture
20     release surgery or regrafting that time is of the essence in
21     providing those surgeries?
22 A   We do not have that information available.
23 Q   Wouldn't that be a critical factor in determining whether or
24     not to approve a 407?
25            MR. O'DOWD:  I'm going to object for a lack of