# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF MICHIGAN

Derico Thompson, #234651

    Plaintiff,

v.

Corizon, Inc., et al.

    Defendants.

Case No: 2:20-cv-00158
District Judge: Robert J. Jonker
Magistrate Judge: Maarten Vermaat

---

| | |
|---|---|
| DERICO THOMPSON, #234651<br>Kinross Correctional Facility<br>4533 W. Industrial Park Drive<br>Kincheloe, MI 49788<br>*Pro Se Plaintiff* | CHAPMAN LAW GROUP<br>Devlin K. Scarber (P64532)<br>Attorney for Corizon Health, Inc.<br>and Wendy Jamros, N.P.<br>1441 West Long Lake Rd., Suite 310<br>Troy, MI 48098<br>(248) 644-6326<br>dscarber@chapmanlawgroup.com |

**DEFENDANTS CORIZON HEALTH, INC., AND WENDY JAMROS, N.P.'S**
***REPLY BRIEF*** **REGARDING THEIR MOTION FOR SUMMARY JUDGMENT**

**PROOF OF SERVICE**

    Plaintiff's case constitutes a disagreement with medical judgment and a desire for different treatment (i.e., primarily a court-ordered back surgery). This is even further demonstrated by his Response (**ECF No. 57**) and his expert's declaration (**ECF No. 57-1**). The law is clear that "allegations that more should have been done by way of diagnosis and treatment and suggestions of other options that were not pursued raise at most a claim of medical malpractice, not a cognizable Eighth Amendment claim." *Rhinehart v. Scutt*, 894 F.3d 721, 741 (6th Cir. 2018). Federal Courts typically do not intervene in questions of medical judgment. *Youngberg v. Romeo*, 457 U.S. 307, 321 (1982). "Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Westlake v. Lucas*, 537

F.2d 857, n.5 (6th Cir. 1976).  Indeed, Plaintiff's ultimate position in this case is that he requires and wishes to receive a different course of treatment (i.e., immediate back surgery), and that the medical doctors who treated and reviewed his medical condition were incorrect in their medical judgments to provide conservative treatment and that he did not require surgery, including one (1) of the neurosurgeons that Plaintiff saw for a neurosurgical consult.

According to Plaintiff's Complaint: "Plaintiff's MRI revealed problems with the discs in his spine that a *medical professional with average skill would have* obviously recognized as requiring immediate surgery and immediate professional treatment..." (**ECF No. 1, PageID.4, ¶20**).  In an effort to establish that he was to receive different kinds of back treatment and back surgery, and to establish that the multiple treatments that he did receive for his back were not appropriate, Plaintiff proffers a signed (unsworn) declaration of Dr. Susan Lawrence, M.D.  Dr. Lawrence's medical specialty is medical oncology.  Perhaps what is most astounding is Dr. Lawrence's disagreement with two (2) neurosurgeons, including a treating neurosurgeon who actually performed a neurosurgical consult and determined that, "at this time, I would not recommend surgery for him."  (**ECF No. 56-1, PageID.272**).  Essentially, Plaintiff would have this Honorable Court issue a court order that he requires back surgery because Dr. Lawrence, a currently nonpracticing internal medicine medical oncologist from California says so.  It is equally astounding that Dr. Lawrence has not even personally reviewed Plaintiff's actual MRI films (**ECF No. 57-1, PageID.390, ¶2**), unlike the neurosurgeons in this case, including consulting neurosurgeon Dr. Amritraj Loganathan, M.D., and retained expert neurosurgeon Dr. Peter Grain, M.D. (**ECF No. 56-1, PageID.272** and **ECF No. 56-2, PageID.274, ¶3**).   Dr. Lawrence is not even qualified to review a lumbar spine MRI film, yet she still makes a determination of what Plaintiff's MRI films actually showed and attempts to correct two (2) neurosurgeons who reviewed

the films.  Dr. Grain's curriculum vitae was previously referenced in his affidavit and is listed as being attached to his affidavit. (**ECF No. 56-2, PageID.273, ¶1**).[1]

According to the American Board of Medical Specialties (i.e., the national governing body which issues board certifications), a physician who practices internal medicine medical oncology is defined as follows:

> "An internist (medical oncologist) who specializes in the diagnosis and treatment of all types of cancer and other benign and malignant tumors. This specialist decides on and administers therapy for these malignancies, as well as consults with surgeons and radiotherapists on other treatments for cancer."
> www.abms.org/board/american-board-internal-medicine/#abim-mo

On the other hand, a physician who practices neurological surgery (a/k/a neurosurgery) is defined as follows:

> Neurological Surgery constitutes a medical discipline and surgical specialty that provides care for adult and pediatric patients in the treatment of pain or pathological processes that may modify the function or activity of the central nervous system (e.g., brain, hypophysis, and spinal cord), the peripheral nervous system (e.g., cranial, spinal, and peripheral nerves), the autonomic nervous system, the supporting structures of these systems (e.g., meninges, skull & skull base, and vertebral column), and their vascular supply (e.g., intracranial, extracranial, and spinal vasculature).
>
> Treatment encompasses both non-operative management (e.g., prevention, diagnosis—including image interpretation—and treatments such as, but not limited to, neurocritical intensive care and rehabilitation) and operative management with its associated image use and interpretation (e.g., endovascular surgery, functional and restorative surgery, stereotactic radiosurgery, and spinal fusion—including its instrumentation).
>
> Training required prior to initial board certification: Seven years.
> www.abms.org/board/american-board-of-neurological-surgery.

It should be clear from Plaintiff's medical records that he received an abundance of medical treatment for his back condition.  He was routinely given medications, heat treatment, physical

---

[1] Defendants inadvertently did not attach the curriculum vitae and will now amend **ECF No. 56-2** to include it.

therapy, stretching and exercise technique counseling, and epidural injections.  He was sent for an x-ray, MRI, EMG, and two (2) neurosurgical consults. (**ECF No. 56, PageID.268 (Def's Brief); ECF No. 56-3, PageID.280-287 -** Jamros 12-14-21 Affidavit).     And while Plaintiff did not file this action as a medical malpractice action, his claims regarding the treatment that he believes he was to instead receive certainly invoke a state medical malpractice claim as opposed to a deliberate indifference claim.[2]  Indeed, the definition of malpractice is very similar to the allegation in Plaintiff's Complaint.  The Michigan Supreme Court holds that medical malpractice claims entail "what the average" physician would do. *Woodard v. Custer*, 476 Mich. 545, 578 (2016). Compare Plaintiff's Complaint: "Plaintiff's MRI revealed problems with the discs in his spine that medical professional with average skill would have obviously recognized as requiring immediate surgery and immediate professional treatment..." (**ECF No. 1, PageID.4**).

Here, Plaintiff's expert's declaration by Dr. Lawrence repeatedly states that she is familiar with the **"standard of care"** for Mr. Thompson's condition (**ECR 57-1, PageID.390**) and that her opinion is that Defendants NP Jamros and Corizon **failed "to provide treatment that meets the standard of care for his condition."**  (*Id.* at 402).  Throughout the declaration, Dr. Lawrence repeatedly goes through a litany of treatment provided by NP Jamros that she believes is reasonable and complies with the standard of care and that which she believes does not.  (***Id.* at 392, ¶7; 393, ¶8; 394, ¶11**).  It is the fact that Plaintiff did not receive the surgery he desires that Dr. Lawrence believes violates the standard of care.   Dr. Lawrence's declaration also misstates several facts and is not consistent with the evidence and Plaintiff's medical records, including making several misstatements about what NP Jamros "knew" and the reasons why NP Jamros did certain things.

---

[2] Interestingly, in order to allege a claim for medical malpractice, Plaintiff would also need to file suit against the consulting neurosurgeon, Dr. Amritraj Loganathan, M.D., who determined that "at this time, I would not recommend surgery for him." (**ECF No. 56-1, PageID.272**).

Clearly, Dr. Lawrence has no foundation to testify as to what NP Jamros thought in her mind nor NP Jamros' internal medical reasoning.  In that regard, NP Jamros submits for her Reply an affidavit (**Exhibit H)**, as follows:

> 2.    Recently, I was provided with and reviewed the Declaration of Plaintiff's expert, Susan Lawrence, M.D., an internal medicine medical oncology expert, which was submitted on behalf of Plaintiff in this matter.
>
> 3.    When I was involved in Plaintiff's care and treatment from September 9, 2019 to August 6, 2020, bowel and bladder incontinence was frequently inquired of by the medical staff as part of our assessment.  Merely because this inquiry was only one part of an assessment does not mean that I believed that surgical intervention would be required for Plaintiff.  A patient's self-reports, including regarding incontinence, are assessed in light of the patient's overall presenting symptoms and medical picture.  According to Plaintiff's expert, Mr. Thompson only reported fecal incontinence on two occasions during my involvement in his treatment, both of which occurred in July 2020, over 10 months after his original injury and one month before I was no longer involved in his treatment.  In my medical judgment, his self-report is inconsistent with a serious medical condition related to his back, is inconsistent with cauda equina syndrome, and did not require emergent treatment or emergency surgery.
>
> 4.    Despite the allegations stated in Plaintiff's expert declaration, I have not seen any records indicating that Plaintiff "has continued to experience fecal incontinence 1-2 times per week." (Plt's expert, ¶6). Nor was he experiencing this when I saw him.  Nor have I seen any records demonstrating Plaintiff requesting any pads or medical supplies for this self-report of incontinence.
>
> 5.    Based upon Plaintiff's medical records, he made no complaints at all of fecal incontinence during his first neurosurgical consultation on September 22, 2020, and there were no such findings by the neurosurgeon at that time.  At his second neurosurgical consultation on May 3, 2021, the neurosurgeon documented that the patient "is not describing any consistent incontinence" and the neurosurgeon did not recommend any surgery nor emergent surgery, which is an indication by the neurosurgeon that this alleged incontinence was not a serious medical concern. Therefore, Plaintiff's self-reports did not demonstrate cauda equina nor require him to be sent to an emergency room, nor require emergent surgery, and not even the two neurosurgeons who saw Plaintiff for a neurosurgical consult ever found that his symptoms were consistent with cauda equina, nor did they recommend any emergent surgery.

6. Contrary to Plaintiff expert's declaration, I did not "deduce" that plaintiff had an actual sensory problem or nerve problem in his L5-S1 dermatome. (Plt's expert, ¶10). I was describing symptoms that the patient was reporting. When Plaintiff was seen for his first neurosurgical consult on September 22, 2020, the neurosurgeon documented that "sensory examination demonstrates **no** dermatomal pattern of sensory loss."

7. I do not agree with Plaintiff's expert's statement that "if a patient's symptoms do not respond to physical therapy invasive treatment, is indicated. From the medical records, it is clear NP Jamros knew this." (Plt's expert, ¶9). Nor did I ever subjectively know, nor do I believe in my medical judgment, that invasive surgical treatment is indicated for Mr. Thompson.

8. Contrary to Plaintiff's expert declaration, my statement in the medical records that "if no improvement in six to eight weeks consider MRI (EMG)?" does not indicate that I knew that if physical therapy failed, Plaintiff's spine would need to be relieved surgically. (Plt's expert, ¶11). My reasoning for considering an MRI at that point was not for surgical planning as Plaintiff's expert alleges, but instead was for further evaluation of Plaintiff's symptoms if needed.

9. Merely because I may write in a medical record that I will "consider" taking a particular action does not mean that I will definitively take that particular action nor that I will definitively do it within a certain time. (Plt's expert, ¶12). I use my medical judgment to determine whether I will ultimately take said action and the timing of if or when it will be done.

10. Contrary to Plaintiff's expert's declaration, I have not seen any record of Plaintiff having suffered any side effects such as diabetes, osteoporosis, cataracts, hypertension, or cognitive changes as a result of any medications that I prescribed. (Plt's expert, ¶13).

11. In my medical judgment both an MRI and an EMG were helpful and evaluating Plaintiff's complaints and symptoms. (Plt's expert, ¶14). Also, in my medical judgment an EMG in Plaintiff's case is still a proper approach after his MRI because although an MRI may demonstrate a structural abnormality, it does not demonstrate a particular nerve dysfunction. The September 22, 2020 neurosurgical consult actually found no sensory loss in his neurologic exam of Plaintiff. In my experience, many times a neurosurgeon will utilize both an MRI and EMG and will request an EMG after an MRI has been done. Therefore, I do not agree with Plaintiff's expert that "an EMG was not necessary once a definitive diagnosis has been made via MRI." (Plt's expert, ¶20). In my experience, utilization management may wish for the neurosurgeon to have both an EMG and MRI available for a neurosurgical consult. This was done in this case.

>12. I disagree with Plaintiff expert's opinion that the Plaintiff having a back surgery "would have alleviated his symptoms with minimal post-operative risk." (Plt's expert, ¶12). It was documented and explained to Plaintiff during his first neurosurgical consult that there were no guarantees with a potential surgery and that the surgery could result in neurologic compromise, paraplegia, persistent loss of bladder and bowel function, and pseudoarthrosis, along with surgical complications such as coma and death.

As demonstrated above, this case is nothing more than a disagreement amongst medical professionals regarding the best course of treatment for Plaintiff. Here, Plaintiff has already received a neurological consult from a licensed neurosurgeon from Henry Ford Hospital (a nationally recognized hospital) in Michigan in the area where the surgery would need to be performed in Michigan's lower peninsula. (See **ECF No. 56, PageID.249, ¶21**). Moreover, <u>Defendant has grossly misstated the facts, including misrepresenting that Plaintiff's condition did not improve with conservative treatment</u>. Indeed, his September 1, 2021 record states "patient reports pain for the most part is controlled" (**ECF No. 56-4, PageID.352**), <u>and</u> his October 20, 2021 medical record clearly documents that with conservative treatment, it "helped 'improve day-to-day functioning'" and "right now I'm actually good." (**ECF No. 56-4, PageID.354**).

Plaintiff's response is really non-responsive to most of the issues that were raised in Defendants' motion for summary disposition. It is well-settled that **"[i]f a party fails to properly address another party's assertion of fact as required by Rule 56(c), the court may consider the fact undisputed for purposes of the motion."** *Rugiero v. Nationstar Mortg.*, LLC, 580 F. App'x 376, 378 (6th Cir. 2014). Neither Plaintiff's response nor his expert specifically addresses the MDOC's Covid-19 restrictions for non-emergent medical procedures that were in place in most of 2020 and much of 2021 (as documented in his medical records), including Covid-19's impact on offsite doctor availability, nor any of the other issues impacting Plaintiff's situation, including

7

his own contraction of Covid-19 during the relevant time period.   (**ECF No. 56, PageID.262-263**).

"When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Instead of focusing on the facts and evidence in this case, Plaintiff opts to go off on a tangent in an attempt to attack Corizon's utilization management process and to criticize previous and recent Corizon employees who are not even involved in Plaintiff's case. (**ECF No. 57, PageID.371-378**).  For instance, Plaintiff's ***Exhibits D through O*** (**ECF Nos. 57-4 to 57-15**) (i.e., information concerning Corizon's contract bids, the testimony of Corizon's employees in other cases (none of which has anything to do with Plaintiff's facts, NP Jamros, back surgeries, or delaying treatment), and FOIA emails of a Corizon employee merely stating that a request for an offsite procedure will not be approved where a medical provider has not responded to the information he requested or where there is no medical necessity <u>are all completely irrelevant to Plaintiff's facts</u>. The only reason that Plaintiff has resorted to these tactics is because Plaintiff's own facts and evidence do not support deliberate indifference, nor any unconstitutional policy or custom employed by Corizon which was the "moving force" for him not receiving surgery. Furthermore, see *Cross v. City of Detroit,* No. 06-11825, 2008 U.S. Dist. LEXIS 23779, at *14 (E.D. Mich. Mar. 26, 2008), holding "

> Here, the facts underlying the prior suits and complaints and how they compare to Plaintiff's allegations are unknown. Also, there is no evidence of: how the number of complaints and suits filed compares with similarly sized cities; <u>how many of the claims asserted in the lawsuits were substantiated</u>, and; <u>what action Defendant took in response to substantiated claims in the lawsuits</u> or in the majority of the "sustained" citizen complaints. **In short, without sufficient evidence to put the**

8

**prior lawsuits and complaints into context, there is no basis for the trier of fact to infer a pattern and practice of illegal conduct or that Defendant was on notice of the same.** *Id.* at *15.

See also *Marvin v. City of Taylor,* 2006 U.S. Dist. LEXIS 42747, 2006 W.L. 1779394, *9 (E.D. Mich. 2006) (the number of civil rights complaints filed against the City of Taylor is insufficient to show a policy or custom where there were no comparative statistics of similarly sized cities and there was no information about the underlying facts); *Mettler v. Whitledge,* 165 F.3d 1197, 1205 (8th Cir. 1999). Plaintiff fails to relate how any of these exhibits from other cases have any contextual relationship with Corizon's policies/customs or the facts of the present lawsuit. Nor does Plaintiff's Response demonstrate "a clear and persistent pattern" of Corizon denying back treatment or surgeries to persons in Plaintiff's situation. *Thomas v. City of Chattanooga, 398 F.3d 426, 433 (6th Cir. 2005).* Here, there is nothing about the facts and evidence in this case demonstrating that Corizon had a policy of not basing decisions on medical judgment and instead trying to save cost. In fact, Plaintiff's situation is quite the opposite in that he received all of the offsite services that were requested. The only thing he did not receive was back surgery, for which there is a documented neurosurgical consultation on May 3, 2021 demonstrating that surgery was not recommended at that time.

No individual from Corizon's utilization department is even named in this case as having committed any wrongdoing. Plaintiff misstates the holding of *Winkler v. Madison Cty.*, 893 F.3d 877, 904 (6th Cir. 2018). *Winkler* specifically indicated "we need not decide whether, under our court's precedent, a municipality liability under 1983 is always contingent on a finding that an individual defendant is liable for having committed a constitutional violation." *Id.* at 901. The *Winkler* Court was able to easily conclude that "there were no facts from which a jury could find" that the defendant caused a violation of the inmate's constitutional rights. *Id.* Furthermore,

9

*Winkler's* analysis concerned named defendants who had been exonerated at the trial, not on holding the county liable for claims against individuals who had never even been named in a lawsuit or alleged to have committed wrongdoing in the first place.

This Honorable Court has previously decided a case very similar to Plaintiff's case involving an inmate's disagreement that he should have surgery. See *Calhoun v Corizon Health*, 2021 U.S. Dist. LEXIS 229969, at *17-18 (W.D. Mich., Nov. 1, 2021) (**Exhibit I**), holding:

> Dr. Papendick is not involved with the day-to-day medical care of inmates. Instead, his duties include evaluation of provider requests for offsite medical services that cannot be provided at MDOC facilities. When considering a provider's request, he reviews the associated prisoner medical records that are either identified by the medical provider or are determined to be associated with the outpatient healthcare request based on the information provided by the medical provider. Dr. Papendick then ***recommends*** an appropriate course of treatment, which may involve the treatment requested or an alternative treatment plan (ATP). (emphasis added)
> \* \* \*
> <u>His claim against Dr. Papendick—that he should have approved the request for an orthopedic consult instead of requiring physical therapy—amounts only to disagreement with Dr. Papendick's exercise of medical judgment, not a deliberate indifference claim</u>. (citations omitted).

Based upon the above analysis, *Calhoun* was dismissed at 2021 U.S. Dist. LEXIS 228783 (W.D. Mich., Nov. 30, 2021) (J. Jonker, presiding) (**Exhibit J**): "[A]s Plaintiff's objections make clear, <u>he simply disagrees with the approach Corizon took that required he first attend physical therapy instead of the treatment path that Plaintiff subjectively preferred. This is not an Eighth Amendment violation</u>. The Court agrees that Defendants are entitled to summary judgment for the very reasons articulated by the Magistrate Judge." And while Plaintiff attempts to attack Corizon physicians such as Dr. Papendick and others, there are absolutely no claims against these individuals here. But even if there were such claims, just like the result in *Calhoun*, Plaintiff's arguments should be dismissed. See also *Mitchell v. Hininger*, 2014 U.S. App. LEXIS, 6397, *7-8 (6th Cir. Apr. 4, 2014) (**Exhibit K**), holding:

> <u>Mitchell counters that his complaint is not with the medical care he received but with the administrators who prevented him from receiving more—and more aggressive—treatment, including steroid injections and earlier **back surgery**</u>. But a desire for additional or different treatment does not suffice by itself to support an Eighth Amendment claim. See, e.g., *Estelle*, 429 U.S. at 107; *Rhinehart v. Scutt*, 509 F. App'x 510, 513-14 (6th Cir. 2013); *Graham v. Cnty. of Washtenaw*, 358 F.3d 377, 384 (6th Cir. 2004).
>
> * * *
>
> Mitchell targets the medical staff's failure to provide more or better treatment, not indifference to his condition, what amounts to a plea for us to "second guess medical judgments" as opposed to enforce the cruel-and-unusual-punishments ban in the Eighth Amendment. *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976) (emphasis added).

See also *Wieckhorst v. Squire*, 2011 U.S. Dist. LEXIS 103606, *19-20 (W.D. Mich. Apr. 13, 2011) (**Exhibit L**), holding:

> <u>The Court again notes that Plaintiff's claim is not that he was denied treatment altogether, but that he was denied the specific treatment **(back surgery)** that he desired</u>. As the evidence makes clear, however, <u>Plaintiff's claim is based on nothing more than his personal disagreement with the decision to not reschedule his **back surgery**</u>. *Id.* at 18.

Plaintiff's argument that the sworn affidavits of NP Jamros and Dr. Grain are insufficient <u>should not</u> persuade this Honorable Court from considering these affidavits. The phrase at the end of the affidavits, i.e., "the statements made…are true and accurate to the best of my current knowledge, information, and belief," is merely a routinely used statement in many affidavits to demonstrate that the witness is being truthful in all respects. Here, both witnesses sufficiently outlined throughout each paragraph of their affidavits the basis of their statements and that it was based upon personal knowledge related to their involvement in this case. For instance, throughout her affidavit, NP Jamros demonstrated her knowledge of the actions that she exercised concerning her treatment, the basis of her actions, her personal knowledge of Corizon and the MDOC, and that she further reviewed all records concerning her treatment, along with Plaintiff's Complaint and other medical records. Likewise, throughout Dr. Grain's affidavit, he demonstrates that his

opinions are based upon his review of Plaintiff's medical records, including review of Plaintiff's actual MRI films (See also **ECF No. 56-2, PageID.274 and 276, ¶¶3 and 11** for the materials he reviewed), and is based upon personal knowledge from him being "a board-certified neurosurgeon," "Chief of Surgery at Pontiac General Surgery," medical school professor of neurosurgery, and his "nearly forty years of experience in the area of neurosurgery." (*Id.* at 273, ¶1). This case is not akin to the case cited by Plaintiff, *Ondo v City of Cleveland*, 795 F.3d 597 (6th Cir. 2015), in which the plaintiff's submitted affidavits that contradicted their prior statements in their original Complaint and Amended Complaints, the evidence and photos, and in which the court easily concluded that there was no factual basis for the accounts alleged in plaintiff's affidavits. *Id.* at 604-605.  It was for that reason that the *Ondo* Court concluded that the affidavits should be stricken as not being based upon personal knowledge.  The court did not strike the affidavits merely because of a statement that "they were based on personal knowledge and belief." The court further recited Fed. R. Civ. P. 56(c)(4) that "affidavits defeat summary judgment only if they are "made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." *Id*. at 604.  It was because of the *Ondo* plaintiffs' inconsistencies and contradictions of the clear evidence that the *Ondo* Court ruled that it could not determine a valid basis of personal knowledge, and not because of the stylistic preface. *Id.* at 605.  Here, it is truly Plaintiff's affidavit and his expert's declaration submitted to oppose summary judgment that would be inconsistent with the facts, evidence, and medical records in this case, not Defendants' affidavits.

      WHEREFORE, based upon the foregoing reasons, the Corizon Defendants respectfully request that this Honorable Court GRANT the Corizon Defendants Motion for Summary Judgment and provide any and all further relief that this Court deems just and equitable.

                                        Respectfully submitted,

                                        CHAPMAN LAW GROUP

Dated: January 27, 2022             /s/Devlin K. Scarber
                                        Devlin Scarber (P64532)
                                        Attorney for Corizon, Inc., and
                                        Wendy Jamros, N.P.
                                        1441 West Long Lake Rd., Suite 310
                                        Troy, MI 48098
                                        (248) 644-6326
                                        dscarber@chapmanlawgroup.com

## **PROOF OF SERVICE**

I hereby certify that on January 27, 2022, I presented the foregoing paper to the Clerk of the Court for filing and uploading to the ECF system, which will send notification of such filing to the attorneys of record listed herein and I hereby certify that I have mailed by US Postal Service the document to the involved nonparticipants.

                                        /s/ Devlin Scarber
                                        Devlin Scarber (P64532)
                                        1441 W. Long Lake Rd., Suite 310
                                        Troy, MI 48098
                                        (248) 644-6326
                                        dscarber@chapmanlawgroup.com