**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MICHIGAN**

Derico Thompson, #234651

        Plaintiff,

v.

Corizon, Inc., et al.

        Defendants.

Case No: 2:20-cv-00158
District Judge: Robert J. Jonker
Magistrate Judge: Maarten Vermaat

| | |
|---|---|
| DERICO THOMPSON, #234651<br>Kinross Correctional Facility<br>4533 W. Industrial Park Drive<br>Kincheloe, MI 49788<br>*Pro Se Plaintiff* | CHAPMAN LAW GROUP<br>Devlin K. Scarber (P64532)<br>Attorney for Corizon Health, Inc.<br>and Wendy Jamros, N.P.<br>1441 West Long Lake Rd., Suite 310<br>Troy, MI 48098<br>(248) 644-6326<br>dscarber@chapmanlawgroup.com |

**DEFENDANTS CORIZON HEALTH, INC., AND WENDY JAMROS, N.P.'S**
***REPLY BRIEF*** **REGARDING THEIR MOTION FOR SUMMARY JUDGMENT**


Exhibit H      Supplemental Affidavit of Jamros

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MICHIGAN**

Derico Thompson, #234651

    Plaintiff,

v.

Corizon, Inc., et al.

    Defendants.

Case No: 2:20-cv-00158
District Judge: Robert J. Jonker
Magistrate Judge: Maarten Vermaat

| | |
|---|---|
| DERICO THOMPSON, #234651<br>Kinross Correctional Facility<br>4533 W. Industrial Park Drive<br>Kincheloe, MI 49788<br>*Pro Se Plaintiff* | CHAPMAN LAW GROUP<br>Devlin K. Scarber (P64532)<br>Attorney for Corizon Health, Inc.<br>and Wendy Jamros, N.P.<br>1441 West Long Lake Rd., Suite 310<br>Troy, MI 48098<br>(248) 644-6326<br>dscarber@chapmanlawgroup.com |

**SUPPLEMENTAL AFFIDAVIT OF WENDY JAMROS, N.P.**

STATE OF MICHIGAN    )
                             ) SS
COUNTY OF _____)

I, Wendy Jamros, N.P., being first duly sworn, deposes and states:

1. I submitted a prior affidavit in this matter which was signed and dated December 14, 2021. Said prior affidavit and this affidavit is based upon my personal knowledge, review of the Complaint, and review of the Plaintiff's medical records.

2. Recently, I was provided with and reviewed the Declaration of Plaintiff's expert, Susan Lawrence, M.D., an internal medicine medical oncology expert, which was submitted on behalf of Plaintiff in this matter.

1

3. When I was involved in Plaintiff's care and treatment from September 9, 2019 to August 6, 2020, bowel and bladder incontinence was frequently inquired of by the medical staff as part of our assessment. Merely because this inquiry was only one part of an assessment does not mean that I believed that surgical intervention would be required for Plaintiff. A patient's self-reports, including regarding incontinence, are assessed in light of the patient's overall presenting symptoms and medical picture. According to Plaintiff's expert, Mr. Thompson only reported fecal incontinence on two occasions during my involvement in his treatment, both of which occurred in July 2020, over 10 months after his original injury and one month before I was no longer involved in his treatment. In my medical judgment, his self-report is inconsistent with a serious medical condition related to his back, is inconsistent with cauda equina syndrome, and did not require emergent treatment or emergency surgery.

4. Despite the allegations stated in Plaintiff's expert declaration, I have not seen any records indicating that Plaintiff "has continued to experience fecal incontinence 1-2 times per week." (Plt's expert, ¶6). Nor was he experiencing this when I saw him. Nor have I seen any records demonstrating Plaintiff requesting any pads or medical supplies for this self-report of incontinence.

5. Based upon Plaintiff's medical records, he made no complaints at all of fecal incontinence during his first neurosurgical consultation on September 22, 2020 and there were no such findings by the neurosurgeon at that time. At his second neurosurgical consultation on May 3, 2021, the neurosurgeon documented that the patient "is not describing any consistent incontinence" and the neurosurgeon did not recommend any surgery nor emergent surgery, which is an indication by the neurosurgeon that this alleged incontinence was not a serious medical concern. Therefore, Plaintiff's self-reports did not demonstrate cauda equina nor

require him to be sent to an emergency room, nor require emergent surgery, and not even the two neurosurgeons who saw Plaintiff for a neurosurgical consult ever found that his symptoms were consistent with cauda equina, nor did they recommend any emergent surgery.

6. Contrary to Plaintiff expert's declaration, I did not "deduce" that plaintiff had an actual sensory problem or nerve problem in his L5-S1 dermatome. (Plt's expert, ¶10). I was describing symptoms that the patient was reporting. When Plaintiff was seen for his first neurosurgical consult on September 22, 2020, the neurosurgeon documented that "sensory examination demonstrates **no** dermatomal pattern of sensory loss."

7. I do not agree with Plaintiff's expert's statement that "if a patient's symptoms do not respond to physical therapy invasive treatment, is indicated. From the medical records, it is clear N.P. Jamros knew this." (Plt's expert, ¶9). Nor did I ever subjectively know, nor do I believe in my medical judgment, that invasive surgical treatment is indicated for Mr. Thompson.

8. Contrary to Plaintiff's expert declaration, my statement in the medical records that "if no improvement in six to eight weeks consider MRI (EMG)?" does not indicate that I knew that if physical therapy failed, Plaintiff's spine would need to be relieved surgically. (Plt's expert, ¶11). My reasoning for considering an MRI at that point was not for surgical planning as Plaintiff's expert alleges, but instead was for further evaluation of Plaintiff's symptoms if needed.

9. Merely because I may write in a medical record that I will "consider" taking a particular action does not mean that I will definitively take that particular action nor that I will definitively do it within a certain time. (Plt's expert, ¶12). I use my medical judgment to determine whether I will ultimately take said action and the timing of if or when it will be done.

10. Contrary to Plaintiff's expert's declaration, I have not seen any record of Plaintiff having suffered any side effects such as diabetes, osteoporosis, cataracts, hypertension, or cognitive changes as a result of any medications that I prescribed. (Plt's expert, ¶13).

11. In my medical judgment both an MRI and an EMG were helpful and evaluating Plaintiff's complaints and symptoms. (Plt's expert, ¶14). Also, in my medical judgment an EMG in Plaintiff's case is still a proper approach after his MRI because although an MRI may demonstrate a structural abnormality, it does not demonstrate a particular nerve dysfunction. The September 22, 2020 neurosurgical consult actually found no sensory loss in his neurologic exam of Plaintiff. In my experience, many times a neurosurgeon will utilize both an MRI and EMG and will request an EMG after an MRI has been done. Therefore, I do not agree with Plaintiff's expert that "an EMG was not necessary once a definitive diagnosis has been made via MRI." (Plt's expert, ¶20). In my experience, utilization management may wish for the neurosurgeon to have both an EMG and MRI available for a neurosurgical consult. This was done in this case.

12. I disagree with Plaintiff expert's opinion that the Plaintiff having a back surgery "would have alleviated his symptoms with minimal post-operative risk." (Plt's expert, ¶12). It was documented and explained to Plaintiff during his first neurosurgical consult that there were no guarantees with a potential surgery and that the surgery could result in neurologic compromise, paraplegia, persistent loss of bladder and bowel function, and pseudoarthrosis, along with surgical complications such as coma and death.

13. The statements made in this affidavit are true and accurate to the best of my current personal knowledge and review.

4

Dated: _____, 2022  _____
                                                    Wendy Jamros, N.P.

Subscribed and sworn to before me this
\_\_\_\_ day of _____ 2022.


_____
_____, Notary Public
County of _____
Acting in _____
My Commission Expires: _____