UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

DERICO THOMPSON #234651,                          Case No. 2:20-cv-158

                    Plaintiff,                    Hon. Robert J. Jonker
                                                  Chief U.S. District Judge
        v.

CORIZON, INC., et al.,

                    Defendants.
_____/

## **REPORT AND RECOMMENDATION**

### I.    **Introduction**

This Report and Recommendation (R&R) addresses Defendants' motion for summary judgment.  (ECF No. 56.)

Plaintiff — state prisoner Derico Thompson — filed this civil rights action pursuant to 42 U.S.C. §1983 on August 27, 2020.  In his unverified complaint, Thompson said that he injured himself while exercising at Kinross Correctional Facility (KCF) in Kincheloe, Michigan.  (ECF No. 1, PageID.3.)  He asserted that four employees of Corizon, Inc. ("Corizon") — the entity responsible for providing healthcare services at KCF at the time — and the KCF Warden violated his Eighth and Fourteenth Amendment rights by treating his back conservatively after it became apparent that he needed surgical intervention. (ECF No. 1, PageID.4-6.)  Thompson claimed that Corizon's cost-saving policy of denying medical procedures

such as MRIs unless "absolutely necessary" was the driving force behind the violation of his rights.  (*Id.*)

On September 8, 2020, this Court issued an Opinion (ECF No. 4) and Order (ECF No. 5) dismissing all but Thompson's Eighth Amendment claims against Nurse Practitioner (NP) Wendy Jamros and Corizon.   Defendants now move for summary judgment, arguing that: (1) there are no genuine issues of material fact, (2) NP Jamros was not deliberately indifferent when she provided Thompson with continuous treatment, (3) Corizon cannot be held liable because NP Jamros was not deliberately indifferent, and (4) Thompson has not demonstrated that a policy or custom of Corizon was the driving force behind a violation of his constitutional rights. (ECF No. 56, PageID.258-268.)

The undersigned respectfully recommends that the Court grant Defendants' motion for summary judgment and dismiss the case because there are no genuine issues of material fact and Thompson has not shown: (1) that the treatment NP Jamros provided was so inadequate as to constitute no treatment at all, (2) that NP Jamros acted with deliberate indifference to his medical needs, or (3) that Corizon had a policy or custom of denying adequate medical care to save costs.

## II.    Factual Background

Both parties rely primarily on Thompson's medical records to set forth the pertinent facts of the case.  As such, there is little disagreement between the Parties as to the facts.  Those records, along with any inconsistencies between Thompson and NP Jamros's factual allegations, are summarized as follows.

2

On or around August 27, 2019, Thompson injured his back while exercising at KCF.  (ECF No. 57-3, PageID.412 (Thompson's Affidavit).)  He requested to see KCF Health Services regarding the injury on September 8, 2019, and staff scheduled him for an appointment on September 10.  (ECF No. 56-4, PageID.290 (Thompson's Medical Records).)  During that appointment, Thompson told a nurse that he was barely able to walk, and he was experiencing pain in his back and down his right leg. (*Id.*, PageID.292.)  The nurse provided him with a hot water bottle and Ibuprofen to alleviate his pain.  (*Id.*, PageID.292.)

On September 13, 2019, Thompson informed Health Services that the Ibuprofen was not helping him manage his pain.  (ECF No. 57-3, PageID.412.)  NP Jamros prescribed Flexeril, Medrol, and a higher dose of pain medication to help Thompson's back. (ECF No. 56-4, PageID.294.)  She also ordered that Thompson follow an exercise program and utilize a warm compress.  (*Id.*, PageID.294.) Thompson went to Health Services again on September 17 to report that the medications were not helping his back.  (ECF No. 57-3, PageID.412.)  He was told to continue with the regimen he was given the week before.  (*Id.*)

On September 25, 2019, NP Jamros examined Thompson.  (ECF No. 56-4, PageID.298-299.)  Thompson reported that his back was no longer spasming, but he was still experiencing pain and discomfort.  (*Id.*, PageID.298.)  Thompson did not report experiencing incontinence.  (*Id.*)  NP Jamros diagnosed Thompson with lumbago, prescribed Prednisone, Ketorolac, and Medrol, and told Thompson to continue with exercise and warm compresses.  (*Id.*, PageID.299.)

Jamros also ordered x-rays.  (*Id.*)  The x-rays took place on September 30.  (ECF No. 56-3, PageID.283 (Jamros's Affidavit).)   NP Jamros reviewed the results of Thompson's x-rays with Thompson on October 3, 2019.  (ECF No. 56-4, PageID.302-303.)  Jamros noted degeneration of Thompson's discs at L5-S1.  (*Id.*, PageID.302.) Thompson reported that he was still experiencing pain, but that he had brief improvement with Toradol and Prednisone, and that he had been doing simple stretches.  (*Id.*)  Jamros stopped Thompson's prednisone at this visit, and prescribed Naprosyn.  (*Id.*, PageID.303.)  She then put in a request for a physical therapy consult.  (*Id.*, PageID.305.)  According to Thompson, NP Jamros also told him that he might need an MRI if his pain did not improve with physical therapy, but that "it is customary that Corizon must be absolutely certain that an MRI is necessary before allocating funds for any type of treatment."  (ECF No. 57-3, PageID.412.)  NP Jamros denies making any such statement to Thompson.  (ECF No. 56-3, PageID.288.)

On November 19, 2019, Thompson attended his physical therapy consultation, where he was given a list of stretches to perform back at KCF.  (ECF No. 57-3, PageID.412.)  According to Thompson, the stretches did not help his condition or his pain.  (*Id.*)  Two days after Thompson's physical therapy consult, NP Jamros issued special accommodation orders for Thompson to be given an extra pillow and a bottom bunk. (ECF No. 56-4, PageID.309.)

On February 17, 2020, NP Jamros put in her first request for an EMG.  (*Id.*, PageID.310.)  She noted that Thompson had to sit to use the phone and microwave in order to prevent his back from spasming.  (*Id.*)  Utilization Management denied

the request on February 20 on the basis that the EMG was unlikely to result in a new diagnosis or to alter the course of treatment. (*Id.*, PageID.311.)

NP Jamros put in a request for an MRI the next day, February 21. (*Id.*, PageID.313.)  Utilization Management approved the MRI request on February 26 (*id.*) and Thompson received an MRI of his lower back on March 11, 2020 (*id.*; ECF No. 56-5, PageID.356-357 (MRI Record)).  The next day, NP Jamros requested a neurosurgical consult for Thompson. (*Id.*, PageID.314.)  She noted that Thompson's MRI reflected degenerative discs, stenosis, and disc herniation. (*Id.*)  Jamros's consultation request was denied, but Utilization Management granted her prior request for an EMG. (ECF No. 56-3, PageID.283.)  That EMG was ultimately scheduled for August 3, 2020 due to the Covid-19 pandemic. (ECF No. 56-4, PageID.318.)

On April 20, 2020, Corizon's regional medical director approved Thompson for a trial of Cymbalta to treat his back pain at the request of NP Jamros. (ECF No. 56-4, PageID.316.)  On June 22, 2020, NP Jamros prescribed Nabumetone after Thompson reported that the Cymbalta and Naprosyn were not helping his pain. (*Id.*, PageID.320-321.)

On July 2, 2020, and again on July 6, 2020, Thompson reported that he had experienced bowel incontinence. (ECF No. 57-2, PageID.405-408.)  During his July 6 appointment, a KCF nurse provided Thompson with injections to address his pain. (*Id.*, PageID.408.)  NP Jamros met with Thompson via telephone on July 15, 2020. (*Id.*, PageID.409.)  During this call, Thompson says that Jamros told him to "stop

faking" and that Corizon would not authorize surgery. (*Id.*) NP Jamros denies making these statements. (ECF No. 56-3, PageID.288.) Jamros prescribed Diclofenac Sodium after the appointment. (ECF No. 57-2, PageID.410.)

Thompson underwent the EMG on August 3, 2020. (*Id.*, PageID.283; ECF No. 56-6, PageID.358-359 (EMG Record).) On September 8, 2020, Utilization Management approved Thompson for the neurosurgery consult NP Jamros had previously requested. (ECF No. 56-4, PageID.329.) Thompson attended the consult on September 22, and the neurosurgeon ultimately recommended surgery. (ECF No. 56-7, PageID.360-362 (First Consultation Record).) *By this time, NP Jamros was no longer treating Thompson's back condition.* (ECF No. 56-3, PageID.281 ("After August 6, 2020, I was no longer involved in [Thompson's] lumbar care and treatment.").)

From September 22, 2020 to May of 2021, Thompson says that he was under the impression that he was on a list to receive surgery. (ECF No. 57-3, PageID.413.) Instead, he was scheduled for a second neurosurgical consult at the request of the KCF provider who was now treating his back. (ECF No. 56-4, PageID.337.) The consult was initially scheduled for December 7, 2020 (*id.*) but was rescheduled on one occasion because Thompson contracted Covid-19 (*id.*, PageID.339), on another occasion because the neurosurgeon was unavailable (*id.*, PageID.343), and on several more occasions for non-clinical reasons (*id.*, PageID.344-347). The Michigan Department of Corrections (MDOC), not Corizon, was responsible for scheduling

(ECF No. 56-3, PageID.288), and rescheduling (ECF No. 56-4, PageID.344-347) Thompson's offsite procedures.

On May 3, 2021, Thompson attended his second neurosurgery consult. (ECF No. 56-1, PageID.270-273 (Second Consultation Record).) This time, the neurosurgeon recommended against surgery. (*Id.*) Thompson says that the second surgeon was not as thorough in reviewing his records, and that the surgeon did not physically examine him. (ECF No. 57-3, PageID.413.) Staff proceeded with non-surgical treatments.

On June 7, 2021, Thompson says that he experienced a shooting pain in his leg that caused him to fall. (*Id.*, PageID.414.) A KCF medical provider gave Thompson injections for his back and provided him with a wheelchair accommodation. On June 16, 2021, September 1, 2021, and October 20, 2021, Thompson went to Health Services for back pain and was given prescriptions including Naproxen, Magnesium, Duloxetine, and Acetaminophen, as well as injections to manage his pain.[1] (ECF No. 56-4, PageID.351, 353, 355.) During the June 16 appointment, Thompson indicated that the injections had helped resolve some of his shooting pains. (*Id.*, PageID.350.) During the September 1 and October 20 appointments, Thompson reported that the medications were helping to alleviate his pain. (*Id.*, PageID.352, 354.) But Thompson says that at present he is

---

[1]    Grand Prairie Healthcare Services, P.C. took over the responsibility of providing healthcare services at KCF on September 29, 2021. *See* Notice of Contract No. 210000000685 between the State of Michigan and Grand Prairie Healthcare Services, P.C. (Apr. 14, 2021), http://www.michigan.gov/documents/dtmb/2100000006 85_723331_7.pdf.

experiencing incontinence once or twice per week, and that neither his condition nor his pain has improved.  (ECF No. 56-4, PageID.414.)

### III.    Summary Judgment Standard

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; *Kocak v. Comty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 468 (6th Cir. 2005).  The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### IV.    NP Jamros

Thompson says that NP Jamros acted with deliberate indifference when she continued with conservative treatment after Thompson reported experiencing incontinence.  (ECF No. 57, PageID.385.)  The Eighth Amendment prohibits the infliction of cruel and unusual punishment against those convicted of crimes.  U.S. Const. amend. VIII.  It obligates prison authorities to provide medical care to incarcerated individuals, as a failure to provide such care would be inconsistent with

contemporary standards of decency. *Estelle v. Gamble*, 429 U.S. 102, 103-04 (1976). The Eighth Amendment is violated when a prison official is deliberately indifferent to the serious medical needs of a prisoner. *Id.* at 104-05; *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001). A claim for the deprivation of adequate medical care has an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

### a. Objective Component

To satisfy the objective component, the plaintiff must allege that the medical need at issue is sufficiently serious. *Id.* In other words, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm. *Id.*

The Sixth Circuit distinguishes "between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976). If "a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Id.*; *Rouster v. Saginaw Cty.*, 749 F.3d 437, 448 (6th Cir. 2014); *Perez v. Oakland Cty.*, 466 F.3d 416, 434 (6th Cir. 2006); *Kellerman v. Simpson*, 258 F. App'x 720, 727 (6th Cir. 2007); *McFarland v. Austin*, 196 F. App'x 410 (6th Cir. 2006); *Edmonds v. Horton*, 113 F. App'x 62, 65 (6th Cir. 2004); *Brock v. Crall*, 8 F. App'x 439, 440 (6th Cir. 2001); *Berryman v. Rieger*, 150 F.3d 561, 566 (6th Cir. 1998).

To succeed on a claim of deliberate indifference, a prisoner who has received medical attention "must show that his treatment was 'so woefully inadequate as to amount to no treatment at all.'"  *Mitchell*, 553 F. App'x at 605 (quoting *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011)).  And the prisoner must place medical evidence into the record verifying the detrimental effect of the inadequate treatment. *See Napier v. Madison Cty.*, 238 F.3d 739, 742 (6th Cir. 2001) (establishing that a prisoner must submit verifying medical evidence to support a deliberate indifference claim based on treatment delay); *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890 (6th Cir. 2004) (reiterating that a prisoner must submit verifying medical evidence to support a deliberate indifference claim based on inadequate treatment).

Here, Thompson does not allege the complete denial of medical treatment.  As set forth above, Thompson complains that NP Jamros's conservative treatment approach was inadequate after he began experiencing bowel incontinence.  As such, Thompson was required to place medical evidence on the record verifying that NP Jamros's treatment was so inadequate as to constitute no treatment at all, and that it had a detrimental impact on his health.  In addition to his medical records (ECF Nos. 56-4, 57-2), Thompson provided a declaration from Dr. Susan Lawrence, who is board-certified in Internal Medicine and Medical Oncology (ECF No. 57-1).

In her declaration, Dr. Lawrence opines that when Thompson first began complaining of pain in September of 2019, NP Jamros's decision to proceed with conservative treatment including anti-inflammatory medications and injections was reasonable.  (*Id.*, PageID.392.)  She similarly offers that NP Jamros's decision to

request a physical therapy appointment to develop a home exercise program for Thompson in October of 2019 was reasonable.  (*Id.*, PageID.393.)  However, Dr. Lawrence says that when Thompson's symptoms did not improve, NP Jamros should have taken a more invasive approach.  (*Id.*)  In fact, Dr. Lawrence says that records reflect that NP Jamros knew that more invasive treatment was appropriate as early as November 21, 2019.[2]  (*Id.*)  During the November 21 appointment, NP Jamros noted "radicular symptoms in L5-S1" and that an MRI or EMG may be appropriate further down the line.  (*Id.*)  Dr. Lawrence says that these symptoms are associated with nerve compression in the lower back.  (*Id.*)

According to Dr. Lawrence, Thompson's need for surgical intervention was clear as of January of 2020.  (*Id.*, PageID.395.)  She says the fact that Thompson had been administered steroids on numerous occasions despite risks associated with their long-term use was yet another indication that conservative treatment was not effective.  (*Id.*)  At this point, Dr. Lawrence says, Jamros should have requested an EMG and an MRI.  (*Id.*)  But NP Jamros waited until mid-February to make those requests.

Turning to Thompson's reports of bowel incontinence in July of 2020, Dr. Lawrence implies that the appropriate response was to send Thompson to an

---

[2]    In an affidavit responding to Dr. Lawrence's declaration, NP Jamros rejects Dr. Lawrence's evaluation of her subjective awareness and beliefs.  (ECF No. 61, PageID.716.)  Jamros submits that her medical judgment never led her to believe surgical intervention was necessary.  (*Id.*)

emergency room to determine whether he should undergo emergency surgery. (*Id.*, PageID.398.) NP Jamros did not take that course of action. (*Id.*)

Ultimately, Dr. Lawrence opines that Thompson's condition "poses substantial health risks if not treated." (*Id.*, PageID.399.) These risks include chronic pain, permanent nerve damage, and incontinence. (*Id.*) She further points to the June 7, 2021 incident in which Thompson's legs gave out, and after which Thompson was given a wheelchair detail, as evidence that Thompson's symptoms progressively worsened with conservative treatment.[3] (*Id.*, PageID.401-402.)

Along with their motion for summary judgment, Defendants provided the affidavit of Dr. Peter R. Grain, a board-certified neurosurgeon. (ECF No. 56-2.) According to Dr. Grain, Thompson's MRI films from March of 2020 most likely indicate a back condition that predates the injury Thompson sustained while exercising in August or September of 2019. (*Id.*, PageID.276.) Dr. Grain refers to the condition as "flat back syndrome" which, in his opinion, does not constitute a serious medical condition, does not mandate treatment, and does not post a substantial health risk without treatment.[4] (*Id.*)

With regards to Thompson's initial neurosurgery consult, Dr. Grain explains that the fact that the neurosurgeon recommended surgery does not mean surgery was necessary. (*Id.*, PageID.277.) In fact, Dr. Grain says that the neurosurgeon did not

---

[3]     Dr. Lawrence offered additional opinions in her declarations, but those opinions are not relevant to Thompson's deliberate indifference claim against NP Jamros.

[4]     In her affidavit, Dr. Lawrence asserts that a diagnosis of flatback syndrome is "blatantly contradicted" by Thompson's medical records. (ECF No. 57-1, PageID.391.)

identify any emergent issues necessitating what Dr. Grain regards as the "overly invasive" surgery that was recommended.  (*Id.*)  In Dr. Grain's opinion, conservative treatment was, and continues to be, appropriate to address Thompson's back condition.  (*Id.*, PageID.277-278.)  Dr. Grain's opinion is in line with that of the second neurosurgeon that evaluated Thompson.  (*Id.*, PageID.278.)

Ultimately, Dr. Grain says that Thompson's medical records reflect that his symptoms improved with conservative treatment.  (*Id.*, PageID.279.)  Dr. Grain believes that NP Jamros provided timely and appropriate care, even during a period of time when nonemergent treatments were delayed throughout the state due to the Covid-19 pandemic.  (*Id.*)

The undersigned is sympathetic to Thompson's back condition, and the chronic pain that he experiences as a result.  But neither Thompson's medical records nor the declaration provided by Dr. Lawrence establish that NP Jamros's decision to proceed with conservative treatment after Thompson reported bowel incontinence was so inadequate as to constitute no treatment at all, or that it had a detrimental effect on Thompson's health.  To be sure, there were times when Thompson reported that his pain was worse despite treatment.  But there were also times when Thompson reported that his pain was significantly better.[5]  And Thompson's medical records do

---

[5]     For example, on September 13, 2019, Thompson rates his pain as a ten out of ten.  (ECF No. 56-4, PageID.295.)  On November 4, 2020, Thompson rates his pain as a six out of ten.  (*Id.*, PageID.334.)  On June 7, 2020, Thompson rates his pain as a six or a seven out of ten.  (*Id.*, PageID.348.)  Then on October 20, 2021, Thompson rates his pain as a four or five out of ten.  (*Id.*, PageID.354.)

not show that the degeneration or stenosis in Thompson's back worsened because Thompson was not provided with surgical intervention.

While Dr. Lawrence asserts in her declaration that spinal stenosis can, "if untreated,[6] result[] in substantial health risks of permanent nerve damage, incontinence, and poor quality of life" (ECF No. 57, PageID.390), Thompson's medical records do not reflect permanent nerve damage or incontinence[7] resulting from NP Jamros's medical decisions. And it is the medical records, not Thompson's own statements, that must establish such detrimental effects in light of his claims. But even if Thompson had satisfied the objective component of his claim against NP Jamros, he has not shown that NP Jamros acted with deliberate indifference.

### b. Subjective Component

The subjective component requires an inmate to show that prison officials have "a sufficiently culpable state of mind in denying medical care." *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000) (citing *Farmer*, 511 U.S. at 834). Deliberate indifference

---

[6]      Dr. Lawrence repeatedly emphasizes that "Mr. Thompson's condition absolutely *poses substantial health risks if not treated*." But at this stage Thompson must show that the decisions have had a detrimental impact on his health, not that they could in theory. And, once again, Thompson's records reflect that he received treatment, just not the treatment he thought best.

[7]      Dr. Lawrence says that Thompson's medical records reflect that he experienced bowel incontinence once or twice per week. (ECF No. 57-1, PageID.392.) In response, NP Jamros submits that the records do not reflect consistent incontinence, nor did Thompson experience consistent incontinence during the time she treated him. (ECF No. 61, PageID.715.)  The undersigned agrees that Thompson's medical records reflect that he reported only two episodes of incontinence. It is Thompson's affidavit, not his medical records, that reports bowel incontinence once or twice per week as of January 3, 2022 (ECF No. 57-3, PageID.414), and neither Defendant has been involved in Thompson's treatment since September of 2021.

"entails something more than mere negligence," *Farmer*, 511 U.S. at 835, but can be "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.*; *see also Estelle*, 429 U.S. at 105-06 ([A]n inadvertent failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain or to be repugnant to the conscience of mankind. . . . Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.")

Under *Farmer*, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. Differences in judgment between inmate and prison medical personnel regarding the appropriate medical diagnosis or treatment are not enough to state a deliberate indifference claim. *Sanderfer v. Nichols*, 62 F.3d 151, 154-55 (6th Cir. 1995); *Ward v. Smith*, No. 95-6666, 1996 WL 627724, at *1 (6th Cir. Oct. 29, 1996). This is so even if misdiagnosis results in an inadequate course of treatment and considerable suffering. *Gabehart v. Chapleau*, No. 96-5050, 1997 WL 160322, at *2 (6th Cir. Apr. 4, 1997).

The subjective component was recently summarized in *Rhinehart v. Scutt*, 894 F.3d 721 (6th Cir. 2018). There, the court of appeals stated the following:

> A doctor's errors in medical judgment or other negligent behavior do not suffice to establish deliberate indifference. Instead, the plaintiff must show that each defendant acted with a mental state "equivalent to criminal recklessness." This showing requires proof that each defendant "subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk" by failing to take reasonable measures to abate it.

15

A plaintiff may rely on circumstantial evidence to prove subjective recklessness: A jury is entitled to "conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." And if a risk is well-documented and circumstances suggest that the official has been exposed to information so that he must have known of the risk, the evidence is sufficient for a jury to find that the official had knowledge.

But the plaintiff also must present enough evidence from which a jury could conclude that each defendant "so recklessly ignored the risk that he was deliberately indifferent to it." A doctor is not liable under the Eighth Amendment if he or she provides reasonable treatment, even if the outcome of the treatment is insufficient or even harmful. A doctor, after all, is bound by the Hippocratic Oath, not applicable to the jailor, and the physician's job is to treat illness, not punish the prisoner. Accordingly, when a claimant challenges the adequacy of an inmate's treatment, "this Court is deferential to the judgments of medical professionals." That is not to say that a doctor is immune from a deliberate-indifference claim simply because he provided "some treatment for the inmates' medical needs." But there is a high bar that a plaintiff must clear to prove an Eighth Amendment medical-needs claim: The doctor must have "consciously expos[ed] the patient to an excessive risk of serious harm."

*Id.* 738–39 (6th Cir. 2018) (internal citations omitted).

In Thompson's brief in opposition to summary judgment, he repeatedly emphasizes that the standard is whether NP Jamros "knew of and disregarded a substantial risk of serious harm." (ECF No. 57, PageID.384.) But he does not set forth any evidence meeting this standard. Instead, he points to a single incident in which NP Jamros allegedly chastised him. (*Id.*, PageID.385.) But Thompson's medical records reflect that NP Jamros provided him with continuous treatment from September of 2019 to August of 2020, when another medical provider took over. Furthermore, the records demonstrate that when Thompson complained that a particular medication was not adequately addressing his symptoms, NP Jamros

prescribed new medications — even when it required her to seek approval from another provider.  This case presents a classic example of a disagreement between an inmate and a prison medical provider as to appropriate medical treatment; NP Jamros believed that Thompson's condition called for conservative treatment, and Thompson believes that his condition called for surgical intervention as soon as he experienced bowel incontinence.  Such disagreement is an insufficient basis for a deliberate indifference claim.

## V.    Corizon

In *Monell v. Department of Social Services*, 436 U.S. 658 (1978), the United States Supreme Court held that municipalities could be subject to Section 1983 actions for alleged constitutional violations, albeit in a narrow set of circumstances. "A municipality may not be held liable under § 1983 on a *respondeat superior* theory – in other words, '*solely* because it employs a tortfeasor.'"  *D'Ambrosio v. Marino*, 747 F.3d 378, 388-89 (6th Cir. 2014) (quoting *Monell*, 436 U.S. at 691 (emphasis in original)).  Instead, a municipality may only be liable under § 1983 when its policy or custom causes the injury, regardless of the form of relief sought by the plaintiff.  *Los Angeles Cnty. v. Humphries*, 562 U.S. 29, 35-37 (2010) (citing *Monell*, 436 U.S. at 694 (1974)).

In evaluating a municipal liability claim, a court must first determine whether the municipality had a policy or custom. *Doe v. Claiborne Cnty.*, 103 F.3d 495, 509 (6th Cir. 1996). The policy or custom must be the moving force behind the constitutional injury. *Turner v. City of Taylor*, 412 F.3d 629, 639 (6th Cir. 2005);

*Alkire v. Irving,* 330 F.3d 802, 815 (6th Cir. 2003); *Doe*, 103 F.3d at 508–509.  "To show the existence of a municipal policy or custom leading to the alleged violation, a plaintiff can identify: (1) the municipality's legislative enactments or official policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal violations." *Baynes v. Cleland*, 799 F.3d 600, 621 (6th Cir. 2015) (citing *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir.2005)).

"The principle is well settled that private medical professionals who provide healthcare services to inmates at a county jail qualify as government officials acting under the color of state law for the purposes of § 1983." *Winkler v. Madison Cty.*, 893 F.3d 877, 890 (6th Cir. 2018) (citing *Harrison v. Ash*, 539 F.3d 510, 521 (6th Cir. 2008)).  Similarly, the delivery of health care by a private provider to state prisoners pursuant to a contract with the state constitutes actions under color of state law for purposes of Section 1983.   *West v. Atkins*, 487 U.S. 42, 57 (1988).  As such, Corizon may be held liable under § 1983.  *See*, *e.g.*, *Nobles v. Quality Correctional Care of Michigan, et al.*, No. 1:21-CV-199, 2021 WL 1827077, at *5 (W.D. Mich. May 7, 2021) ("Corizon, like a governmental entity, may be held liable under § 1983 if it actually caused the constitutional deprivation.").

Thompson does little to address his claim against Corizon in his brief opposing summary judgment.  While he claims that Corizon had a policy of denying care to save costs, the bulk of his argument focuses instead on whether this Court may find Corizon liable for the violation of his constitutional rights if it finds that NP Jamros

did not violate his rights. (ECF No. 57, PageID.386-387.)  Thompson relies on the Sixth Circuit's dicta in *Winkler* to support his argument that Corizon's liability need not be predicated on the individual liability of NP Jamros.

In *Winkler*, the Sixth Circuit casted doubt on whether municipal liability is contingent upon a finding of individual liability.  893 F.3d at 899-900 ("Despite the fact that Watkins broadly states that the imposition of municipal liability is contingent on a finding of individual liability under § 1983, other cases from this circuit have indicated that the principle might have a narrower application." (citing *Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001))).  The court pointed to a concurring opinion in another of its cases, wherein the judge suggested that "[a] municipality . . . may be liable even when the individual government actor is exonerated, including where municipal liability is based on actions of individual government actors other than those who are named as parties." *Id.* (citing *Epps v. Lauderdale Cnty.*, 45 F. App'x 332 (6th Cir. 2002) (Cole, J., concurring)).  But dicta is not binding.  *Preterm-Cleveland v. McCloud*, 994 F.3d 512, 531 (6th Cir. 2021).  And even if it was, the Court's ability to hold Corizon liable for the actions of employees other than NP Jamros is immaterial here because Thompson has not established that Corizon had a policy or custom that caused a violation of his right to adequate medical care.

Thompson makes a variety of blanket assertions in support of his claim that Corizon has a policy of denying necessary medical care to keep costs low.  But the thrust of his argument is that the way that Corizon tracks costs associated with

specialty referrals approved by Utilization Management employees incentivizes those employees to approve less referrals. (ECF No. 57, PageID.375.)  And the way that Corizon tracks the percentage of specialty referrals requested and approved by each primary-care provider incentivizes its providers to make less referrals.  (*Id.*, PageID.377-378.)  But Thompson provides no evidence that Corizon employees are so incentivized, and the facts of this case directly undermine the existence of a cost-saving policy of denying specialty referrals.  NP Jamros made numerous referral requests pertaining to Thompson's back.  She requested an EMG, an MRI, a physical therapy consult and a neurosurgery consult.[8]  And while some of these referrals were initially denied by Utilization Management, all of the referrals were ultimately approved.  Thompson received an MRI, an EMG, a physical therapy consult, and two neurosurgery consults all pertaining to the injury at issue in this case.  Thompson has not established the existence of a cost-saving policy of denying medical care.

## VI.    Recommendation

The undersigned respectfully recommends that the Court grant Defendants' motion for summary judgment and dismiss the case because there are no genuine issues of material fact and Thompson has not shown: (1) that the treatment NP Jamros provided was so inadequate as to constitute no treatment at all, (2) that NP

---

[8]     Thompson's assertions that NP Jamros did not submit requests for an EMG or MRI in early of January 2020 "not because she believed waiting was medically appropriate, but because she did not want her referral request to be denied" (ECF No. 57, PageID.379) is conjecture that does not find support in the record.

Jamros acted with deliberate indifference to his medical needs, or (3) that Corizon

had a policy or custom of denying adequate medical care to save costs.

Dated:  May 25, 2022                          /s/ *Maarten Vermaat*
                                                        MAARTEN VERMAAT
                                                        U. S. MAGISTRATE JUDGE

## NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).