# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

**DERICO THOMPSON**,
 Plaintiff,

v.

**CORIZON HEALTH, Inc.,**, et al,
Defendants.

Case No.: 2:20-cv-00158
Hon.: Robert J. Jonker
Mag.: Maarten Vermaat

Ian T. Cross (P83367)
*Margolis & Cross*
Attorneys for Plaintiff
214 S. Main St., Suite 200
Ann Arbor, MI 48104
Phone: (734) 994-9590
Email: ian@lawinannarbor.com

Delvin Scarber (P64532)
Jeffrey L. Bomber (P85407)
*Chapman Law Group*
Attorneys for Defendants Corizon Health, Inc.
and Wendy Jamros, NP
1441 West Long Lake Rd., Suite 310
Troy, MI 48098
Phone: (248) 644-6326
Email: dscarber@chapmanlawgroup.com
Email: jbomber@chapmanlawgroup.com

## PLAINTIFF'S OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION (ECF NO. 62)

# TABLE OF CONTENTS

| SECTION | PAGE NO. |
|---|---|

**Table of Contents**………………………………………....…………    **ii.**

**Table of Authorities** …………………………………………………    **iii.**

**Controlling or Most Appropriate Authorities**…………..………….    **v.**

## <u>Objections</u>

**I)** The Magistrate Judge erred in concluding that the receipt of more than *de minimis* medical treatment precludes a Plaintiff from establishing either the Objective Component or the Subjective Component of a deliberate-indifference-to-medical-needs claim...………………………………………………………    **1**

**II)**  The Report and Recommendation misapplied the "verifying medical evidence" requirement, incorrectly finding that Plaintiff must present medical proof of a tangible residual injury or deterioration in his condition to satisfy the objective component.…………..……………………………………………….…    **10**

**III)** The Report and Recommendation erred in finding that because Plaintiff was allowed surgical consults (although not surgery) after he grieved the denial of treatment and filed this lawsuit, he cannot show a causal relationship between Corizon's cost-reduction strategies and the fact that Corizon did not provide a decompressive laminectomy in the two years after it became clear that conservative treatment was ineffective.…..………..……...…………………………..….…    **19**

**IV)** The Report and Recommendation erred in failing to temporally limit its subjective-prong analysis to the specific alleged wrongful acts and omissions, instead concluding that Defendant Jamros was not deliberately-indifferent because she acted to provide care at other times…………………………………….    **26**

# TABLE OF AUTHORITIES

**CASES**

*All-Tech Telecom, Inc. v. Amway Corp.,* 174 F3d 862 (7th Cir. 1999)………………………..11

*Anthony v. Swanson,* 701 Fed.Appx. 460 (6th Cir. 2017)  …………………………………… 9

*Blackmore v. Kalamazoo Cty*., 390 F.3d 890 (6th Cir. 2004) ………………………………… 2

*Brooks v. Celeste,* 39 F.3d 125 (6th Cir. 1994)……....………………………………………… 2

*Brown v. Bargery,* 207 F.3d 863 (6th Cir. 2000)……....……………….……………………..20

*Clark-Murphy v. Foreback,* 439 F3d 280 (6th Cir. 2006)……..…………….…………….....12, 19

*Comstock v. McCrary,* 273 F.3d 693 (6th Cir. 2001)……………….....…….…………….....2,19

*Darrah v. Krishner,* 865 F.3d 631 (6th Cir. 2017) ………....……....…………………..…*passim*

*Davidson v. Corizon Inc.,* 2015 U.S. Dist. LEXIS 89527 (N.D. Ala. 2015)…………..……....14

*Davis v. Gallagher,* 951 F.3d 743 (6th Cir. 2020) …..…..….…..….…..….…..….…..…......15

*Estate of Carter v. City of Detroit,* 408 F.3d 305, 312 (6th Cir. 2005)……………......…..…....8

*Estate of Majors v. Gerlach,* 821 Fed. Appx. 533 (6th Cir. 2020)……………….....…..3,15,19,20

*Estelle v. Gamble,* 429 U.S. 97 (1976)……………………….…………….……..…………….…..5

*Farmer v. Brennan,* 511 U.S. 825 (1994)……………………….…………..…………...1,5,7,18

*Fields v. Corizon Health, Inc.,* 490 Fed. Appx. 174 (11th Cir. 2012)……...…………..……....15

*Gambrel v. Knox Cty*., 25 F.4th 391 (6th Cir. 2022)……………………..…………………..15

*Helling v. McKinney,* 509 U.S. 25 (1993)……………………….………………………………7

*Hill v. Marshall*, 962 F.2d 1209 (6th Cir. 1992)………….………...………………...7,11,20

*Jackson v. Corizon Health, Inc*., __ F. Supp. 3d. __ (E.D. Mich. March 31, 2022)…..…..……..5

*Johnson v. Karnes*, 398 F.3d 868 (6th Cir. 2005)……………………..…………………….3

*Lemarbe v. Wisneski*, 266 F.3d 429 (6th Cir. 2001)………..…………………………..*passim*

*Lumbard v. Lillywhite*, 815 Fed. Appx. 826 (6 th Cir. 2020)…..………………………………8

*Maley v. Corizon Health, Inc*., 2018 U.S. Dist. LEXIS 27864 (S.D. Ga. 2018) ……..…..….…16

*McCarthy v. Place*, 313 Fed. Appx. 810 (6ᵗʰ Cir. 2008)…………..………………………….5

*Monell v. Department of Social Services,* 436 U.S. 658 (1978)…..………………………14,15

*Murray v. Ohio*, 29 F.4th 779 (6th Cir. 2022) ………..………………………………....2,6

*Napier v. Madison Cty.*, 238 F.3d 739 (2001)...……………….....……………………*passim*

*Parrish v. Johnson*, 800 F.2d 600 (1986)…..………………………………………………...8

*Phillips v. Tangilag*, 14 F.4th 524 (6th Cir. 2021)………………………………………..11

*Quigley v. Tuong Vinh Thai*, 707 F.3d 675 (6th Cir. 2013)…………………………….....10

*Rhodes v. Michigan*, 10 F.4th 665 (6th Cir. 2021)………………………………...….…5,6

*Santiago v. Ringle*, 734 F.3d 585 (6th Cir. 2013) ...……………..……………..……….....12

*Sildack v. Corizon Health, Inc*., 2014 U.S. Dist. LEXIS 121801 (E.D. Mich. 2014) …….....…..6

*Terrance v. Northville Reg'l Psychiatric Hosp*., 286 F.3d 834 (6th Cir. 2002) ...…………....2,6

*Westlake v. Lucas,* 537 F.2d 857 6th Cir. 1976) …………………………..………………..4,8

*Winebarger v. Corizon, LLC*, 2019 U.S. Dist. LEXIS 43588 (W.D. Mo.2019)...…………..…14

iv

<u>CONTROLLING OR MOST APPROPRIATE AUTHORITIES</u>

1. *Darrah v. Krishner*, 865 F.3d 631 (6th Cir. 2017)

2. *Lemarbe v. Wisneski*, 266 F.3d 429 (6th Cir. 2001)

3. *Murray v. Ohio,* 29 F.4th 779 (6th Cir. 2022)

OBJECTION 1: The Magistrate Judge erred in concluding that the receipt of more than *de minimis* medical treatment precludes a Plaintiff from establishing either the Objective Component or the Subjective Component of a deliberate-indifference-to-medical-needs claim.

The Report and Recommendation incorrectly asserts that a prisoner cannot establish either the objective component or the subjective component of *Farmer's* deliberate-indifference test if the prisoner has received more than *de minimis* medical treatment.  In its statement of the legal standard governing the objective component, the R&R asserts that "a prisoner who has received medical attention 'must show that his treatment was 'so woefully inadequate as to amount to no treatment at all,'" (ECF No. 62, PageID.728), then concludes that Plaintiff failed to create a genuine issue of material fact as to the objective component because "neither Thompson's medical records nor the declaration provided by Dr. Lawrence establish that NP Jamros's decision to proceed with conservative treatment after Thompson reported bowel incontinence was so inadequate as to constitute no treatment at all." (ECF No. 62, PageID.731). The Report and Recommendation also argues that the subjective prong similarly cannot be satisfied where more than *de minimis* treatment is provided. It notes that "NP Jamros provided him with continuous treatment from September of 2019 to August of 2020, when another medical provider took over," (ECF No. 62, PageID.734), and concludes:

1

> This case presents a classic example of a disagreement between an inmate and a prison medical provider as to appropriate medical treatment; NP Jamros believed that Thompson's condition called for conservative treatment, and Thompson believes that his condition called for surgical intervention as soon as he experienced bowel incontinence. Such disagreement is an insufficient basis for a deliberate indifference claim.

(ECF No. 62, PageID.735).

Yet this analysis cannot be correct, because numerous published Sixth Circuit decisions deny summary judgment to prison doctors who provide more than cursory medical treatment. In *Lemarbe v. Wisneski*, 266 F.3d 429 (6th Cir. 2001), summary judgment was denied to a prison doctor who, a) diagnosed the plaintiff with chronic gallstone problems, specifically cholecystitis; b) performed a cholecystectomy (gallbladder removal surgery) on the plaintiff; c) "met with LeMarbe for follow-ups to his surgery and noted that LeMarbe was recovering well," *Id.* at 432; d) reviewed the plaintiff's lab tests, and met with the plaintiff again after lab tests showed his recovery was faltering; e) inserted a nasogastric tube into the plaintiff's stomach; f) performed an exploratory laparotomy on the plaintiff, g) drained bile from plaintiff's abdominal cavity, and h) referred the plaintiff to a specialist to address his bile leak. *Lemarbe*, 266 F.3d at 432-33, 439. In *Comstock v. McCrary*, 273 F.3d 693 (6th Cir. 2001), summary judgment was denied to a prison psychologist who, a) met with and evaluated the prisoner for

2

suicidal tendencies, b) placed him on suicide watch as a result of the evaluation, c) evaluated the prisoner again the following day, and d) removed him from suicide watch based on the second evaluation. *Comstock*, 273 F.3d at 698-99, 711. In *Brooks v. Celeste*, 39 F.3d 125, 127 (6th Cir. 1994), dismissal of a deliberate-indifference class action brought by inmates at an Ohio prison was reversed, where evidence showed that the prison's physician, Dr.  Guilermo Martinez, repeatedly committed acts constituting medical malpractice while treating various patients over an extended period of time. In *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 678, 685 (6th Cir. 2013), summary judgment was denied to a prison psychiatrist, where he prescribed both 50mg of amitriptyline and 100mg of trazodone to treat plaintiff's depression, after conducting a comprehensive psychiatric assessment. Recently, in *Murray v. Ohio,* 29 F.4th 779 (6th Cir. 2022), a unanimous panel denied qualified immunity to a prison doctor who provided ongoing treatment with blood thinners for the plaintiff's deep-vein thrombosis, but "moved at a 'lackadaisical pace' in ascertaining Murray's INR level and adjusting his Coumadin dosage." *See also, Terrance v. Northville Reg'l Psychiatric Hosp.,* 286 F.3d 834, 845-46 (6th Cir. 2002) (denying summary judgment to nurse and psychiatrist on Eighth-Amendment claim, where "Dr. Lee continued to prescribe increasing amounts of psychotropic drugs to the decedent, although she knew the drugs

3

caused drug-induced hyperthermia," and "Nurse Owens failed to equip the decedent's ward with proper medical equipment, such as ice, an ice water enema, and a rectal thermometer"); *Johnson v. Karnes*, 398 F.3d 868, 872, 875-76 (6th Cir. 2005) (reversing grant of summary judgment to jail doctor who ordered plaintiff's stitches to remain in place until he could be seen by a plastic surgeon, rather than scheduling wrist surgery within seven days as recommended by outside medical provider); *Estate of Majors v. Gerlach*, 821 Fed. Appx. 533, 545-46 (6th Cir. 2020) (denying summary judgment to prison doctor who treated plaintiff's multiple sclerosis with an MRI and Interferon injections, but inexplicably waited two months before requesting permission for the MRI from Corizon's Utilization Management department).

Particularly instructive on this point is *Darrah v. Krishner*, 865 F.3d 631 (6th Cir. 2017), a case that represents the epitome of 'a disagreement between an inmate and a prison medical provider as to appropriate medical treatment.' The plaintiff in *Darrah* had psoriasis, and he wanted to be treated with a specific drug: Soriatane. *Darrah*, 865 F.3d at 365. Defendant Dr. Weil became the plaintiff's primary-care physician upon the plaintiff's transfer to Dr. Weil's prison on January 18, 2011. *Id.* at 365. Shortly after assuming responsibility for the plaintiff's care, Dr. Weil made numerous attempts to provide the treatment that plaintiff wanted. Dr. Weil

4

requested Soriatane for the plaintiff on four separate occasions: March 2, 2011, March 22, 2011, March 28, 2011, and April 4, 2011. *Id.* at 365-66. But Dr. Weil's requests were denied by defendant Dr. Krishner, an off-site supervisory physician, because Soriatane was not on the prison's drug formulary. *Id.* at 366. Instead, Dr. Krishner recommended an alternative treatment plan: the plaintiff should be treated with Methotrexate, along with high-potency steroids, folic acid, and Dovenex, and the plaintiff's liver enzymes should be monitored. *Id.*

The plaintiff agreed to try the alternative treatment plan. *Id* at 373 n.6. But in June 2011, the plaintiff reported to Dr. Weil that the alternative medications were not alleviating his symptoms. *Id.* at 366. So Dr. Weil prescribed a higher dosage of Methotrexate. *Id.* In July of 2011, in response to the plaintiff's continued complaints of psoriasis on his feet, the plaintiff was sent to a podiatrist. *Id.* In November of 2011, when plaintiff continued to complain of pain from his psoriasis, Dr. Weil prescribed pain medication. *Id.* Finally, in January of 2012, Dr. Weil assisted the plaintiff in obtaining the drug he wanted, Soriatane, at plaintiff's own expense. *Id.* At no point did Dr. Weil ignore the plaintiff or refuse to provide treatment. The panel specifically noted that the record was to the contrary: "[a]fter Darrah began receiving Methotrexate in April of 2011, **the record is replete with**

5

**evidence that Dr. Weil examined him numerous times**[.]" *Id.* at 369 (emphasis added).

In short, the plaintiff in *Darrah* received a plethora of medical treatments for his condition. He was given Methotrexate, Dovenex, high-potency steroids, folic acid, a 20-day lay-in, numerous examinations, monitoring of his liver enzymes, a higher dose of Methotrexate, a consultation with a podiatrist, and pain medication. Eventually, he received Soriatane, the fissures in his feet disappeared, and he suffered no permanent injuries as a result of the delay in receiving the specific treatment he wanted. *Id.* at 366-67. Yet, in a published decision, a unanimous panel of the Sixth Circuit reversed grants of summary judgment to Dr. Krishner, the issuer of the alternative treatment plan, to Dr. Weil, plaintiff's primary care physician, and to Dr. Eddy, another supervisory physician who chose to continue the alternative treatment after the plaintiff complained that it was ineffective. *Id.* at 368-373. The panel even reversed a grant of summary judgment to a health unit administrator, Nurse Stanforth, who had no ability to prescribe medication and whose duties were purely administrative. *Id.* at 370-71.

Why were these individuals liable? How can this outcome be squared with shibboleths such as, "[w]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally

6

reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law""? *Darrah*, 865 F.3d at 372 (quoting and citing *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976)). The way to resolve the apparent contradiction is to examine the function of the subjective component of *Farmer's* deliberate indifference test. The subjective component is, essentially, a heightened *mens rea* requirement that shields prison doctors from Eighth Amendment liability for honest mistakes. *See, e.g. Rhodes v. Michigan,* 10 F.4th 665, 678 (6th Cir. 2021) ("[w]here a prison official's conduct is merely negligent—i.e., where simply an accident has occurred—there is no viable claim"); *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 685 (6th Cir. 2013) ("a government doctor is entitled to qualified immunity if he has merely made a reasonable mistake") (quoting *Lemarbe v. Wisneski*, 266 F.3d 429, 440 (6th Cir. 2001)). Usually, when a doctor breaches the standard of care while providing medical treatment, he does so by mistake. So in most cases, when a prison doctor has acted to provide care, he will be protected from Eighth-Amendment liability for any deficiencies in the care he provided by the subjective component's onerous requirement that the plaintiff prove that the doctor's breach of the standard of care was reckless or intentional.

But not every serious deficiency in the care provided to an inmate is an accident. Sometimes, prison healthcare providers intentionally provide substandard

7

care, because doing so is cheaper or easier. *See, e.g. McCarthy v. Place*, 313 Fed. Appx. 810, 816 (6th Cir. 2008) (prison dentist gives inmate ibuprofen packets for seven months rather than placing a temporary filling in his cavity); *Estelle v. Gamble*, 429 U.S. 97, 104 & n.10 (1976) (surgeon throws away prisoner's severed ear and stitches the stump, rather than attempting to reattach the ear); *Jackson v. Corizon Health, Inc.*, __ F. Supp. 3d. __ 2022 U.S. Dist. LEXIS 61242 (E.D. Mich. March 31, 2022) (Corizon provides monitoring, colostomy bags, patches, and adhesive paste for plaintiff's colostomy, rather than colostomy reversal surgery). Evidence of the intentional provision of "an 'easier and less efficacious treatment'" was the basis for denying summary judgment to Dr. Eddy and Dr. Krishner, the supervisory physicians in *Darrah*. *See* 865 F.3d at 372-73. This type of conduct satisfies the subjective component because it is intentional.

But what about Dr. Weil? He clearly tried to help, requesting Soriatane on four separate occasions, examining the plaintiff "numerous times," increasing plaintiff's Methotrexate dosage, prescribing pain medication, and referring the plaintiff to a podiatrist. What about Nurse Stanforth, who was not even authorized or licensed to prescribe medication? How were they deliberately indifferent? Dr. Weil and Nurse Stanforth were exposed to Eighth Amendment liability because they knew the plaintiff was suffering, they knew what needed to be done to

8

alleviate the plaintiff's suffering, and they failed to provide, or ensure the provision of, the necessary treatment in a timely manner. *See Darrah*,  865 F.3d at 370, 371. In such a circumstance, "we can no more say that only an accident occurred than where an imprisoned person "is in her cell when a fire breaks out" and the "prison guard . . . fails to unlock the cell door."" *Rhodes v. Michigan*, 10 F.4th 665, 678 (6th Cir. 2021).

For the first three months of plaintiff's confinement at his prison, Dr. Weil moved at a "lackadaisical pace" in attempting to provide relief for the plaintiff's condition. *Darrah* at 369. A slow response alone satisfies the subjective component when the circumstances call for prompt action to alleviate suffering or prevent a serious risk of harm. *See Murray v. Ohio*, 29 F.4th 779 (6th Cir. 2022) (holding that "lackadaisical pace" in monitoring plaintiff's INR level and adjusting his Coumadin dosage amounted to deliberate indifference); *Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 844 (6th Cir. 2002) (on-call doctor deliberately-indifferent where he did not arrive at the facility until approximately one hour after his pager was activated). Dr. Weil's acts in the latter half of 2011 constituted deliberate indifference as well, because he continued the plaintiff's Methotrexate treatment regimen after it became clear that Methotrexate was not alleviating the plaintiff's symptoms.  *Darrah* at 369-370. In short, his liability

9

stems from his continued adherence to a treatment plan that he knew was ineffective. *See also, Sildack v. Corizon Health, Inc.,* 2014 U.S. Dist. LEXIS 121801 at \*25-\*28 (E.D. Mich. 2014) (summary judgment denied to Corizon physicians who acquiesced in continuation of conservative treatment plan for prisoner's nerve-root impingement and disc herniations in lumbar spine, despite their awareness of his need for back surgery).

OBJECTION 2: The Report and Recommendation misapplied the "verifying medical evidence" requirement, incorrectly finding that Plaintiff must present medical proof of a tangible residual injury or deterioration in his condition to satisfy the objective component.

The Report and Recommendation argues that Plaintiff cannot satisfy the objective component of an Eighth Amendment claim because he has not proffered medical proof of a tangible residual injury. (ECF No. 62, PageID.732). It cites *Napier v. Madison Cty.*, 238 F.3d 739 (2001) and *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890 (6th Cir. 2004) for this alleged requirement. (ECF No. 62, PageID.728). The Report and Recommendation also asserts, without citation to authority, that:

> Dr. Lawrence repeatedly emphasizes that "Mr. Thompson's condition absolutely *poses substantial health risks if not treated*." But at this stage Thompson must show that the decisions have had a detrimental impact on his health, not that they could in theory.

10

(**ECF No. 62, PageID.732**)

This final assertion is clearly wrong. *See*, *e.g. Helling v. McKinney*, 509 U.S. 25, 37 (1993) ("[t]oday the Court expands the Eighth Amendment in yet another direction, holding that it applies to a prisoner's mere *risk* of injury. Because I find this holding no more acceptable than the Court's holding in *Hudson*, I again dissent.") (Thomas, J. dissenting) (emphasis in original); *Blackmore v. Kalamazoo County*, 390 F.3d 890, 899 (6th Cir. 2004) ("[a]s the Supreme Court has held, the test for deliberate indifference is whether there exists a "*substantial risk* of serious harm," *Farmer,* 511 U.S. at 837 (emphasis added), and does not require actual harm to be suffered"); *Hill v. Marshall*, 962 F.2d 1209, 1214-1215 (6th Cir. 1992) (holding that prisoner's mere increased risk of developing tuberculosis was compensable); *Darrah v. Krishner,* 865 F.3d 361, 370 ("during the time his HPK was being ineffectively treated with Methotrexate, he faced a substantial risk of contracting a contagious disease, and Defendants disregarded this risk. The district court discounted this argument . . . We disagree with the district court's reliance on the fact that Darrah did not develop an infection").

It is equally clear that a tangible residual injury is not a necessary component of an Eighth-Amendment medical-needs claim. This is the holding of *Westlake v. Lucas*, 537 F.2d 857 (6th Cir. 1976), which overturned a dismissal of Edward

11

Westlake's lawsuit due to his failure to allege a "tangible residual injury." *Westlake*, 537 F.2d at 859-860. The principle that a tangible residual injury is not an element of the constitutional tort was reaffirmed in *Parrish v. Johnson,* 800 F.2d 600, 610 (1986), and reaffirmed again in *Boretti v. Wiscomb*, 960 F.2d 1150, 1155 (6th Cir. 1991). The plaintiff in *Darrah v. Krishner*, 865 F.3d 361 (6th Cir. 2017) similarly had a viable claim in spite of uncontroverted evidence that after he received Soriatane, his symptoms disappeared, and he suffered no permanent damage from the delay. *Id*. at 367.

The Report and Recommendation's assertion that Plaintiff must present proof of a permanent injury is based on a misinterpretation of the "verifying medical evidence" requirement applicable to certain Eighth-Amendment medical-needs claims. This is a messy and confusing part of the Sixth Circuit's Eighth-Amendment jurisprudence, largely because courts require verifying medical evidence to prove different components of a claim in different circumstances, and seek to achieve these disparate aims by twisting the definition of the word "obvious." *See Lumbard v. Lillywhite*, 815 Fed. Appx. 826, 832 (6th Cir. 2020) (discussing contradictory 'obvious-to-a-layperson' tests).

Sometimes, in claims involving "minor maladies and non-obvious complaints," *Estate of Carter v. City of Detroit*, 408 F.3d 305, 312 (6th Cir. 2005),

12

verifying medical evidence is necessary to prove that the medical need at issue is objectively serious. The classic example of this application is *Napier v. Madison County*, 238 F.3d 739 (6th Cir. 2001). The plaintiff in *Napier* was detained in the county jail for a total of twenty-nine hours and missed one scheduled dialysis appointment, allegedly due to the deliberate indifference of the defendants. *Napier*, 238 F.3d at 741. But Mr. Napier had frequently skipped dialysis appointments of his own accord both before and after his brief stay in the Madison County Jail, and his own doctor testified that missing these individual dialysis sessions had no effect on his morbidity or mortality. *Napier* at 743. Without any evidence of pain, suffering, or even exposure to any heightened medical risk, Mr. Napier could not establish that his purported need for dialysis during his twenty-nine hours in the Madison County Jail was an objectively serious medical need. *Id*.

Another line of cases require verifying medical evidence for an entirely different purpose, which is also typically subsumed within the objective component: proving that the medical defendant committed the *actus reus* of the constitutional tort. *Anthony v. Swanson*, 701 Fed.Appx. 460 (6th Cir. 2017) is a representative example. The plaintiff in *Anthony* had cancer, and a series of radiation treatments had caused him to develop severe radiation poisoning in his rectum. *Anthony*, 707 Fed.Appx. at 461. There was no dispute that Mr. Anthony

13

endured considerable suffering, that he had an objectively serious medical condition, and that he obviously required treatment. *Id.* at 463-464. What was missing was *evidence that the medical defendants actually violated the standard of care* in their treatment of the plaintiff. The plaintiff did not present "any medical testimony from which this Court may conclude that his symptoms would have been alleviated by" the treatment he desired, "[n]or has any expert testified as to the inadequacy of the treatments he did receive at the hands of Dr. Swanson." *Id.* at 464.  Consequently, his claim could not proceed to trial.  This requirement to proffer medical testimony to prove the *actus reus* applies where two circumstances are present: the defendant(s) have provided substantial medical treatment, and the plaintiff has "a complex diagnosis," such that it is "far too difficult for a fact-finder to determine, without the benefit of expert testimony," whether the treatment provided by the medical defendant(s) was grossly inadequate. *Id*. at 464.

Expert testimony may also be necessary to prove other components of the claim. Sometimes it is required to prove causation, i.e. that the *actus reus* committed by the defendant caused the harm the plaintiff suffered.[1] Notice that this is a different inquiry than the question at issue in *Napier*: whether the plaintiff

---

1   It is important to note that the causation question is relevant only to damages, because in the Eighth Amendment context, mere exposure to a risk is sufficient to establish liability. *See, e.g. Hill v. Marshall*, 962 F.2d 1209, 1214-1215 (6th Cir. 1992); *Brown v. Bargery*, 207 F.3d 863, 867-68 (6th Cir. 2000); *Darrah*, 865 F.3d at 370.

14

suffered any harm (or even exposure to risk of harm) at all. And often, the same expert testimony used to prove causation is also used to prove that the medical defendant possessed the requisite *mens rea,* deliberate indifference, at the time he committed the *actus reus*. A representative case of this genre is *Quigley v. Tuong Vin Thai*, 707 F.3d 675 (6th Cir. 2013). *Quigley* involved a 23-year-old prisoner who died three days after a prison psychiatrist prescribed 100 mg of Trazadone and 50 mg of Amitryptyline to treat his depression. *Quigley*, 707 F.3d at 678. The prisoner had been diagnosed with a seizure disorder, although he had not had any seizures in the ten years preceding his death. *Id.* at 678 & n.1.

The autopsy indicated that Quigley died of a seizure, and defendant's experts agreed with this assessment. But plaintiff's experts averred that it was the drug interaction between Trazadone and Amitryptyline that killed the prisoner. *Id*. They further testified that "a tetracyclic like Trazadone should not be administered in conjunction with a tricyclic like Amitryptyline" because these drugs can exponentially increase each other's potency, leading to coma and death, and that the extreme danger of this drug combination was well-known within the psychiatric profession. *Id.* at 682. This expert testimony was crucial to creating an issue of material fact on the subjective component: "a reasonable juror could infer

15

that Thai knew based on the fact that most professionals would know, even if all did not." *Id.*

The Report and Recommendation is correct in finding that a prisoner who has received medical attention is generally required to support his claim with verifying medical evidence, i.e. expert testimony. But *Blackmore* and *Napier* do not form the basis for this requirement; both are "no-treatment" cases. The provision of substantial medical treatment to the plaintiff triggers a need for expert testimony because juries cannot evaluate the purported wrongfulness of complex medical decisions without it. The appropriate treatment for rectal radiation poisoning, *Anthony*, 701 Fed. Appx. at 464, or the effects of interrupting a course of treatment with Isoniazid ("INH") on a prisoner's future risk of developing tuberculosis, *Hill v. Marshall*, 962 F.2d at 1215, are not obvious to a layperson. *See also, Phillips v. Tangilag,* 14 F.4th 524, 536 (6th Cir. 2021) ("how is a lay jury supposed to know what type of care was objectively proper for a hematoma caused by a plantaris rupture?"). It is for this reason that expert testimony is necessary in 'some-treatment' cases; to prove a breach of the standard of care, to prove causation, i.e., that the breach exposed the plaintiff to an excessive risk of serious harm, and often, to prove that the medical professional knew that her acts or omissions were likely to harm the plaintiff.

16

But the provision of "some treatment" to the prisoner does not trigger a requirement to prove a medical deterioration or tangible residual injury. The Report and Recommendation appears to glean this finding from the following sentence in *Blackmore*:

> *Napier* applies where the plaintiff's "deliberate indifference" claim is based on the prison's failure to treat a condition adequately, or where the prisoner's affliction is seemingly minor or non-obvious. In such circumstances, medical proof is necessary to assess whether the delay caused a serious medical injury. *Napier*, 238 F.3d at 742.
>
> *Blackmore*, 390 F.3d a 898.

To conclude from this passage that proof of a residual injury is mandated whenever some treatment is provided would be to "treat [the] judicial opinion as if it were a statute, every clause of which is Law." *All-Tech Telecom, Inc. v. Amway Corp.*, 174 F.3d 862, 866 (7th Cir. 1999) (Posner, J.). Neither *Napier* nor *Blackmore* concerned a challenge to the adequacy of medical treatment. The defendants in both cases were guards who ignored requests for medical attention, not medical personnel that provided it. The *Blackmore* opinion is merely noting, as an aside, that medical proofs are required in cases involving disputes over the adequacy of treatment, in addition to cases about delays in providing treatment for minor and non-obvious maladies, such as *Napier*, which it is distinguishing. As subsequent cases make clear, a prolonged period of pain and suffering alone can constitute the "medical

17

injury" or "detrimental effect of the delay" in this context. *See Clark-Murphy v. Foreback*, 439 F.3d 280, 293 (6th Cir. 2006); *Santiago v. Ringle*, 734 F.3d 585, 590-91 (6th Cir. 2013).

> The *Santiago* panel explained:
>
> Santiago is correct that pain can be a sufficiently serious medical need, *see Boretti*, 930 F.2d at 1154-55, and on this record a reasonable jury could find that Santiago was still in pain between February 20 and March 17 . . . **For example, if a prisoner's alleged medical need would have been serious absent any treatment, the prisoner could submit medical proof that the provided treatment was not an adequate medical treatment of his condition or pain.** But here, the record contains no such proof. . . . and thus he has not satisfied the objective component of his Eighth Amendment claim.
>
> *Santiago*, 734 F.3d at 590-91 (emphasis added).

Submitting "medical proof that the provided treatment was not an adequate medical treatment of his condition or pain" is exactly what the Plaintiff did in the case at bar. (ECF No. 57-1, PageID.390-402). Thus, the Magistrate erred in relying in *Napier* and *Blackmore* in concluding that no triable issue of material fact exists as to the objective component of Plaintiff's Eighth Amendment claim.

18

OBJECTION 3: The Report and Recommendation erred in finding that because Plaintiff was allowed surgical consults (although not surgery) after he grieved the denial of treatment and filed this lawsuit, he has no evidence of a causal relationship between Corizon's cost-reduction strategies and the fact that Corizon did not provide a decompressive laminectomy in the two years after it became clear that conservative treatment was ineffective.

The sequence of events in this case is as follows: The injury occurred in late August, 2019. (ECF No. 62, PageID.721). Conservative treatment was initially attempted, starting with Ibuprofen, heat and stretching. When this did not lead to improvement after approximately a month, Defendant Jamros prescribed steroids (Prednisone and Medrol). *Id.*  In mid-November, after approximately two and a half months without improvement, the Plaintiff was sent for a course of physical therapy. (ECF No. 62, PageID.721). In mid-February 2020, just shy of six months after the injury, NP Jamros requested an EMG. The request was denied by Corizon Utilization Management. (ECF No. 57-1, PageID.396). The day after the EMG was denied, Jamros requested an MRI. The MRI was approved. *Id*. Almost immediately upon receipt of the MRI results, NP Jamros requested a referral to a neurosurgeon. *Id*. Corizon Utilization Management denied this request. *Id.* at PageID.396-397.

The day after her neurosurgery referral request was denied, NP Jamros requested an EMG a second time. This second request for an EMG was approved, but the EMG did not occur until August, several months later. *Id*. at PageID.397. In

19

the meantime, during the summer of 2020, Plaintiff reported the onset of bowel incontinence. (ECF No. 57-2, PageID.406). He also filed a grievance against Corizon and Jamros concerning the care he was receiving and pursued it through all three steps of the MDOC grievance procedure. On August 27, 2020, after exhausting his administrative remedies, he filed this lawsuit.

Shortly thereafter, on September 8, 2020, Corizon Utilization Management approved a neurosurgery referral for Mr. Thompson. (ECF No. 56-4, PageID.329). The visit occurred on September 22, 2020, and the neurosurgeon recommended surgery. (ECF No. 56-4, PageID.330). But rather than schedule Mr. Thompson for surgery, Corizon sent him for another consult with a different neurosurgeon. (ECF No. 62, PageID.724). The second consult occurred eight months later in May of 2021. (ECF No. 62, PageID.725). Per Mr. Thompson, this second neurosurgeon did not even examine him before opining that Mr. Thompson did not need surgery, and did not recommend any specific treatment for Mr. Thompson's intractable symptoms. (ECF No. 57-3, PageID.413) Approximately two weeks after seeing the second neurosurgeon, Mr. Thompson collapsed in his cell. (ECF No. 56-4, PageID.348). He was given a wheelchair detail, (ECF No. 57-3, PageID.414), but he did not receive any more specialty care between the day his legs gave out and

20

the day that Corizon's contractual relationship with the MDOC ended: September 29, 2021. (ECF No. 62, PageID.725).

The Report and Recommendation argues that this sequence of events defeats any reasonable inference that a causal relationship exists between Corizon's cost-reduction strategies and the fact that Mr. Thompson never received a decompressive laminectomy. (ECF No. 62, PageID.738) ("while some of these referrals were initially denied by Utilization Management, all of the referrals were ultimately approved.")  But other courts to consider the effects of subsequently-provided treatment on a prisoner's *Monell* claim have not drawn the same conclusion. For example, in *Davidson v. Corizon Inc.*, 2015 U.S. Dist. LEXIS 89527 (N.D. Ala. 2015), the prisoner had recurrent ear infections that needed to be addressed via ear surgery. *Id*. at *13. Corizon actually provided not only a consult with an ear specialist, but also the actual ear surgery itself before the Plaintiff filed his lawsuit. *Id.* Yet, the fact that the surgery was actually provided did not defeat an inference that Corizon's cost-reduction policies contributed to the failure to provide ear surgery earlier:

> Mr. Davidson has presented evidence that creates a question of fact whether Corizon, in accordance with its policies, delayed sending Mr. Davidson to an outside specialist to increase profits, which is not a medical justification for delay. Additionally, Mr. Davidson has presented evidence that Corizon pursued a less efficacious method of treatment (repeated use of antibiotics) because it was more cost-

21

> effective than referring Mr. Davidson to an ENT specialist to determine
> the underlying cause of his recurring ear infections.

*Davidson v. Corizon Inc.,* 2015 U.S. Dist. LEXIS 89527 at *21 (N.D. Ala. 2015).

Similarly, in *Winebarger v. Corizon, LLC,* 2019 U.S. Dist. LEXIS 43588 (W.D. Mo. 2019), the prisoner claimed an entitlement to a septal myectomy surgery. An outside specialist had tentatively recommended this procedure on August 30, 2014. *Id.* at *14. Four months later, Corizon actually provided the surgery that the prisoner wanted. *Id.* at *15. But the prisoner still sued, claiming that Corizon should have provided the surgery faster. He alleged that the several-month delay between the recommendation and the surgery "caused him a great deal of pain and exacerbated his fear of dying." *Id.* at *17. Again, the fact that Corizon actually provided the surgery that the plaintiff desired did not preclude *Monell* liability: a jury could still find that Corizon's cost-containment measures contributed to its failure to provide surgery faster. *Id.* at *17. *See also, Jackson v. Corizon Health, Inc.,* __F.Supp. 3d.__, 2022 U.S. Dist. LEXIS 61242 at *21 (E.D. Mich. Mar. 31, 2022) (relying on affidavit of prisoner who was actually provided a colostomy reversal surgery by Corizon as evidence of a Corizon policy of refusing to provide colostomy reversal surgeries to save money); *Fields v. Corizon Health, Inc.,* 490 Fed. Appx. 174, 178, 184 (11th Cir. 2012) (jury could find corporate cost-

22

containment policy caused delay in sending inmate to the ER, where inmate was eventually sent to ER).

Nor, as the Report and Recommendation asserts, has Plaintiff failed to provide any evidence of a cost-saving policy. (ECF No. 62, PageID.738). By early January of 2020, NP Jamros knew that the conservative treatment that had been attempted for four months and was not working. She wrote in the Plaintiff's medical record: "Patient has completed his HEP and has had no improvement. He has to sit to use the phone, microwave, etc. Otherwise his back will spasm." (ECF No. 57-1, PageID.395). Yet, just like PA LaNore did in *Estate of Majors*, 821 Fed. Appx. at 546,  NP Jamros waited over a month to submit a request for an MRI to Corizon Utilization Management. Why did she wait? If a jury were to believe Mr. Thompson's testimony, she said: "it is customary that Corizon must be absolutely certain that an MRI is necessary before allocating funds for any type of treatment." (ECF No. 62, PageID.722).

This is evidence. For purposes of opposing a summary judgment motion, it must be assumed to be true, even if it is merely the "self-serving statement" of a prisoner-plaintiff.[2] *Davis v. Gallagher*, 951 F.3d 743, 750 (6th Cir. 2020) (inmate's

---

2   The Report and Recommendation also asserts that "it is the medical records, not Thompson's own statements," that must establish that he regularly experiences incontinence. (ECF No. 62, PageID.732). This is a misinterpretation of the verifying-medical-evidence requirement. Patients are generally competent to testify to the symptoms they experience. They are not competent to testify to

23

evidence, "consist[ing] wholly of self-serving statements" that corrections' officer planted heroin in his pocket, precludes summary judgment); *See also, Gambrel v. Knox Cty.,* 25 F.4th 391, 404-405 (6th Cir. 2022). And this is not the only evidence in the record that Corizon has a policy of denying care to reduce costs. Plaintiff's Exhibit 9 is an example of Corizon's Utilization Management department denying replacement hearing aides to a hard-of-hearing prisoner to save money. (ECF No. 57-9, PageID.453-54). In Plaintiff's Exhibits 13 and 15, (ECF No. 57-15, PageID.656 and ECF No. 57-13, PageID.490), Corizon brags of saving millions of dollars by cutting spending on antipsychotic medication for mentally-ill inmates in Michigan and Missouri. In Plaintiff's Exhibit 5, at ECF No. 57-5, PageID.440, a Corizon Regional Medical Director testified, "I spend a whole lot of time doing kind of quality assurance studies. We look at different things like the ER runs to see if we think that the ER runs were – to see if there are an unusual number of unnecessary ER runs."

This testimony comports with information in Plaintiff's Exhibit 15, which shows Corizon's ImpactPro data analytics tool. Corizon used ImpactPro to

_____

causation, i.e. that their symptoms resulted from of the medical defendants' challenged conduct. Causation is what must be proved with verifying medical evidence. *See Johnson v. Karnes,* 398 F.3d. 858, 875 (6th Cir. 2005) (experts' testimony that delay in providing surgery could cause loss of function in prisoner's hand, combined with *prisoner's testimony that he had experienced a loss of function*, sufficient to establish objective component).

24

"highlight key opportunities . . . to reduce unnecessary costs." (ECF No. 57-15, PageID.659). ImpactPro contained a dashboard displaying the "Top 10 ED Visits *by Provider*." (ECF No. 57-15, PageID.657-58) (emphasis added). It would not be unreasonable for a jury to infer that Corizon management's policy of reducing the number of ER runs to save money, and of tracking how many ER runs are initiated by each medical provider, affected NP Jamros' decision not to send the Plaintiff to the emergency room in July of 2020. (ECF No. 62, PageID.729-30). *See Maley v. Corizon Health, Inc.*, 2018 U.S. Dist. LEXIS 27864 at *26-*27 (S.D. Ga.  2018) (doctor's testimony that "Corizon fostered a culture of making certain medical decisions based primarily on the financial implications of the decision" and that "there was constant pressure not to send inmates to the emergency room if that option could be avoided" supported Monell liability for failure to send inmate to the ER); *Fields v. Corizon Health, Inc.*, 490 Fed. Appx. 174, 179-80 (11th Cir. 2012) (testimony that supervisors admonished jail nurses "to be sure that the inmate had an emergency because it cost money to send inmates to the hospital" supports *Monell* liability for delay in sending inmate to the ER).

25

<u>OBJECTION 4: The Report and Recommendation erred in failing to temporally limit its subjective-prong analysis to the specific alleged wrongful acts and omissions, instead concluding that Defendant was not deliberately-indifferent because she acted to provide care at other times.</u>

Plaintiff did not allege that NP Jamros exhibited deliberate indifference continuously, throughout all of her interactions with the Plaintiff. In fact, he agrees that many of the actions she took were appropriate. *See* <u>Plaintiff's Ex. 1, Declaration of Dr. Susan Lawrence, MD</u>, ¶¶ 8, 11, 16, 17, 32 (ECF No. 57-1, PageID.393-394, 396, 402). Yet the Report and Recommendation appears to conclude that NP Jamros cannot have been deliberately-indifferent on one occasion, because she tried to help the patient on many other occasions. (ECF No. 62, PageID.734-735). This is not the law. A medical provider's liability in the Eighth Amendment context can be premised on a single act or omission, regardless of whether the professional acted in good faith to try to provide appropriate care to the patient at many other times.

*Lemarbe v. Wisneski*, 266 F.3d 429 (6th Cir. 2001), illustrates this principle. In that case, Dr. Wisneski performed two surgeries on the plaintiff: a gallbladder removal surgery on July 22, 1996, and an exploratory laparotomy nine days later, on July 31, 1996. *Lemarbe,* 266 F.3d at 432-433. The defendant decided to remove the plaintiff's gallbladder to treat plaintiff's cholecystitis, a condition the defendant

26

had previously diagnosed.  *Id.* at 432. Dr. Wisneski performed the gallbladder removal surgery, checked on the plaintiff on the second day and on the third day following the procedure, and determined that he was recovering well. *Id.* But on the fourth day, the plaintiff's condition began deteriorating. By the seventh day, July 29th, lab tests indicated that an internal bile leak may have been the cause of plaintiff's deterioration. *Id*. The plaintiff's expert later testified that bile leaks cause serious injuries. *Id*. at 438.

Why did the plaintiff develop a bile leak between the first and second surgeries? Probably because during the first surgery, Dr. Wisneski accidentally cut the bile duct. *Id.* at 433. In a state-law medical-malpractice case, this fact would be front-and-center: the *res ipsa loquitur* argument that "Dr. Wisneski must have cut the bile duct!" would be the focus of the litigation. But in an Eighth Amendment case, it does not matter. Clearly, if Dr. Wisneski cut the bile duct while removing plaintiff's gallbladder, it was an accident. So his conduct during the first surgery, while extremely harmful, did not violate the Eighth Amendment.

Nor did Dr. Wisneski violate the Eighth Amendment when he unsuccessfully attempted to fix the problem he had created. On July 30th, he inserted a nasogastric tube into the plaintiff's stomach to empty it. Then, "[a]fter unsuccessfully taking other steps to resolve LeMarbe's problems, Dr. Wisneski made a decision to

27

perform exploratory surgery on LeMarbe." *Id.* at 433. During the exploratory surgery, Dr. Wisneski saw that the plaintiff's abdominal cavity was full of bile. He tried to find the source of the bile leak, but was unable to do so. Then he enlisted a colleague, Dr. Eichum, to help find the leak. But Dr. Eichum could not find the leak either. *Id.* at 433. Again, whether a surgeon of average skill would have been able to find and fix the bile leak is immaterial. Mere incompetence is not deliberate indifference. None of this conduct involves "act[ing] or fail[ing] to act despite his knowledge of a substantial risk of serious harm." *Id.* at 436 (quoting *Farmer v. Brennan*, 511 U.S. 825, 842 (1994)).

It is not until the end of the second surgery, when Dr. Wisneski "closed LeMarbe's incision and then failed to take the action his training indicated was necessary to stop the bile leak in a timely manner," *Lemarbe,* 266 F.3d at 436, that he possessed the requisite mental state. At this point, "Dr. Wisneski knew that he had not stopped the bile leak . . . made no immediate plans to seek help to stop the leak after he sewed LeMarbe back up . . . [and] knew that if the leak were not timely closed, the bile would continue to leak and would cause LeMarbe serious harm." *Id.* at 436-37. This is deliberate indifference. It is not excused because Dr. Wisneski continued to provide treatment in the weeks following the exploratory surgery, or by "the fact that Dr. Wisneski eventually referred LeMarbe to a

28

specialist" to address to the bile leak.[3] *Id.* at 439. Dr. Wisneski's actions in treating the plaintiff on other occasions, before and after he committed the constitutional tort, did not immunize him from liability.

The same principle is at work in most cases where the prison doctor provided ongoing treatment. In *Estate of Majors v. Gerlach*, 821 Fed. Appx. 533 (6th Cir. 2020), Physician's Assistant LaNore examined the prisoner, referred him for an MRI to reconfirm his multiple-sclerosis diagnosis, and then treated him with Interferon. *Estate of Majors*, 821 Fed. Appx. at 545. But before he did so, and after he became aware of the need for treatment, LaNore inexplicably waited for over a month to submit a request for an MRI to Corizon's Utilization Management department. *Id*. at 545-546. His initial failure to act exposed him to Eighth Amendment liability, notwithstanding the appropriate treatment he subsequently provided.[4] *Id*. at 546. In *Comstock v. McCrary*, 273 F.3d 693 (6th Cir. 2001), a

_____

3 Note that in both *Estate of Majors* and *Lemarbe*, a determination of _why_ the medical defendant delayed making the referral to a specialist was not a required component of the subjective-prong analysis. Dr. Wisneski may have waited to refer LeMarbe to a specialist in the hope the leak would heal on its own, and no one would discover that he had cut the patient's bile duct. Or he may have just been lazy. But the court does not need to address this question. "[I]t is enough [for the prisoner to show] that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Lemarbe*, 266 F.3d at 436. Once actual knowledge of the risk is shown, the defendant's subjective motivation for disregarding the risk is irrelevant to his individual liability.

4  This is similar to NP Jamros' conduct between January 2, 2020 and February 17, 2020, when she inexplicably waited six weeks to request an MRI and EMG for Mr. Thompson, after she knew that conservative treatment had failed. (ECF

29

suicide case, the prison psychologist evaluated the decedent for suicidal tendencies twice over the course of two days. *Comstock,* 273 F.3d at 698-699. The panel carefully limited its subjective-component analysis to "whether McCrary perceived that Montgomery was suicidal when he commenced his [second] evaluation of Montgomery," *Id.* at 704, and did not consider whether McCrary believed the decedent to be suicidal half an hour later, at the *end of the second evaluation,* when he made the fateful decision to release the decedent from suicide watch. *Id.* This is "because it was McCrary's cursory evaluation of Montgomery prior to his recommendation that Montgomery be released which, according to plaintiff, constituted the deliberate indifference," rather than the judgment call he made at the conclusion of that insufficient evaluation. *Id.* at 704.

*Comstock* teaches that the inquiry into the defendant's subjective mental state should focus on what the defendant knew and thought at the specific moment in time that she is alleged to have committed a wrongful act or omission. The Report and Recommendation instead takes a birds-eye view, considering the entire course of treatment provided by NP Jamros over almost a year, and merely determines whether she generally acted to provide care over that time period. (ECF No. 62, PageID.735). The medical providers in *Darrah, Lemarbe, Murray, Brooks,*

––––––––––––––––––
No. 57-1, PageID.395).

30

*Comstock,* and *Estate of Majors* would all have been granted summary judgment under the test employed in the Report and Recommendation.


*/s/Ian T. Cross*
Ian T. Cross (P83367)
Attorney for Plaintiff
402 W. Liberty St.
Ann Arbor MI 48103
(734) 994-9590
ian@lawa2.com

## Local Rule  7.2(b)(ii) Certificate of Compliance

Per L. Civ. R. 72.3(b) and L. Civ. R. 7.2(b)(i), I certify that the above objections were produced on a computer, and contain 7,135 words, not including the case caption, table of contents, tables of authorities, and signature blocks. The word-processing software used for the word count and to create this document is LibreOffice, version 7.0.3.1.

*/s/Ian T. Cross*
Ian T. Cross (P83367)
Attorney for Plaintiff
402 W. Liberty St.
Ann Arbor MI 48103
(734) 994-9590
ian@lawa2.com

31