# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF MICHIGAN

Derico Thompson, #234651

    Plaintiff,

v.

Corizon, Inc., et al.

    Defendants.

Case No: 2:20-cv-00158
District Judge: Robert J. Jonker
Magistrate Judge: Maarten Vermaat

| MARGOLIS LAW, P.C. | CHAPMAN LAW GROUP |
|---|---|
| Ian T. Cross (P83367) | Devlin K. Scarber (P64532) |
| *Attorney for Plaintiff* | Jeffrey L. Bomber (P85407) |
| 214 S. Main St. | *Attorneys for Corizon Health, Inc.* |
| Suite 200 | *and Wendy Jamros, N.P.* |
| Ann Arbor, MI 48104 | 1441 West Long Lake Rd., Suite 310 |
| (734) 994-9590 | Troy, MI 48098 |
| ian@lawinannarbor.com | (248) 644-6326 |
| | dscarber@chapmanlawgroup.com |
| | jbomber@chapmanlawgroup.com |

**DEFENDANTS CORIZON HEALTH, INC. AND WENDY JAMROS, N.P.'S RESPONSE TO PLAINTIFF'S OBJECTIONS (ECF NO. 63) TO THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION (ECF NO. 62)**

    NOW COMES Defendants CORIZON HEALTH, INC. and WENDY JAMROS, N.P., by and through their counsel, CHAPMAN LAW GROUP, and for their Response to Plaintiff's Objections to the Magistrate's Report and Recommendation state as follows:

**Response to Plaintiff's Objection #1:**

    Plaintiff's first objection to the Report and Recommendation avers that the Magistrate Judge "erred in concluding that the receipt of more than *de minimis* medical treatment precludes a Plaintiff from establishing either the Objective Component or Subject Component of a deliberate-indifference-to-medical-needs claim." **ECF No. 63, PageID.745**. In arguing this objection, Plaintiff relies on some self-identified concept of "*de minimis*" treatment to support his argument,

when the Magistrate Judge's recommendation does not discuss nor allude to any idea of *de minimis* treatment. Rather, the Magistrate Judge properly recommended that summary judgment was proper because there is <u>no evidence</u> to support that the treatment that was provided to Plaintiff "<u>was so inadequate as to constitute no treatment at all</u>, or that it had a detrimental effect on Thompson's health." **ECF No. 62, PageID.731**. This was a proper conclusion of law, as supported by the Sixth Circuit's recent holding in *Phillips v. Tangilag*.

The Magistrate Judge correctly identified that the instant case falls under the second category of deliberate indifference claims where "doctors provide some care and prisoners challenge their treatment choices as inadequate." **ECF No. 62, PageID.728**; *Phillips v. Tangilag*, 14 F.4th 524, 534-35 (U.S. 6th Cir. 2021). The Magistrate Judge also correctly notes that in cases such as this one, the plaintiff "must show that his treatment was 'so woefully inadequate as to amount to no treatment at all." **ECF No. 62, PageID.728**. This language mirrors that which is found in the Sixth Circuit's recent holding in *Phillips v. Tangilag*. See *Phillips v. Tangilag*, 14 F.4th 524, 535 (U.S. 6th Cir. 2021) ("Only grossly or woefully inadequate care – not just care that falls below a professional standard – can be called 'cruel and unusual.'"). To prove this type of claim, the plaintiff must "place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment." *Santiago*, 734 F.3d at 590 (quoting *Napier*, 238 F.3d at 742.

In fact, the caselaw Plaintiff relies upon for support can easily be reconciled with the caselaw relied upon in the Magistrate's recommendation. Plaintiff first turns to *LeMarbe v. Wisneski*. Plaintiff failed to identify the key facts that the Sixth Circuit relied upon in holding that a jury could find that the defendant in *LeMarbe* was deliberately indifferent. See **ECF No. 63, PageID.746**. The key facts identified by the Sixth Circuit were:

2

> "(1) that Dr. Wisneski encountered <u>five liters of fluid in LeMarbe's stomach…</u> and he knew that the fluid was bile; (2) that Dr. Wisneski knew that the bile came from a leak; (3) that Dr. Wisneski knew that he had not stopped the bile leak when he closed LeMarbe's surgical incision from the exploratory surgery…; (4) <u>that Dr. Wisneski made no immediate plans</u> to seek help to stop the bile leak after he sewed LeMarbe back up; and (5) that <u>Dr. Wisneski knew</u> that if the leak were not timely closed, <u>the bile would continue to leak and would cause LeMarbe serious harm</u>."

*Lemarbe v. Wisneski*, 266 F.3d 429, 436-37 (6th Cir. 2001) (emphasis added).

Plaintiff's analysis of *LeMarbe* obfuscates the fact that the defendant in *LeMarbe* failed to do anything to timely address the <u>five-liter bile leak</u> found in the plaintiff's stomach and instead, Plaintiff surreptitiously states that the defendant "referred the plaintiff to a specialist to address his bile leak." However, the referral did not immediately take place after the exploratory surgery which revealed the bile leak for which no cause was identified. No subsequent action was taken despite the identified and untreated bile leak. Only after the plaintiff had presented with a severely distended abdomen, which turned out to be a leak of <u>fourteen more liters of bile</u> in the peritoneal cavity in his abdomen, did the plaintiff get referred to a gastroenterologist. *Lemarbe v. Wisneski*, 266 F.3d 429, 433-34 (6th Cir. 2001). Despite the "more than *de minimis*" treatment provided leading up to the exploratory surgery that revealed a bile leak, the defendant in *LeMarbe* failed to provide any treatment whatsoever <u>after</u> a bile leak was clearly identified until <u>fourteen more liters of bile had leaked into the plaintiff's stomach</u>. It is easy to see how an exploratory surgery that found a clear medical issue coupled with no subsequent plans to address the cause of the medical issue amounts to treatment "so woefully inadequate as to amount to no treatment at all," despite the "more than *de minimis* treatment" provided leading up to the exploratory surgery.

Similarly, *Darrah v. Krisher* is easily reconciled with the Magistrate Judge's recommendation while also being easily distinguishable from the instant case. In *Darrah*, there was significant evidence that the Defendant physicians knew and understood that the chosen

3

treatment for the plaintiff's HPK was ineffective, "and that Soriatane had been the only effective treatment for [Plaintiff's] HPK out of a number of medications that [Plaintiff] had tried." *Darrah v. Krisher*, 865 F.3d 361, 373 (6th Cir. 2017). The defendants in *Darrah* maintained the course of <u>ineffective treatment</u>, and there was significant evidence to indicate that the defendants had <u>knowledge that the treatment was ineffective</u>. *Darrah*, at 369-70 ("Similarly, Darrah has sufficiently shown that Dr. Weil's actions during the ten-month period that his HPK was being <u>ineffectively</u> treated with Methotrexate could constitute deliberate indifference."); *Id*., at 373 ("Defendants were aware of the severe nature of [plaintiff's] HPK, that he had been taking Soriatane prior to his transfer, and that Soritane had been the only <u>effective</u> treatment for his HPK out of a number of other medicines that he had tried."); *Id*., at 373 (Defendant Dr. Eddy maintained the ineffective treatment for three (3) months despite plaintiff's continued complaints of pain, reviewed pictures of the plaintiff's fissured feet, and continued the ineffective treatment plan despite there being no signs of improvement). In other words, the Sixth Circuit found that a reasonable jury could find that a defendant doctor was deliberately indifferent when the defendant has knowledge of a treatment with bona fide efficacy [1] for a particular patient yet opts for a different

---

[1] It should be noted that in the herein case, the medical doctors, including the consulting and treating neurosurgeon Dr. Amritraj Loganathan, M.D., and Defendant's neurosurgery expert, Dr. Peter Grain, M.D., both disagreed that a spinal fusion surgery was a proper or bona fide effective treatment for Plaintiff. (See **ECF No. 56-1**, 5/3/21 Neurosurgical Consult; **ECF No. 56-2**, Affidavit of Dr. Grain, ¶16). Dr. Grain opined that "Mr. Thompson is only 47 years old, and such a procedure would likely be difficult and debilitating requiring sometimes years for recovery. His condition can be best treated with conservative treatment in the form that he is already receiving, and which had been previously implemented by NP Jamros. It would not be best treated with an instrumented fusion. There would be no guarantee of success!" (*Id.*) Also, although NP Jamros did not participate in any decisions as to whether Plaintiff ultimately underwent a spinal fusion surgery, she stated that, in her opinion and experience, spinal fusion was not a proper or bona fide treatment for Plaintiff. (**ECF No. 56-3**, ¶¶25, 32). Therefore, this case is certainly distinguished from a case such as *Darrah* where there was little dispute that the treatment being provided was ineffective and where all agree that a different treatment (e.g., a spinal fusion) would be an effective treatment.

4

treatment that was <u>clearly ineffective</u> given thirteen (13) months of healthcare complaints and <u>no medical evidence</u> to show that the chosen treatment did anything to resolve the plaintiff's medical issue.

Returning to the instant matter, the Magistrate Judge did not recommend that "more than *de minimis* care" is dispositive of the objective and subjective components of deliberate indifference. The Magistrate properly recommended in accordance with Sixth Circuit caselaw that there is <u>no evidence</u> to show that the conservative treatment provided "<u>was so inadequate as to constitute no treatment at all</u>, or that it had a detrimental effect on Thompson's health." Unlike *LeMarbe* where the defendant failed to treat plaintiff for a known bile leak until fourteen <u>more</u> liters of bile had leaked into the Plaintiff's abdomen, the Magistrate Judge found that "there were also times when Thompson reported that his pain was significantly better [following the decision to provide non-surgical intervention]. And Thompson's medical records do not show that the degeneration or stenosis in Thompson's back worsened because Thompson was not provided with surgical intervention." **ECF No. 62, PageID.731-32**. Unlike *Darrah* where the plaintiff was maintained on a medication that the defendants knew was doing nothing to treat the plaintiff's medical issue while being fully aware of a medication that would, Plaintiff in the instant matter had periods of improvement coupled with no evidence to show that the Plaintiff's stenosis or degeneration had worsened without Plaintiff's desired treatment. (*Id.*). Plaintiff's argument pertaining to his First Objection is without merit.

**Response to Plaintiff's Objection #2:**

Plaintiff misrepresents the Magistrate Judge's recommendation in arguing his second objection. The Magistrate Judge did not state that "Plaintiff cannot satisfy the objective component of an Eighth Amendment claim because he has not proffered medical proof of a <u>tangible residual

5

injury" as Plaintiff argues. **ECF No. 63, PageID.754**. Rather, the Magistrate Judge held, in accordance with well-established caselaw, that Plaintiff must establish "detrimental effects [to his health] in light of his claims." **ECF No. 62, PageID.732**; see *Owusu v. Mich. Dep't of Corr. Pain Mgmt. Comm.*, No. 20-1217, 2022 U.S. App. LEXIS 2825, at *20 (6th Cir. Jan. 31, 2022) ("Pain can constitute a serious medical need, but a prisoner suffering pain must show that a delay in receiving treatment had a detrimental effect or that the medical provider knew that a detrimental effect was likely to occur.") (emphasis added); *Phillips v. Tangilag*, 14 F.4th 524, 538 (U.S. 6th Cir. 2021) ("Phillips needed to place 'verifying medical evidence in the record to establish the detrimental effect of the delay in treatment.'") *Dodson v. Wilkinson*, 304 F. App'x 434, 440 (6th Cir. 2008) ("Dodson has failed to proffer verifying medical evidence of a 'detrimental effect' caused by a delay in treatment that exposes Dodson to an unreasonable risk of serious harm in the future."). The Magistrate Judge was correct in his conclusion of law by recommending that Plaintiff be required to establish detrimental effect and was further correct in finding that Plaintiff failed to establish such effect.

**Response to Plaintiff's Objection #3:**

. Plaintiff relies on a misrepresented sequence of events to support an argument that Defendant Corizon Health, Inc. has some unidentified cost-saving policy that affected Plaintiff's course of treatment. **ECF No. 63, PageID.763-765**, *cf* **ECF No. 62, PageID.721-726**. The thrust of the argument appears to center around an alleged one-month delay from January 2020 to February 2020 in providing Plaintiff an MRI. **ECF No. 63, PageID.767**. Plaintiff then points to befuddlingly tenuous "evidence" as support of this cost-saving policy.

Plaintiff's misrepresented sequence of events do not even support his theory that Corizon had some nefarious cost-saving policy that impacted Plaintiff's care. There is absolutely no

evidence to support that Plaintiff's EMG and/or MRI referral was delayed until February of 2020 due to some cost-saving policy of Corizon's as Plaintiff argues. The theory makes even less sense given the fact that the requested EMG was initially designated for alternative treatment <u>for medical purposes</u>, as the "EMG would be unlikely to reveal new diagnosis or alter management," (**ECF No. 56-4, PageID.311**), and an MRI request was made only four (4) days later was approved. (**ECF No. 56-4, PageID.313**). Furthermore, Plaintiff's theory is further frustrated given the fact that Plaintiff alleged that the conversation with NP Jamros in which she allegedly stated, "it is customary that Corizon must be absolutely certain that an MRI is necessary <u>before</u> allocating funds for any type of treatment" took place on October 3, 2019. (**ECF No. 57-3, PageID.412, ¶ 6**). Ironically, NP Jamros placed a request for a physical therapy consultation <u>for treatment</u> of Plaintiff's lumbar spine the very same day that this alleged conversation occurred, <u>which was subsequently approved on October 9, 2019</u>. (**ECF No. 56-4, PageID.305-06**). Plaintiff's theory of liability as to Corizon simply has no factual or legal basis.

The "evidence" Plaintiff cites to in his objection similarly does not support his theory of liability as to Corizon. Plaintiff first refers to a June 20, 2012, 407-request for a patient named Emanuel Coates for an audiogram, which Plaintiff states (without even a shred of support) was denied "to save money." **ECF No. 63, PageID.768; ECF No. 57-9, PageID.453-54**. This is a blatant inaccurate statement, as the request specifically outlines that it was denied because there was medical evidence to show that the hearing aid was not medically necessary. Importantly, the patient referred to in the 407-request, Emanuel Coates, had brought a similar claim to Plaintiff in the instant matter wherein he attempted to rely on hearsay evidence from a nurse who told him that "Corizon had a policy of denying medical needs if they were not life threatening in order to contain cost." *Coates v. Jurado*, No. 12-15529, 2015 U.S. Dist. LEXIS 132313, at *11 (E.D. Mich.

7

Sep. 30, 2015) The District Court for the Eastern District of Michigan granted summary judgment to the Defendants in that matter. *Id.* at *11-*15.

Next, Plaintiff refers to Exhibits 13 and 15 from his Response to the Motion for Summary Judgment (**ECF No. 57-13; ECF No. 57-15**), stating that "Corizon brags of saving millions of dollars by cutting spending on antipsychotic medication for mentally-ill inmates in Michigan and Missouri." **ECF No. 63, PageID.768**. In reality, Exhibit 13 discusses that Corizon's Chief Psychiatry Officer at the time had worked with Corizon's psychiatry leaders at the MDOC to "monitor prescribing behavior and provide individual consultation and group supervision that occurs regularly and as needed to shape prescribing behaviors to what best matches patient needs… Prescribing behavior is compared to standardized quality indicators that are based on American Psychiatric Association guidelines and the American Academy of Psychiatry and the Law Document for Prescribing in Corrections." **ECF No. 57-13, PageID.490**. Corizon does not "brag" about cutting spending on psychotropic medications, but the exhibit merely discusses a program designed to better shape prescribing behavior in comparison to well-founded guidelines, which correlated in less overall spending on psychotropic medications. This does not support Plaintiff's theory of liability that Corizon's unidentified "cost-saving policy" resulted in Plaintiff being denied treatment (despite the fact that in the same visit where NP Jamros allegedly mentioned this "cost-saving policy," Plaintiff was referred and approved for physical therapy to treat his back).

Plaintiff then blatantly misrepresents the purpose of ImpactPro, as identified in Plaintiff's Exhibit 15, in an attempt to further mislead the Court. The relevant portion of the exhibit states:

> "At MDOC, Corizon Health proposes our continued use of Optum's Impact Pro, a clinical informatics solution that uses multidimensional, episode-based predictive modeling for population health management teams to target health care services to those individuals who will benefit most.

8

> Approved and appreciated by MDOC, Impact Pro identifies and stratifies patients by healthcare risk, complexity, and treatment need, which enables our healthcare providers to identify-high risk patients <u>before disease conditions become complex</u>. At MDOC, Impact Pro enhances cost savings <u>by identifying those patients who would derive the most from targeted and specialized interventions before their health conditions become catastrophic</u>."

**ECF No. 57-15, PageID.659**. Use of a system designed to identify high-risk patients in advance of serious health problems becoming catastrophic <u>is not unconstitutional</u>. Furthermore, Plaintiff failed to show what effect, if any, Corizon's use of Impact Pro had on his course of treatment, or how Corizon making efforts to review psychiatrists prescribing habits in comparison to the APA relates to the treatment of his back. In herein case, the records demonstrate that all of the treatment that was requested and appropriate for Plaintiff was actually provided to Plaintiff (i.e., he received physical therapy, low bunk detail, extra pillows, medications, pain inhibitor (epidural) injections, x-rays, and offsite testing and procedures in the form of MRIs, EMGs, and neurosurgical consults). (**ECF No. 56**, PageID.234, 268). Plaintiff essentially leans on a flurry of irrelevant and blatantly misrepresented "evidence" and caselaw in a wayward attempt to avoid summary judgment. Plaintiff's third objection is without merit.

### Response to Plaintiff's Objection #4:

Plaintiff's fourth objection is a long-winded discussion centered around the false premise that the Magistrate Judge concluded "that NP Jamros cannot have been deliberately-indifferent on one occasion, because she tried to help on many other occasions." **ECF No. 63, PageID.770**. This misrepresents the Magistrate Judge's conclusion. Instead, the Magistrate Judge found that Plaintiff "does not set forth any evidence" that NP Jamros "knew of and disregarded a substantial risk of serious harm," and instead merely "points to a single incident when which NP Jamros allegedly chastised him." **ECF No. 62, PageID.734**. The Magistrate Judge came to this conclusion by

9

looking to Plaintiff's medical records, which "reflect that NP Jamros provided him with continuous treatment from September of 2019 to August of 2020, when another medical provider took over." *Id*. Rather than point to any evidence to argue how Plaintiff believes the Magistrate Judge erred in his conclusion that NP Jamros "provided [Plaintiff] with continuous treatment from September of 2019 to August of 2020," Plaintiff turns caselaw that is unrelated to the relevant issues in this case. Plaintiff's entire fourth objection essentially is a strawman argument for a conclusion of law that the Magistrate Judge did not in fact reach, and instead of pointing to evidence to show that NP Jamros "knew of and disregarded a serious risk of harm," Plaintiff turns to caselaw to argue this legal conclusion that the Magistrate Judge does not in fact draw. Plaintiff's fourth objection is meritless.

WHEREFORE, Defendants CORIZON HEALTH, INC. and WENDY JAMROS, N.P. respectfully request that this Honorable Court adopt the Magistrate Judge's Report and Recommendation granting summary judgment to the Corizon Defendants or alternatively grant summary judgment to Defendants on grounds which the Court finds proper and grant any and all other further relief that the Court deems just and equitable.

                        Respectfully submitted,

                        CHAPMAN LAW GROUP

Dated: June 21, 2022           /s/Devlin Scarber
                        Devlin K. Scarber (P64532)
                        Attorney for Advanced Correctional
                        Healthcare, Inc. and Denise Raymo
                        1441 W. Long Lake Rd., Suite 310
                        Troy, MI 48098
                        (248) 644-6326
                        dscarber@chapmanlawgroup.com

## **PROOF OF SERVICE**

I hereby certify that on June 21, 2022, I presented the foregoing paper to the Clerk of the Court for filing and uploading to the ECF system, which will send notification of such filing to the attorneys of record listed herein and I hereby certify that I have mailed by US Postal Service the document to the involved non participants.

        /s/Devlin Scarber
        Devlin K. Scarber (P64532)
        1441 W. Long Lake Rd., Suite 310
        Troy, MI 48098
        (248) 644-6326
        dscarber@chapmanlawgroup.com