## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
## NORTHERN DIVISION

**DERICO THOMPSON**,
 Plaintiff,

v.

**CORIZON, Inc.,**
Defendant.

Case No.: 2:20-cv-00158
Hon.: Robert J. Jonker
Mag.: Maartin Vermaat

---

Ian T. Cross (P83367)
Laurence H. Margolis (P69635)
Attorneys for Plaintiff
214 S. Main St., Suite 200
Ann Arbor, MI 48104
Phone: (734) 994-9590
Email: ian@lawinannarbor.com
Email: larry@lawinannarbor.com

Delvin Scarber (P64532)
Jeffrey Bomber (P85407)
*Chapman Law Group*
Attorneys for Defendant Corizon Health, Inc.
1441 West Long Lake Rd., Suite 310
Troy, MI 48098
Phone: (248) 644-6326
Email: dscarber@chapmanlawgroup.com
Email: jbomber@chapmanlawgroup.com

## PLAINTIFF'S MOTION TO SUBSTITUTE CHS TX, INC. AS THE DEFENDANT IN THIS MATTER IN PLACE OF CORIZON HEALTH, INC.

NOW COMES Plaintiff Derico Thompson, by and through his attorneys, and pursuant to Fed. R. Civ. P. 25(c), seeks an order substituting CHS TX, Inc., a Texas corporation recently formed via a divisional merger transaction, for Defendant Corizon Health, Inc. as an alter-ego or successor entity in this action. In support of his Motion, Plaintiff states as follows:

1   In the time this case has been pending, Corizon has rapidly lost market share in the correctional healthcare industry and its ability to satisfy its obligations to its creditors has consequently deteriorated.

2   Corizon has recently defaulted on over twenty million dollars in trade debt to its subcontractors in Michigan and Missouri.

3   In the face of this financial distress, from December of 2021 through June of 2022, the officers and directors of the entity formerly known as Corizon Health, Inc. executed a corporate restructuring that effectively secreted substantially all of the assets of the Corizon family of companies into a new successor entity: CHS TX, Inc.

4   While all of Corizon's employees, all of its active contracts with its clients, and most of its cash and other valuable assets were assigned to CHS TX, Inc., the vast majority of pre-divisional-merger Corizon's unsecured liabilities remained behind in Corizon. Among the liabilities left behind are all of the MDOC-related tort claims pending against Corizon or its employees, including this case.

5   The effect of the 2022 corporate restructuring was to place the Corizon assets beyond the reach of Corizon's unsecured creditors, including personal injury claimants such as the Plaintiff, former Corizon employees owed duties of defense and indemnification, and trade creditors whom Corizon Health, Inc. has recently failed to pay in the ordinary course of business.

6   On information and belief, the purpose of the 2022 corporate restructuring was to preserve value for the equity participants in the enterprise by hindering, delaying, and defrauding all of Corizon's unsecured creditors.

7   The 2022 corporate restructuring was not an arms-length transaction in which Corizon sold substantially all of its assets to a third party for their fair-market value. Rather, it was an insider transaction in which Corizon's beneficial owners placed Corizon's assets into new entities that they also control, for the purpose of carrying on the business enterprise.

8   The removal of substantially all assets from Defendant Corizon rendered Defendant Corizon wholly incapable of satisfying any meaningful judgment in this case, should plaintiff prevail at trial.

9   CHS TX, Inc. is an alter-ego, successor, or mere continuation of Corizon
    Health, Inc., and is responsible for assuming Corizon's obligations to
    Plaintiff.

10  Fed. R. Civ. P. 25(c) provides that, "If an interest is transferred, the action
    may be continued by or against the original party unless the court, on
    motion, orders the transferee to be substituted in the action or joined with the
    original party. The motion must be served as provided in Rule 25(a)(3)."

11  Rule 25(c) provides a mechanism to substitute a successor entity as the
    defendant when the named corporate defendant secretes its assets once
    litigation has commenced. *See, e.g., 3M v. Eco Chem, Inc.*, 757 F.2d 1256,
    1262 (7th Cir. 1985); *Sullivan v. Running Waters Irrigation, Inc.*, 739 F.3d
    354, 357-60 (7th Cir. 2014); *Rodriguez-Miranda v. Benin*, 829 F.3d 29, 40-
    44 (1st Cir. 2016).

12  In reviewing a contested Rule 25(c) motion, "the court must first determine
    whether the evidence before the court shows that there is no genuine issue as
    to any material fact and that the moving party is entitled to joinder or
    substitution as a matter of law. Cf. Fed. R. Civ. P. 56(c). If it does, the court

should grant the motion; if it does not, however, the court should conduct an evidentiary hearing to decide whether the motion should be granted." *United States v. Harold,* 423 F.Supp. 3d 410, 414 (E.D. Mich. 2019) (cleaned up) (quoting *Luxliner P.L. Export, Co. v. RDI/Luxliner, Inc.*, 13 F.3d 69, 72-73 (3rd Cir. 1993).

13 Plaintiff has sought concurrence in this motion from counsel for Defendant Corizon Health, Inc. Defendant Corizon Health, Inc. did not concur in the relief sought, despite the fact that the relief Plaintiff seeks would remove Corizon Health, Inc. as a Defendant in this action.

WHEREFORE, for the reasons more fully set forth in Plaintiff's Brief in Support, Plaintiff respectfully requests that this Honorable Court grant his Motion, substitute CHS TX, Inc., a Texas corporation, for Defendant Corizon Health, Inc. as an alter-ego or successor entity of Corizon Health, Inc., and grant such other relief as the Court deems just and equitable under the circumstances.

*/s/ Ian T. Cross*
Ian T. Cross (P83367)
Attorney for Plaintiff
402 W. Liberty St.
Ann Arbor, MI 48103
Phone: (734) 994-9590
Email: ian@lawinannarbor.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
## NORTHERN DIVISION

**DERICO THOMPSON**,
 Plaintiff,

v.

**CORIZON, Inc.,**
Defendant.

Case No.: 2:20-cv-00158
Hon.: Robert J. Jonker
Mag.: Maartin Vermaat

## PLAINTIFFS' BRIEF IN SUPPORT OF HIS MOTION TO SUBSTITUTE CHS TX, INC. AS THE DEFENDANT IN THIS MATTER IN PLACE OF CORIZON HEALTH, INC.

## TABLE OF CONTENTS

SECTION                                                                                      PAGE NO.

Table of Contents……………..…………………......…………          ii.

Index of Exhibits ……………………………..………………          iii.

Controlling or Most Appropriate Authorities…………………………          v.

I) Statement of Facts……..……………………...…..……..…………..          1

### ARGUMENT

II) Michigan law governs whether CHS TX, Inc is an alter-ego
or successor entity to Corizon Health, Inc. in this matter. In the
alternative, if Michigan law does not apply, federal common
law applies…………………………...…..……...………………………..          9

III) CHS TX, Inc. is a successor entity to which Corizon's
liabilities attach under Michigan law….…………………….…………          13

IV) If Texas law applied, CHS TX would be an alter-ego of
Corizon…………………………………………………….…………….          17

## <u>INDEX OF EXHIBITS</u>

Ex. 1: *Excerpt from Corizon's Best and Final Offer to Missouri DOC, 03/17/21*

Ex. 2:  *Excerpt from Corizon's Bid Protest Letter to State of Michigan Procurement, 03/08/21*

Ex. 3: *Judgment in Corizon's lawsuit against Missouri's Procurement Department, 11/03/21*

Ex. 4: *2021 Florida Annual Report for Corizon Health, Inc., 04/13/21*

Ex. 5: *Excerpt from Complaint in Kelly v. Corizon Health, Inc., 2:22-cv-10589 (E.D. Mich.)*

Ex. 6: *Excerpt from Corizon's Answer to Complaint in <u>Kelly</u>, 2:22-cv-10589 (E.D. Mich.)*

Ex. 7: *2021 Florida Annual Report for Corizon Health, Inc., 4/19/22*

Ex. 8: *Lefkowitz Email, 10/6/2020*

Ex. 9: *Perigrove, LLC Articles of Organization*

Ex. 10: *New York Department of Health - Health Planning Counsel Meeting Minutes for Project # 211132-B, April 13, 2021*

Ex. 11: *Excerpt from New York City Mayor's Office of Contract Services Doing Business Report- Entities with Related Officers, Owners and Managers, June 20, 2022*

Ex. 12:  *Excerpt from Corizon's Plan of Divisional Merger*

Ex. 13: *Corizon Services LLC Articles of Organization, 12/06/21*

Ex. 14: *Corizon Health Staffing Inc. Articles of Incorporation, 12/10/21*

Ex. 15: *MDOC-Corizon Monthly Contract Financial Meeting Minutes, Oct. 2020-Dec. 2020*

Ex. 16: *Excerpt from MDOC-Corizon 2016-2021 Service Contract*

Ex. 17: *Affidavit of Yvonne Johnson*

Ex. 18: *Affidavit of Robin Damschroder*

Ex. 19: *University of Missouri Complaint for Breach of Contract*

Ex. 20: *Cameron Regional Medical Center Complaint*

Ex. 21: *Email from Corizon's counsel to Plaintiff's counsel, July 20, 2022*

Ex. 22: *Email from CHS TX employee to Brevard County Sheriff's Dept. Client, 6-2-2022*

Ex. 23: *Email from CHS TX employee to Wyoming Dep't of Corrections Client, 6-3-2022*

Ex. 24: *Yescare Corp. Certificate of Formation*

Ex. 25: *Email from CHS TX' In-House Counsel to CHS TX Senior VP Steve Tomlin, 06/01/22*

Ex. 26: *MOU Edited by CHS TX' In-House Counsel, 06/01/22*

Ex. 27: *Corizon Health, Inc. Certificate of Divisional Merger, 05/03/22*

## CONTROLLING OR MOST APPROPRIATE AUTHORITIES

1) *Kelly v. Corizon Health, Inc.,* 2022 U.S. Dist. LEXIS 198725 (E.D. Mich. Nov. 1, 2022)

2) *Chrysler Corp. v. Ford Motor Co.*, 972 F. Supp. 1097 (E.D. Mich. 1997)

3) *Sullivan v. Running Waters Irrigation, Inc.*, 739 F.3d 354 (7th Cir. 2014)

4) *Plastronics Socket, Ltd. v. Hwang*, 2022 U.S. App. LEXIS 883 (Fed. Cir. 2022)

5) *DBMP LLC v. Those Parties Listed on Appendix A to Complaint (In re DBMP LLC)*, 2021 Bankr. LEXIS 2194 (Bankr. W.D.N.C. Aug. 10, 2021)

BRIEF IN SUPPORT OF PLAINTIFF'S MOTION TO SUBSTITUTE PARTIES

## I. STATEMENT OF FACTS

### i. Corizon Loses Market Share and Becomes Insolvent

At the time of its formation via a merger of two competing prison healthcare contractors in 2011, Corizon Health was the largest firm in the prison healthcare industry, managing the delivery of medical care to over 300,000 inmates across the United States and generating annual revenues in excess of one billion dollars. But over the last six years, Corizon rapidly lost market share to competitors and shrank to a fraction of its former size. In the five-year period from March 17, 2016 to March 17, 2021, Corizon lost twenty-five prison and jail healthcare service contracts to competitors. These lost contracts covered facilities with a combined average daily population of 192,711 prisoners. (Ex. 1, pg. 12). Over the same time period, Corizon only won four new service contracts, covering a mere 20,810 prisoners. (Ex. 1, pg. 12).

By March of 2021, Corizon was aware that it faced the impending loss of its contract with the Michigan Department of Corrections, at that time its largest remaining client. The Michigan DOC had announced on February 26th that it would hire a different contractor to provide healthcare in its prisons when Corizon's

1

contract expired on September 30. (Ex. 2). Another blow was dealt when Corizon's second-largest remaining client, the Missouri Department of Corrections, also declined to renew its contract with Corizon. The Missouri DOC contract expired in November of 2021.[1] The Michigan and Missouri contracts had together covered approximately 57,960 inmates, more than half of Corizon's remaining business. (Ex. 1, pg. 12).  By the fourth quarter of 2021, Corizon was, by its own admission, "deeply insolvent and headed towards bankruptcy." *See* 2:22-cv-10589 ECF No. 32, PageID.1441 (E.D. Mich).

### ii. Corizon's Current Owners Buy Corizon While it is Facing an Impending Financial Crisis

It was in this context of long-term negative growth, deep insolvency, and impending financial crisis that Corizon's current owners acquired the company. The exact date of the acquisition is unknown, because the sale was not publicly-announced. But Corizon's representations confirm that the transaction occurred between March 17, 2021 and April 5, 2022, and the available evidence suggests that the current owners most likely purchased Corizon between April 17, 2021 and December 6, 2021. On March 17th of 2021, Corizon represented in contract bid

---

1 Corizon was able to extend its Missouri contract for a few months by suing Missouri's state procurement office and obtaining a preliminary injunction preventing the transition of services to the competing vendor. Judgment was entered against Corizon in that matter, and the preliminary injunction was vacated, on November 3, 2021. (Ex. 3).

2

materials submitted to Missouri that its owner was Flacks Group, Michael Flacks' private equity fund. (Ex. 1, pg. 3). On April 13, 2021, a Florida Annual Report for Corizon Health confirmed that Mr. Flacks was still Chairman of Corizon's Board. (Ex. 4).

Yet by April 5, 2022, Corizon denied that it was still owned or controlled by Flacks Group. (*compare* Ex. 5, ¶ 12 *with* Ex. 6, ¶ 12). Corizon's 2022 Florida Annual Report revealed that Corizon's Board of Directors had undergone complete turnover some time in the preceding year. Michael Flacks had been replaced as Chairman by David Gefner, the principal of Perigrove, a New York-based private equity firm.[2] The other new Directors were **1)** Abraham "Abe" Goldberger (vice-chair), **2)** Yitzchok (a/k/a "Isaac," "Jack") Lefkowitz, **3)** Jay Leitner, and **4)** Sara Tirschwell. (Ex. 7).

Lefkowitz and Leitner both claim to work at Perigrove. Lefkowitz holds himself out as a Director, (Ex. 8) while Leitner claims to be the VP of Special Operations. Tirschwell is the CEO of Corizon. (Ex. 7). Corizon Vice-Chairman Abraham Goldberger and his immediate family members hold a variety of significant business interests, the most relevant of which is United Staffing Solutions, a Manhattan-based medical staffing agency that describes itself as "one

---

2   https://www.perigrove.com/ (last accessed 12/13/2022); (Ex. 9).

3

of the largest privately-owned businesses in America."[3] (Ex. 10; Ex. 11). United Staffing Solutions was awarded a contract to provide Corizon with nationwide nurse staffing services some time in early 2022. (Ex. 12, Schedule 3.01(b)(RC) [excerpt]). As early as December of 2021, these new individual Directors began incorporating Corizon-related entities in New York. On December 5th and 6th, Lefkowitz filed articles of organization for "Corizon Services LLC," (Ex. 13), and on December 10th, "Corizon Health Staffing Inc." was incorporated, listing the Manhattan headquarters of United Staffing Solutions as its address. (Ex. 14). The timing of the incorporation of these new Corizon-related entities indicates that the new Directors either took control, or knew that they would take control, of Corizon no later than early December of 2021.

### iii. Corizon Dramatically Increases its Profit Margin for the Final Months of the Michigan DOC and Missouri DOC Contract Terms by Defaulting on Payments to its Subcontractors, While Continuing to Collect Payments from its State-Government Clients

In the final months of its expiring contracts with the Michigan and Missouri Departments of Corrections, Corizon amassed millions of dollars in excess of the normal profit margins it had earned on those contracts. It did so by failing to pay its Michigan and Missouri subcontractors while it continued to collect payments

---

[3] https://www.unitedstaffingsolutions.net/about-us/ (accessed 11/6/2022).

4

from its state-government clients. In the ordinary course of business, Corizon had hired subcontractors to provide specialty medical care to inmates, and typically paid those subcontractors' bills more than ninety days after the date that their invoices were submitted. (Ex. 15); (Ex. 16). Meanwhile, the State of Michigan paid Corizon's invoices on a net-15 basis. (Ex. 16). This arrangement allowed Corizon to collect all of the client payments for the final few months of its contract, then default on its trade debts to its subcontractors for that service period after its contract had terminated.

While this strategy enabled Corizon to capture windfall excess profits on its expiring contracts, it imposed corresponding large losses on Corizon's subcontractors. The primary victims of this scheme in Michigan were Blue Cross Blue Shield of Michigan, which lost approximately $3.4 million dollars, (Ex. 17) and Henry Ford Allegiance Health, which lost approximately $4.2 million. (Ex. 18). Corizon engaged in similar conduct in Missouri, where it caused losses of approximately $12 million to the University of Missouri's hospital system, (Ex. 19), and $575,000 to the Cameron Regional Medical Center. (Ex. 20).

### iv. Corizon Undergoes a Texas Divisional Merger, Placing its Assets and its Liabilities in Separate Companies

In late April and early May of 2022, Corizon underwent a novel corporate restructuring maneuver designed to sequester both its tort liabilities and its

5

recently-accrued debts to its Michigan and Missouri subcontractors in a judgment-proof entity. Meanwhile, all of Corizon's assets were placed in a new corporation, CHS TX, Inc., that continues to carry on its business. This this novel restructuring maneuver, which has come to be known as the "Texas two-step," was pioneered by Georgia-Pacific in 2017 and subsequently copied by several other solvent corporations with large asbestos-related tort liabilities. *See In re LTL Mgmt. LLC*, 2021 Bankr. LEXIS 3155 at *26-*27 (Bankr. W.D.N.C. Nov. 16, 2021) (chronicling recent history of Texas divisional mergers; "[t]he first time any debtor in the country used this procedure was in *Bestwall* in 2017"). *In re DBMP LLC*, 2021 Bankr. LEXIS 2194 (Bankr. W.D.N.C. Aug. 10, 2021), describes a representative example of this type of corporate restructuring:

> On October 23, 2019, CertainTeed Corporation ("Old CertainTeed"), a building products manufacturer with significant asbestos liabilities, underwent a corporate restructuring, including a Texas state law divisional merger, where it divided itself into two new entities. One, CertainTeed LLC ("New CertainTeed"), was essentially a mirror image of Old CertainTeed: a fully operating company which retained all of Old CertainTeed's employees, the bulk of its assets and operations, and all of its non-asbestos creditors. The other entity, DBMP LLC ("DBMP" or the "Debtor") was quite different. The merger allocated to DBMP no employees, no operations, and few assets. However, in one respect the merger was generous with DBMP: it was allocated 100% of Old CertainTeed's considerable asbestos liabilities.

*In re DBMP LLC*, 2021 Bankr. LEXIS 2194 at *6-*7 (Bankr. W.D.N.C. Aug. 10, 2021).

6

Corizon's divisional merger featured a similarly-lopsided allocation of assets and liabilities. All of the employees and active contracts were assigned to the "NewCo," CHS TX, Inc., (Ex. 12, pg. 3 & Schedule 3.01(a)), while the "RemainCo," Corizon Health,  was left with all of the liabilities related to Corizon's expired contracts. (Ex. 21). These liabilities included the recently-incurred $20.1 million in trade debt to the Michigan and Missouri subcontractors, forty-four pending employment-law claims, and nearly five hundred pending tort claims (including the Plaintiff's claim in this case). (Ex. 12, Schedule 4.01(b)RL). The RemainCo, which is largely self-insured, was allocated no active business, no employees, and only $1 million in cash to cover these liabilities. (Ex. 22; Ex. 23; Ex. 12, Schedule 3.01(a)). In addition to being less than 5% of the trade debt, the RemainCo's funding amounts to only $2,105 per personal-injury lawsuit, plainly insufficient to cover even defense costs.[4]

Meanwhile, the NewCo that received the rest of Corizon's assets, CHS TX, Inc., d/b/a "YesCare," continues to perform Corizon's contracts and holds itself out to Corizon's clients as Corizon's successor. Corizon's clients were informed in early June that:

---

4 On December 8, 2022, a tort case assigned to the RemainCo was reduced to a $6.4 million judgment in the Western District of Michigan. *Compare* 1:20-cv-00036 PageID.5701 (W.D. Mich.) *with* 2:22-cv-10589 ECF No. 32-4, PageID.1648 (E.D. Mich). The RemainCo clearly lacks the financial capacity either to satisfy this judgment or to post an appeal bond.

> YesCare acquired all the active business of Corizon. As part of this acquisition, your contract with Corizon is now vested in CHS TX, LLC ("CHS"), a wholly-owned subsidiary of YesCare. . . . Because CHS was split from Corizon through a merger transaction, your contract has not been assigned or transferred[.]

(Ex. 22; Ex. 23). "Yescare Corp." is a Texas corporation formed by Sara Tirchwell, Corizon's then-CEO, in January of 2022. (Ex. 24). CHS TX both became a subsidiary of Yescare Corp. after the divisional merger, (Ex. 22; Ex. 23), and began using the name "YesCare" as a d/b/a. (Ex. 25; Ex. 26, pg. 2).

YesCare's explanation of the transaction to its clients foreshadows its argument as to why this is not a fraudulent transfer. YesCare/CHS represents, "[b]ecause CHS was split from Corizon through a merger transaction, your contract has not been assigned or transferred." (Ex. 22; Ex. 23). The basis for this assertion is found in Texas Business Organizations Code § 10.008, which provides that:

> "all rights, title, and interests to all . . . property owned by each organization that is a party to the merger is allocated to and vested . . . in one or more of the surviving or new organizations as provided in the plan of merger **without . . . any transfer or assignment having occurred.**" (emphasis added).

8

If there is no *transfer*, the argument goes, there can be no *fraudulent transfer*[5]. It is

the availability of this textualist argument that makes Texas the forum of choice for

these transactions. Delaware, Corizon's state of incorporation prior to April 28,

2022, also permits divisional mergers, *See* 6 DE Code § 18-217, and Delaware also

allows assignment of the assets and liabilities among the surviving entities. But

Delaware permits such assignment only "so long as the plan of division does not

constitute a fraudulent transfer under applicable law." 6 DE Code § 18-217 (l)(4).


## ARGUMENT

## II. Michigan law governs whether CHS TX, Inc is an alter-ego or successor entities to Corizon Health, Inc. in this matter. In the alternative, if Michigan law does not apply, federal common law applies

Before reaching the ultimate issue of whether Yescare Corp. is a successor or

alter-ego of Defendant Corizon, the Court must address a threshold choice-of-law

issue. Federal common law sometimes applies to questions of alter-ego and

successor liability in federal-question cases. *See, e.g.*, *Yolton v. El Paso Tenn.*

*Pipeline Co.*, 435 F.3d 571, 586 (6th Cir. 2006); *Trs. of Operating Eng'rs Local*

---

5  Successorship liability is a distinct concept from fraudulent-transfer liability
   under the UFTA, and a viable fraudulent-transfer claim is not required to
   impose successorship liability. *See Ryan Racing, LLC v. Gentilozzi*, 231 F. Supp.
   3d 269, 285, 289 (W.D. Mich. 2017) (imposing successorship liability on asset-
   recipient company, although plaintiff's fraudulent-transfer claim failed).

9

*324 Pension Fund v. Bourdow Contracting, Inc.*, 919 F.3d 368, 375-76 (6th Cir. 2019). Yet the Sixth Circuit has also applied state law to successor-liability and alter-ego issues in some federal-question cases. *See United States v. WRW Corp.*, 986 F.2d 138, 143 (6th Cir. 1993) (Federal Mine Safety and Health Act)*; Mickowski v. Visi-Trac Worldwide, LLC,* 415 F.3d 501, 513 (6th Cir. 2005) (patent-enforcement context).

The question of whether federal common law applies to alter-ego or successor-liability issues in a federal-question case based on a constitutional tort appears to be one of first impression in this Circuit. *Anwar v. Dow Chem. Co.*, 876 F3d 841 (6th Cir. 2017) suggests that the standard for determining whether to apply the federal common law of veil-piercing to a new genre of federal-question cases is whether "a federal interest is implicated," *Id.* at 848-49, while *Mickowski*, which addresses the issue in more detail, articulates the standard as "a 'significant conflict between some federal policy or interest and the use of state law." *Mickowski*, 415 F.3d at 512 (quoting *Atherton v. FDIC*, 519 U.S. 213, 218 (1997)). *Mickowski* suggests one scenario in which the application of state alter-ego or successor-liability law would conflict with a federal policy or interest: when applying state law would result in a particular state "becom[ing] a haven for companies seeking to avoid their obligations[.]" *Mickowski*, 415 F.3d at 513. So if

10

a) Texas law applied to the alter-ego and successor-liability questions in this matter, and b) the Texas Business Organizations Code really allows corporations to do things like separate the duty to pay royalties from the business that sells the product subject to the royalty agreement, *Plastronics Socket*, 2022 U.S. App. LEXIS 883 at \*6-\*7 (Fed. Cir. 2022), or dump their asbestos liabilities into a shell company which immediately files for bankruptcy, and thereby benefit from all of the debtor protections of Chapter 11 without subjecting any of their assets to bankruptcy-court oversight, *Aldrich Pump, LLC,* 2021 Bankr. LEXIS 2294 at \*29-\*34 (Bankr. W.D.N.C. Aug. 23, 2021), then a significant conflict between federal policies and interests and the use of state law would arise. In other words, if Corizon and the other entities attempting to exploit the Texas divisional merger statute are ultimately correct about the legality of their maneuver, Texas would indeed "provide[] a haven for liable companies," *Mickowski*, 415 F.3d at 513 (quoting *Atchison, T. & S.F. Ry. v. Brown & Bryant*, 159 F.3d 358 (9th Cir. 1997)), and the application, or if necessary, the creation, of federal common-law rules would be warranted to prevent the Texas Business Organizations Code from wholly undermining a diverse array of federal policies and interests.

Fortunately, this is likely a moot point, because if state law governs, the law that applies is Michigan's. *See Jackson v. Corizon Health, Inc.*, 2022 U.S. Dist.

11

LEXIS 198717 at *20 (E.D. Mich. 2022) (holding that Michigan law governs successor-liability question in MDOC prisoner's civil rights case following Corizon's divisional merger, where "CHS TX and YesCare have virtually no connection to Texas other than their incorporation"); *See also, Chrysler Corp. v. Ford Motor Co.*, 972 F. Supp. 1097, 1102 (E.D. Mich. 1997) (applying Michigan law to successor-liability question in CERCLA case, "where the matter is not one of internal corporate governance but rather external liability, and where Michigan has a far more significant relationship to the events in question than does the state of incorporation"); *Simon v. AMISCO Techs., Inc. (In re Am. Camshaft Specialties, Inc.)*, 410 B.R. 765, 776-77 (Bankr. E.D. Mich. 2009) (applying Michigan law rather than the law of the state of incorporation, where "the Debtors conducted business in Michigan, their creditors are here, factories were closed here and jobs lost here. The injuries occurred here"); *Ward v. Auerbach*, 2017 U.S. Dist. LEXIS 97147 at *16 (D. Mass. 2017) ("successor liability . . . is not an issue of internal corporate affairs. . . . [B]ecause this is a personal injury case, the law of the state where the plaintiff is domiciled should apply, as that state has a greater interest in the litigation than the state where the corporate defendant is incorporated").

### III. CHS TX, Inc. is a successor entity to which Corizon's liabilities attach under Michigan law

Michigan recognizes five circumstances in which successor liability attaches to a corporation which acquires the business of its predecessor:

> (1) where there is an express or implied assumption of liability; (2) where the transaction amounts to a consolidation or merger; (3) where the transaction was fraudulent; (4) where some of the elements of a purchase in good faith were lacking, or where the transfer was without consideration and the creditors of the transferor were not provided for; or (5) where the transferee corporation was a mere continuation or reincarnation of the old corporation.

*Turner v. Bituminous Casualty Co.,* 397 Mich. 406, 417 n.3 (1976).[6]

Exceptions (2), (3), (4), and (5) are all applicable to Yescare in the present matter.

Exception (2), a "de-facto merger," contains the following four elements:

> 1) continuation of the enterprise, 2) continuity of shareholders, 3) ending of ordinary business operations by the seller, and 4) assumption of liabilities and obligations necessary for uninterrupted continuation of business operations by the purchaser.

*Commonwealth Land Title Ins. Co. v. Metro Title Corp.,* 315 Mich. App. 312, 321 (2016) (quoting *CT Charlton & Assocs., Inc. v. Thule,* 541 Fed. Appx. 549, 551-52 (6th Cir. 2013)).

---

[6] Michigan courts do not defer to the law of the state of incorporation when adjudicating questions of successor liability for Michigan tort claims. *See Turner,* 397 Mich. 406 at 411-413, 430 (1976) (applying Michigan law of successor liability to asset purchase transaction between two New York corporations).

13

Here, all of Old Corizon's contracts are being performed by CHS TX without interruption. (Ex. 22; Ex. 23). There is continuity of shareholders. *See Jackson v. Corizon Health, Inc.*, 2022 U.S. Dist. LEXIS 198717 at *32 (E.D. Mich. 2022). New Corizon has ceased ordinary business operations; it has no remaining "active business." (Ex. 22; Ex. 23). CHS TX has assumed Corizon's long-term corporate debt[7] and Corizon's debts to trade creditors who provide services relevant to its existing service contracts. (Ex. 12, Schedule 4.01(a)). The de-facto merger exception is applicable in these circumstances.

The third and fourth exceptions to the rule against successor liability do not require continuity of beneficial ownership. *See First Presbyterian Church of Ypsilanti v. H.A. Howell Pipe Organs, Inc.*, 2010 U.S. Dist. LEXIS at *20 (E.D. Mich. 2010). Rather, they "allow successor liability to attach where transfers between new and old companies leave the old company's creditors with nothing to collect." *Id.* Here, the old company's creditors have been left with nothing to collect from New Corizon. All of the Old Corizon assets were assigned to CHS TX, Inc. in the divisional merger, and all the liabilities associated with expired

---

7   The assumption of a transferor's secured debt that supposedly exceeds the value of the transferred assets does not insulate the transferee corporation from successor liability under Michigan law. *See Ryan Racing, LLC v. Gentilozzi*, 231 F. Supp. 3d at 275, 285 (W.D. Mich. 2017) (finding transferee corporation, RSR, subject to successor liability as a 'mere continuation' of Rocketsports, where "Rocketsports purportedly transferred $734,870 worth of assets to RSR in exchange for the assumption of $1,292,147 in liabilities").

14

contracts were assigned to New Corizon. New Corizon's assets are plainly insufficient to satisfy even the $20.1 million in trade debts to the Michigan and Missouri subcontractors that were assigned to it, let alone the hundreds of pending tort claims. The same individuals served as officers or directors of Corizon, CHS, and Yescare Corp. throughout the transaction, (Ex. 7, Ex. 24, Ex. 27), and "some elements of a purchase in good faith were lacking." *Wells v. THB Am., LLC (In re Clements Mfg. Liquidation Co., LLC)*, 521 B.R. 231, 254 (Bankr. E.D. Mich. 2014). The practical effect of the entire transaction, consisting of a merger of the parent with subsidiaries, then a divisional merger of the combined entity into a 'DebtCo' and an 'AssetCo,' and then an acquisition of the stock of the 'AssetCo' by a related party, was to effectuate "a shifting of assets of a debtor to a corporation whereby the only assets from which the creditors could expect to be paid are placed beyond the reach of their process." *First Presbyterian*, 2010 U.S. Dist. LEXIS at *20 (E.D. Mich. 2010) (quoting 19 Am. Jur. 2d Corps. § 2322). Exceptions (3) and (4) to Michigan's general rule against successor liability are thus applicable in these circumstances.

The fifth and final basis under which Michigan imposes successor liability, the "mere continuation" exception, applies where "the successor corporation is nothing more than 'a reincarnation of the old' corporation." *Kelly v. Corizon*

15

*Health, Inc.*, 2022 U.S. Dist. LEXIS 198725 (E.D. Mich. 2022) (quoting *Pearce v. Schneider*, 242 Mich. 28, 31 (1928)). Factors to be considered in determining whether the new corporation is a reincarnation of the old include whether:

> there is a continuity of management, personnel, physical location assets, and general business operations of the predecessor corporation; (2) the predecessor corporation ceases its ordinary business operations, liquidates, or dissolves as soon as legally and practically possible; and (3) the purchasing corporation assumes those liabilities and obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the selling corporation."

*Ryan Racing v. Gentillozi,* 231 F. Supp. 3d 269, 282-83 (W.D. Mich. 2017).

Here, there has been a transfer of substantially all assets. Corizon's clients have been informed that, "YesCare acquired all the active business of Corizon." (Ex. 22; Ex. 23). There was also continuity of ownership:

> [a]lthough YesCare later acquired CHS TX, ***under the divisional merger plan, both CHS and Corizon had the same sole shareholder: Valitas Intermediate Holdings.*** This is more than what is required to demonstrate common ownership under Michigan law.

*Kelly v. Corizon Health, Inc.,* 2022 U.S. Dist. LEXIS 198725 at *32 (E.D. Mich. 2022) (internal citation omitted) (emphasis added).

All other factors that Michigan courts consider also weigh in favor of imposing successor liability. Top management is the same. The main corporate purpose is to conduct the same business as the predecessor. The places of business are the same, the employees are the same, and the clients are the same. "Thus, CHS TX is a mere

16

continuation of Corizon" to which "successorship liability attaches" under Michigan law. *Kelly v. Corizon Health, Inc.,* 2022 U.S. Dist. LEXIS 198725 at *33 (E.D. Mich. 2022).

### IV. If Texas law applied, CHS TX would be an alter-ego of Corizon

Even if Texas law applied, it would not require denial of Plaintiff's Motion. Texas permits courts to "disregard the corporate fiction . . . when the corporate form has been used as part of a basically unfair device to achieve an inequitable result." *SSP Partners v Gladstrong Invs. (USA) Corp.,* 275 S.W.3d 444, 454 (Tex. 2008) (quoting *Castleberry v. Branscum*, 721 S.W.2d 270 at 271-72 (Tex. 1986)); *see also, Spring St. Partners-IV, L.P. v. Lam*, 730 F.3d 427, 443-44 (5th Cir. 2013). While Texas does not appear to recognize the mere-continuation doctrine, Texas courts achieve the same result through application of the alter-ego doctrine to asset-recipient corporations. *See, e.g. Tryco Enters., Inc. v. Robinson*, 390 S.W.3d 497, 509-511 (Tex. App. 2012) (holding new corporation liable as alter-ego of predecessor corporation, where owners of predecessor "transferred all of Tryco's assets to Crown Staffing for the purpose of avoiding payment of the judgment"); *Dick's Last Resort of the West End, Inc. v. Market/Ross, Ltd.*, 273 S.W.3d 905, 911 (Tex. App. 2008) (affirming imposition of alter-ego liability on corporations under common ownership, where "Schiff transferred ownership of the restaurant and

17

obligations under the lease among Dick's Texas, Dick's Dallas, and Dick's West End to avoid certain obligations under the lease.").

While it appears that no Texas state court has addressed the issue, it is unlikely that Texas courts would decide a case like *Tryco* differently if, rather than transferring Tryco's assets to Crown Staffing on the day the plaintiff obtained his judgment, the Tryco principals had instead carried out a divisional merger that allocated all of the company's assets to a new entity formed from the merger, while leaving the plaintiff's judgment behind in Tryco. The TBOC itself specifically provides that, "[t]his code does not . . . abridge any right or rights of any creditor under existing laws." TBOC § 10.901. Thus, "while the TBOC permits a company to engage in a divisional merger, it does not permit that company to thereby prejudice its creditors." *In re Aldrich Pump LLC*, 2021 Bankr. LEXIS 2294 at *76 (W.D.N.C. 2021).

The only circuit court to have considered this issue to date has held that under Texas law, an allocation of liabilities in a Texas divisional merger cannot adversely affect the rights of a creditor. *See Plastronics Socket, Ltd. v. Hwang*, 2022 U.S. App. LEXIS 883 at *8-*10 (Fed. Cir. 2022). When the dividing entity attempted such an allocation in *Plastronics Socket*, the panel held <u>both</u> surviving entities liable for the obligation. *Id.* at *11. Other courts have suggested that this is

18

the appropriate remedy when liabilities are assigned to an undercapitalized or insolvent entity in a Texas divisional merger. *See In re DBMP LLC,* 2021 Bankr. LEXIS 2194 at *65 (Bankr. W.D.N.C. 2021).

*/s/ Ian T. Cross*
Ian T. Cross (P83367)
Attorney for Plaintiff
402 W. Liberty St.
Ann Arbor, MI 48103
Phone: (734) 994-9590
Email: ian@lawinannarbor.com


## **CERTIFICATION OF COMPLIANCE WITH LCivR 7.3(b)(i)**

I certify that the above brief, which is in support of a "nondispositive motion" as that term is defined by LCivR 7.3(a), contains less than 4,300 words, not including the case caption, table of contents, table of authorities, signature block, attachments, exhibits, affidavits and other addenda, in compliance with LCivR 7.3(b)(i). The brief contains 4,286 words. The software used to generate the word count is LibreOffice version 7.0.3.1 (x64).

*/s/ Ian T. Cross*
Ian T. Cross (P83367)
402 W. Liberty St.
Attorney for Plaintiff
Ann Arbor, MI 48103
Phone: (734) 994-9590
Email: ian@lawinannarbor.com