## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
## NORTHERN DIVISION

**DERICO THOMPSON** #234651,

Case No. 2:20-cv-158

Plaintiff,

Hon. Robert J. Jonker
Mag: Maarten Vermaat

v.

**CORIZON, INC**.,

Defendant.

_____

| | |
|---|---|
| Ian T. Cross (P83367) | Delvin Scarber (P64532) |
| Laurence H. Margolis (P69635) | Jeffery L. Bomber (P85407) |
| Attorneys for Plaintiff | *Chapman Law Group* |
| 402 W. Liberty St. | 1441 West Long Lake Rd., Suite 310 |
| Ann Arbor, MI 48103 | Troy, MI 48098 |
| Phone: (734) 994-9590 | Phone: (248) 644-6326 |
| Email: ian@lawinannarbor.com | Email: dscarber@chapmanlawgroup.com |
| Email: larry@lawinannarbor.com | Email: jbomber@chapmanlawgroup.com |

_____

## PLAINTIFF'S PRETRIAL NARRATIVE STATEMENT

**1. A brief general statement summarizing the claims of the case, including the manner by which each defendant allegedly violated your constitutional rights:**

The sole claim at issue in this case is a *Monell* claim brought against Corizon, the contractor that managed healthcare for prisoners in the Michigan Department of Corrections until September 29, 2021. Corizon violated Plaintiff's constitutional rights by maintaining a custom or policy of delaying and denying medical care for prisoners in order to cut costs. As a result, Plaintiff was provided grossly-inadequate care for his

1

medical condition. Then, in May of 2022, CHS TX, Inc. was formed and received all of Corizon's employees and valuable assets, while most of Corizon's unsecured liabilities were assigned to the entity now known as Tehum Care Services, Inc. Tehum has no operations or significant assets and exists primarily to sequester liabilities in a judgment-proof entity. Plaintiff alleges that CHS TX, Inc. is liable for Corizon's conduct as a successor or alter-ego of Corizon.

Because the claim proceeding to trial in this matter is a *Monell* claim, Plaintiff is required to present evidence of "specific prior instances of similar alleged misconduct by Corizon against other potential claimants." *Tietz v. Corizon Health, Inc.*, 2021 U.S. Dist. LEXIS 14100 at *23 (E.D. Mich. 2021).

## 2.  A brief narrative written statement of the facts that will be offered by oral or documentary evidence at trial:

Until May of 2022, Corizon Health, Inc. contracted with state and local governments throughout the United States to manage the provision of medical care to prisoners. Corizon's contracts with its state and local government clients typically involved payment on a capitated basis, rather than a fee-for-service basis. This means that government entities paid Corizon a fixed amount per prisoner, per month, regardless of what healthcare services that prisoner required. Corizon thus had a strong financial incentive to spend as little on medical care for prisoners as possible. Corizon's revenue

2

was fixed by the prisoner population at any given contracted facility, and profit margin could only be improved by spending less on medical care. Corizon's 2016-2021 contract to provide medical care in the Michigan Department of Corrections provided for payment on a modified capitated basis involving a risk-share base per-prisoner-per-month (PPPM), and a risk-share-maximum-cap PPPM. The pricing structure is slightly more complicated than a straight full-risk contract, but it preserved Corizon's financial incentive to limit the medical care available to prisoners at all levels of outpatient spending.

Corizon reacted rationally to these economic incentives by minimizing the amount of expensive medical treatment it provided to prisoners. Corizon's largest cost was payroll: it needed to staff correctional facilities with hourly primary-care providers at minimum staffing levels stipulated in its MDOC contract. Corizon generally could not reduce staffing levels without violating the contract. Corizon's largest variable cost for the contract was specialty care. Corizon incurred additional costs each time a prisoner-patient was sent to an outside specialist or hospital for treatment. Corizon's on-site providers were thus encouraged to minimize both the number of hospital admissions they initiated and to minimize the volume of outside specialty care that they requested. In order to reduce the population-wide volume of specialty care, Corizon operated a "Utilization Management" program to screen all requests for specialty care from its on-site providers.

3

To refer a prisoner to a specialist, Corizon's primary-care providers were required to submit a "consultation request," also known as a "407," for review by a Utilization Management physician. The main Utilization Management physician in Michigan was Dr. Keith Papendick. Dr. Papendick reviewed approximately one hundred requests for specialty care each day, spending, on average, a few minutes per request. Dr. Papendick did not speak to or examine patients when determining whether the patient could access the requested specialty care. Nor did he typically review the patient's medical records. His decisions were usually based solely on the information contained in the request form. If specialty care was denied, Dr. Papendick would issue an "Alternative Treatment Plan," commonly known as an "ATP." Many ATPs did not direct the provision of any specific medical care to the patient and were effectively denials of care.

Corizon carefully monitored referral volumes and inpatient hospital days for the prisoner populations it managed. It also tracked referral activity by individual primary-care provider, including both the number of referral requests initiated by each provider and the percentage of each individual provider's referral requests that were approved, known as the provider's "ATP rate." Primary-care providers were expected to achieve an ATP rate under 10%, and were re-trained if their ATP rate was too high. Primary care providers learned through experience what types of care were likely to be approved by Utilization Management. For example, cancer-related treatments were generally approved, but obtaining approval for orthopedic surgeries, or for diagnostic testing

4

related to orthopedic injuries, like an MRI of the knee, was almost impossible. Corizon's primary-care providers learned to "self-censor" by refraining from requesting the types of care that they knew from experience that Utilization Management was unlikely to approve. This had the effect of lowering the provider's individual ATP rate.

The cost-cutting performance of the Utilization Management Medical Directors (UMMD's) was also monitored by Corizon. Corizon's UMMDs were aware of their own outpatient-treatment-cost-per-thousand-prisoners for the populations for whom they screened specialty-care referral requests, as well as the current cost-per-thousand for Corizon's other UMMDs. UMMDs were encouraged to keep their personal cost-per-thousand low. While private insurance outside of the prison context also commonly employs a utilization-review process, Corizon's was far more aggressive than the industry standard. Corizon routinely denied approval for many procedures that are nearly always approved by non-prison health insurers and are considered the standard-of-care for the relevant medical condition. Examples of treatments that Corizon routinely denied include direct-acting antiviral drugs for Hepatitis C patients, particularly those with stage F0 or F1 disease progression, monoclonal antibody therapies for patients with multiple sclerosis, hernia repair surgeries, colostomy reversals, cataract removal surgeries, orthopedic surgeries of all kinds, hearing aides for hard-of-hearing prisoners, and even prosthetic limbs for amputees. One of the types of

5

care that Corizon generally avoided providing is the spinal surgery at issue in this case, a lumbar decompressive discectomy with fusion.

In Michigan, Corizon's efforts to reduce the amount of specialty care provided to prisoners were hugely successful. The total spent on specialty care for Michigan prisoners fell by over sixty percent between 2009 and 2016, saving Corizon, by its own estimation, hundreds of millions of dollars.

Corizon was also aware of the costs associated with prisoner litigation. Corizon knew that these costs were inversely correlated with its spending on specialty care, i.e, when more specialist referrals were approved contract-wide, the volume of grievances and lawsuits filed by prisoners decreased. Conversely, when the overall ATP rate for a population went up, Corizon saved money on care, but incurred larger litigation costs. Corizon sought to achieve the optimal balance between the cost of care and the cost of defending prisoner civil rights litigation, such that its total costs for the contract were minimized.

The Plaintiff in this case, Derico Thompson, is one of countless inmates throughout the United States for whom necessary specialty care was delayed or denied by Corizon. Mr. Thompson suffered a back injury that caused nerve damage affecting his lower extremities and a dramatic decline in function relative to his pre-injury baseline. After he did not improve with physical therapy and conservative treatment, his primary-care provider requested an EMG – which was denied by Corizon Utilization

6

Management. Then, a request for a neurosurgery consult was also denied, on the basis that Mr. Thompson had not received an EMG. After Mr. Thompson filed a grievance, he received an EMG, which showed nerve damage. After he filed this lawsuit, a neurosurgery consult was approved. When neurosurgeon Dr. Paul LaHaye recommended spinal surgery, Corizon sought a second opinion. This second neurosurgeon did not recommend any specific treatment. He saw Mr. Thompson for less than five minutes, over a year after Mr. Thompson's most recent MRI, and he did not conduct a physical examination of the patient.  Mr. Thompson was issued a wheelchair after the second neurosurgery consult but he never received surgery.

Approximately a decade before Mr. Thompson's injury, a former MDOC prisoner, Trenton Sildack, suffered a similar back injury while moving 300-400 pound concrete slabs as part of his prison work assignment. Mr. Sildack reported similar symptoms to Mr. Thompson, including numbness, bowel and bladder incontinence, shooting pain, and weakness in his legs and feet following the injury. These symptoms persisted for years, and Mr. Sildack was eventually sent for a consult with Dr. Paul LaHaye. Dr. LaHaye happens to be the same neurosurgeon who initially examined Mr. Thompson. Dr. LaHaye recommended additional imaging studies, epidural steroid injections, and possible surgery for Mr. Sildack. But Mr. Sildack was not provided with any of the treatment recommended by Dr. LaHaye during his incarceration. Mr. Sildack received the surgery at public expense within approximately one month of his release, but still

7

suffers from permanent nerve damage and decreased function in his lower extremities. Mr. Sildack then sued Corizon for violating his Eighth Amendment rights. The parties reached a confidential settlement.

Mr. Sildack's wife, Melissa Sildack, will also testify in this matter. She will recount her unsuccessful efforts pressure Corizon officials to provide back surgery to Mr. Sildack. She will testify that she was told that Mr. Sildack would not receive spinal surgery during his incarceration because litigating with Mr. Sildack would be less expensive than providing the necessary medical treatment.

Several other current and former MDOC prisoners will also testify in this case. Former prisoner James Blau was incarcerated for thirty years. He witnessed the dramatic decline in the quality of health care available to prisoners when Corizon became the MDOC's healthcare contractor. Mr. Blau will testify that Corizon denied or delayed care for a serious knee injury he suffered in August of 2010 and for an emergent heart condition he developed in 2016. Inmates Larry Cowan and Keith Swift will testify that Corizon repeatedly denied them reversal surgeries for colostomies, for five and ten years, respectively. Mr. Cowan will testify that he only received surgery after he suffered severe and potentially life-threatening complications associated with his stoma, including continuous heavy bleeding that filled his colostomy bag with blood. Mr. Swift will testify that although his colostomy was intended to be left in place for approximately two months while the downstream section of his colon had time to heal, it

was not reversed for over a decade. Mr. Swift received the long-delayed colostomy reversal shortly after Corizon's successor, Wellpath, took over the MDOC contract on September 30, 2021. Mr. Blau, Mr. Cowan, and Mr. Swift will all testify that Corizon's primary-care providers told them that Corizon would not approve surgeries for them, because the surgeries would be too expensive.

In addition to hearing from current and former inmates, the jury will also hear from former Corizon employees. Dr. Jan Watson, Dr. Charles Pugh, Dr. Albert Maier, Dr. Scott Holmes, and P.A. Cristin Rettler will all testify, either in-person, via videoconference should the court allow it, or by reading their deposition transcripts into the record. These medical professionals worked for Corizon in Arizona, Florida, Georgia, Michigan, and Oregon, for periods of time ranging from 2012 to 2021. Each former employee will testify that Corizon delayed and/or denied the provision of specialty care for its prisoner-patients in order to save money. They will testify that Corizon fostered a corporate culture of cost-cutting in which primary-care providers were strongly discouraged from referring patients to specialists.

Dr. Maier will testify that when he was a Site Medical Director for Corizon, Corizon intentionally denied hernia repair surgeries to patients with painful hernias, and intentionally denied direct-acting antivirals to patients with Hepatitis C, for the sole purpose of saving money. He will further testify as follows regarding the manner in which Corizon avoided paying for specialty care:

9

"That was in contrast to what Corizon would do or Wexford would. They just wouldn't approve it. It was not approved. They used an alternate treatment plan. Instead of getting a CT for the patient, hold a magic stone over it. And they just didn't do the procedures. Or they drew the procedures out so long that basically care was denied. . . .

. . . And says, Go ahead and treat Mr. Maier. Dr. Shah says he needs it. He's an F3, whatever. And I would approve that. And from me, that would then go to utilization management. Now, with Corizon, those were -- if it was Corizon, they'd shoot it down right away, because they were not going to buy the drug. They'd come up with an alternative treatment plan. The same thing would happen with Wexford -- or resubmit in six months, preferably after the patient is dead."

During their employment with Corizon, P.A. Rettler and Dr. Pugh attended conferences at Corizon's corporate headquarters in Tennessee. At these conferences, they were trained how to avoid the provision of specialty care so that Corizon could make more money. P.A. Rettler will testify:

"I was shocked that these were medical presentations that were given. You know, it was all doctors and a couple mid-levels. It seemed more like a Wall Street mogul kind of meeting, like how you would, like, avoid – how to make money. That – that seemed the focus of all the talks. It was – it was not about patient care at all. There was really no discussion of patient care.

I thought it was going to be a discussion on how to provide appropriate care within this environment, but that wasn't at all what the lectures were about. It was about how to make Corizon money. Every single lecture was that."

P.A. Rittler will further testify that she was criticized by her Corizon Regional Medical Director every time she ordered a patient transported to the emergency room; in eighteen months of employment, not one of her ER referrals was considered appropriate by Corizon. Every single request she made for off-site specialty care at the jail where she

10

worked was denied. Often, the justification proffered for the denial was an assertion that the detainee could obtain the necessary care after they were released from jail or transferred to prison, at which point Corizon would no longer be financially responsible for their care.

Dr. Pugh, who worked as a Medical Director for Corizon from 2012 to 2014, will testify that "the culture there was to cut cost," and that, "as I learned after I took the job, and it was reemphasized a little bit more as time went along, I was also supposed to look after the finances, the cost." At the annual companywide meetings Dr. Pugh attended at Corizon's Tennessee headquarters, "[a]fter lunch, there's about an hour and a half, hour and forty-five minute meeting about how to cut costs. About taking care of things in-house, not sending them out."

Dr. Holmes will testify that when he worked as a prison doctor for Corizon, "they were watching [costs] like a hawk." He will testify that his supervisors showed him his personal ATP rate, and he was made to feel bad about himself if the percentage of his referral requests that were ATP'd was too high. Per Dr. Holmes, obtaining specialty care for his patients was always a struggle.  It was,

> "very hard to get a guy to see an orthopedic surgeon, very hard to get a knee MRI. You know the guy's got knee pain, – man that was – it's like, oh man, I got a knee MRI approved! – It's like wow, stop the presses, that was big news."

Dr. Watson will testify that when she worked at a Corizon facility in Arizona, her requests for necessary specialty care for prisoners were also routinely denied. Dr.

11

Watson did not care about her ATP rate; she regularly made referral requests that she knew were not likely to be approved. Dr. Watson did so because, "[o]ne, I thought it would be documentation of what would be normally considered appropriate medical care. And there was always a possibility they could surprise me and approve it."

Per Dr. Watson, "I could sit here until next week and list all of the things that they do on a regular basis there that were just substandard." Specific examples include a patient with recurring seizures who was repeatedly denied a neurology consult, a patient with an angled fracture in his hand who was denied an orthopedic consult, and a patient with acute coronary syndrome whom Dr. Watson was told, "that I was to just keep him comfortable and let him die because none of his arteries were bypassable," when medical records from a recent hospital visit showed that some of the patient's arteries were, in fact, bypassable, and that the patient was a candidate for bypass surgery.

Dr. Watson was required to participate in regular conference calls with all of the other Corizon doctors in Arizona that were led by higher-up Corizon officials in Tennessee.  During the meetings, the group would discuss each patient that was sent to the hospital and was encouraged to consider ways in which the patient could have been managed on-site at the prison. In one such meeting, the providers were warned to stop writing negative comments about the Utilization Management Medical Directors in patients' charts following an ATP. An example given of such a comment (which Dr. Watson did not write) was, "did you even go to medical school?"

12

With respect to the patient with seizures, Dr. Watson participated in a meeting about the patient's care with both the patient and her Corizon supervisor, Dr. Stewart. In the meeting:

> Dr. Stewart told him that sometimes we couldn't control seizures. And I said that we had one of the best neurological institutes in the country down the road, so why don't we send him there? And Dr. Stewart told him it cost too much.

Rather than sending the patient to a neurologist to treat his frequent seizures, Dr. Stewart suggested that Dr. Watson obtain a helmet for the patient. Dr. Watson found the incident involving the patient with coronary artery disease, in which her supervisor appeared to prefer to allow the patient to die rather than incur the cost of coronary artery bypass surgery, to be so disturbing that she quit her job. P.A. Rettler also quit her job at Corizon. At the time, she was a single mother with no other employment lined up. Although she needed the job, P.A. Rettler quit "[b]ecause I had serious concerns about the level of care that was being offered to the patients there, and I was concerned for my medical license."

**3) A list of all exhibits to be offered into evidence at the trial of the case (each party will be limited to 25 exhibits, absent leave of court) and  brief narrative written statement of the purpose for which each exhibit is being offered:**

EX 1: Plaintiff's medical records.

Plaintiff's medical records are evidence of the severity of his injuries, the care he did and did not receive at various times, and his providers' knowledge of his medical condition.

EX 2: 2016-2021 Corizon-MDOC contract

The Corizon-MDOC contract is offered to show that Corizon had a strong financial
incentive to limit the amount of specialty care provided to prisoners.


EX 3:  Deposition Transcript of  Albert Carl Maier, M.D., Dated: September 1, 2017,
         _Hoffer v. Jones,_ Case No. 4:17-cv-214-MW/CAS

Plaintiff plans to read portions of this transcript into the record while displaying the text
on the courtroom video screen. The transcript is admissible under F.R.E. 804(b)(1), as
Dr. Maier resides in Florida and cannot be subpoenaed to testify. The testimony is
offered to show how Corizon delayed and denied medical care to prisoners in order to
save money, and as evidence that Corizon's custom or policy of denying care to save
costs both existed and caused Plaintiff's injury.


EX 4: Deposition Transcript of Charles M. Pugh, Jr., M.D., Dated: December 14, 2016,
         _Maley v. Corizon Health, Inc._, Case No. 4:16-cv-00060

Plaintiff plans to read portions of this transcript into the record while displaying the text
on the courtroom video screen. The transcript is admissible under both F.R.E. 804(b)(1)
and Fed. R. Civ. P. 32(a)(1), which operates as an independent exception to the hearsay
rule. *See Lefebre v. Remington Arms Co., LLC,* 2019 U.S. Dist. LEXIS 179670 (W.D.
Mich. 2019).  This testimony is offered to show the existence of a Corizon custom or
policy of delaying and denying medical care for prisoners in order to cut costs. Dr.
Pugh's testimony is important because it shows that Corizon's corporate leadership, not
just local officials, fostered the cost-cutting culture. Dr. Pugh's testimony demonstrates
that Corizon encouraged providers to avoid off-site referrals at annual companywide
meetings it held at its corporate headquarters in Brentwood, Tennessee.


EX. 5:  Transcript of Proceedings Evidentiary Hearing, Dated: February 27, 2018,
         _Parsons v. Ryan_, Case No. CV-12-00601-PHX-DKD (D. Ariz.)

Dr. Jan Watson has expressed a willingness to testify in this matter if she is allowed to
do so via videoconference. Due to her employment-related responsibilities, she is unable
to travel to Marquette to testify in person. Defendants have advised that they intend to

14

oppose any trial testimony via videoconference. Thus, the parties will need to engage in contested motion practice on this issue.

If Dr. Watson is permitted to testify remotely, use of this transcript will not be necessary. If Dr. Watson is not permitted to testify remotely, Plaintiffs will seek to read portions of the transcript of this proceeding into the record while displaying the text on the courtroom video screen. The transcript of this hearing testimony is admissible under F.R.E. 804(b)(1). This testimony is offered to show the existence of a Corizon custom or policy of delaying and denying medical care for prisoners in order to cut costs. Dr. Watson's testimony is important because she worked for Corizon in a different region of the country than Dr. Pugh and Dr. Maier, and her employment began years after Dr. Pugh's, Dr. Maier's, and P.A. Rettler's employment with Corizon ended. Similar testimony from multiple former Corizon employees who worked for the company in different states and at different time periods is necessary to demonstrate that the custom or policy of delaying and denying care to cut costs was not limited to a specific time period or geographic region, but existed in all places where Corizon did business and persisted over many years.

EX. 6:        Deposition Transcript of Cristin Rettler, P.A., taken May 14, 2018 in *Pitkin v. Corizon Health, Inc.*, 3:16-cv-02235-AA (D. Oregon).

Plaintiffs counsel are in contact with P.A. Rettler and she appears likely to voluntarily travel to Marquette to testify in person in this case. If P.A. Rettler testifies in person, the use of this deposition transcript will be unnecessary. In the event that P.A. Rettler later decides not to voluntarily travel to Marquette to testify in person, and arrangements cannot be made to take her testimony remotely, Plaintiff plans to read portions of this transcript into the record while displaying the text on the courtroom video screen. The transcript is admissible under both F.R.E. 804(b)(1) and Fed. R. Civ. P. 32(a)(1). This testimony is offered to show the existence of a Corizon custom or policy of delaying and denying medical care for prisoners in order to cut costs and that the pressure to do so came directly from top management. Specifically, the message was conveyed during seminars that P.A. Rettler attended at Corizon's corporate headquarters. P.A. Rettler's testimony will also show that Corizon officials pressured primary-care providers not to send patients to the hospital, and not to request outpatient treatment. Importantly, it will also show that Corizon officials resisted putting those instructions in writing.

EX. 7: Email Correspondence of Dr. Keith Papendick

15

Dr. Keith Papendick was the primary Utilization Management Medical Director for Michigan at all times relevant to this case. His email correspondence with Michigan-based providers is offered to show the existence of a Corizon custom or policy of delaying and denying medical care for prisoners in order to cut costs. In conjunction with utilization management claims data, Dr. Papendick's emails show that Corizon achieved large cost reductions in Michigan not by providing the same or better care for less money, but by providing less care.

Ex. 8: Utilization Management Monthly Reports Submitted to the State of Michigan by Corizon

These reports are offered to show that Corizon tracked inpatient hospital days, outpatient referrals, ER runs, and the amount of money it spent on various categories of specialty care for the Michigan prison population. The reports are offered to show that Corizon achieved a massive reduction in spending on outpatient care during its tenure as the healthcare contractor for the MDOC, saving itself hundreds of millions of dollars by reducing the amount of care provided to Michigan prisoners.

EX. 9:      Select Medical Records of Trenton Sildack

These medical records will be offered to show that Mr. Sildack suffered a similar spinal injury and resulting medical condition to Plaintiff when Mr. Sildack was in MDOC custody, was also denied spinal surgery despite the recommendations of Dr. LaHaye, and that he suffered permanent nerve damage as a result. Discussion of Mr. Sildack's case is necessary because under in order to hold Corizon liable under *Monell*, Plaintiff must present evidence of "specific prior instances of similar alleged misconduct by Corizon against other potential claimants." *Tietz v. Corizon Health, Inc.*, 2021 U.S. Dist. LEXIS 14100 at *23 (E.D. Mich. 2021).

EX. 10:      Email Correspondence between Melissa Sildack and relevant Corizon and MDOC officials.

These documents will be offered to show that the responsible officials worked in concert to avoid providing necessary spinal surgery to Mr. Sildack.

16

EX. 11:     Select medical records of Larry Cowan, including photographs of his stoma.

These documents will be offered to show the seriousness of Mr. Cowan's medical condition, the fact that Corizon refused to provide a colostomy reversal surgery to Mr. Cowan for approximately five years, and that the conditions that Mr. Cowan was forced to endure violated contemporary standards of decency. Discussion of Mr. Cowan's case is necessary because in order to hold Corizon liable under *Monell*, Plaintiff must present evidence of "specific prior instances of similar alleged misconduct by Corizon against other potential claimants." *Tietz v. Corizon Health, Inc.*, 2021 U.S. Dist. LEXIS 14100 at *23 (E.D. Mich. 2021).

EX. 12:     Select medical records of Keith Swift, including photographs of his stoma.

These documents will be offered to show the seriousness of Mr. Swift's medical condition, the fact that Corizon refused to provide a colostomy reversal surgery to Mr. Swift for the entirety of its tenure as the MDOC healthcare contractor, and that the conditions that Corizon forced Mr. Swift to endure violated contemporary standards of decency. Discussion of Mr. Swift's case is necessary because in order to hold Corizon liable under *Monell*, Plaintiff must present evidence of "specific prior instances of similar alleged misconduct by Corizon against other potential claimants." *Tietz v. Corizon Health, Inc.*, 2021 U.S. Dist. LEXIS 14100 at *23 (E.D. Mich. 2021).

EX. 13:     Corizon's Response to Request For Proposal No. 200000002287 Prisoner Health Care and Pharmacy Services

This bid packet constitutes the responsive materials that Corizon submitted to the State of Michigan in its unsuccessful bid for the next term of the MDOC healthcare contract, which started September 30, 2021. These materials are offered to show that Corizon tracked outpatient referral activity by provider, that Corizon providers in Michigan were expected to achieve an ATP rate under 10% by limiting the services that they requested, and that Corizon saved millions of dollars in Michigan by cutting spending on psychiatric drugs for mentally-ill inmates between 2016 and 2020. These facts are offered to show the existence of a Corizon custom or policy of delaying and denying medical care for prisoners in order to cut costs.

17

EX.14:      Deposition of Dr. Keith Papendick taken on November 19, 2018 in
*Lashuay v. DeLine*, 1:17-cv-13581 (E.D. Mich.).

This deposition transcript is offered to show the existence of a Corizon custom or policy of delaying and denying medical care for prisoners in order to cut costs. Specifically, the testimony shows that Corizon considered medical care for prisoners to be necessary only if failure to provide the care would present a risk to life or limb, or if the prisoner was unable to complete ADLs without the requested treatment. Per Dr. Papendick, treatments necessary to avoid a risk of permanent disability that would limit the patient's future ability to earn a living would "probably not" be medically necessary.

EX.15:      Deposition of Dr. Keith Papendick taken on March 27, 2019 in *Spiller v.
Stieve, et. al.*, 18-cv-00692 (W.D. Mich.).

This deposition transcript is offered to show the existence of a Corizon custom or policy of delaying and denying medical care for prisoners in order to cut costs. Specifically, the testimony shows that Corizon's UMMDs were aware of their own cost-per-thousand-prisoners, as well as the cost-per-thousand figures of other Corizon UMMDs and how they compared. It is further offered to show that Corizon understood that an inverse relationship existed between the amount of care it approved and the number of lawsuits filed against Corizon by prisoners. Per Dr. Papendick, Corizon knew that approving more care led to fewer lawsuits. Yet utilization management monthly reporting data shows that Corizon persisted in dramatically reducing the volume of specialty care provided to prisoners in Michigan. This testimony is offered to show that Corizon's provision of substandard care to the MDOC population was intentional, and stems from a rational calculation that defending the resulting civil rights litigation would be less expensive than providing health care consistent with contemporary community standards.

EX.16:      Deposition of Dr. Robert Lacy taken on March 14, 2019 in *Spiller v. Stieve,
et. al.*, 18-cv-00692 (W.D. Mich.).

Portions of this deposition transcript will be offered to show that Corizon expected its primary-care providers to achieve an ATP rate of under 10%, that the providers were subject to retraining if their ATP rate was too high, and that primary-care providers were effectively incentivized to 'self-censor' by requesting less care.

18

(4.)    WITNESSES

**Witnesses expected to be called by the Plaintiff, except those who may be called for impeachment purposes only, are:**

1.    Derico Thompson #234651
      Kinross Correctional Facilty (KCF)
      4533 W. Industrial Park Drive
      Kincheloe, MI 49788

Mr. Thompson will testify to his injuries, his symptoms, his interactions with health care

personnel at the correctional facilities where he has been housed, and his functional

impairments. He will testify to statements he made to various medical providers

concerning his symptoms and the nature of the treatment he was provided, consistent

with his declaration and the allegations made in his Complaint.


2.    James Blau
      2412 Midland Rd
      Saginaw, MI 48603

Mr. Blau will testify to his interactions with Corizon's health care providers during his

incarceration in the Michigan Department of Corrections. He will testify that treatment

for his medical needs was delayed and denied by various Corizon providers, and to

statements that Corizon employees made to him when he sought medical care. For

example, Mr. Blau will testify that he met with Corizon employee Dr. Zirmont

concerning a knee injury that caused continuous chronic inflammation and pain, and for

which he had been repeatedly requesting treatment for over a year. Dr. Zirmont told Mr.

19

Blau that the game plan was to delay treatment until he was released from prison. At the time, Mr. Blau was serving a life sentence.

Mr. Blau will also testify to the ineffectiveness of his efforts to obtain medical care by filing lawsuits against Corizon and its providers. Mr. Blau filed lawsuits himself and regularly assisted other inmates in filing lawsuits regarding medical care while he was incarcerated. He will testify that inmates typically cannot retain counsel or hire expert witnesses, that the vast majority of claims are dismissed prior to trial, and that for a variety of reasons, prisoners are largely unsuccessful in using litigation to pressure Corizon to provide them with adequate medical care. This testimony is offered to show that Corizon was not afraid of prisoner litigation, could usually defeat such claims cheaply and efficiently, and for many health conditions (such as orthopedic injuries) Corizon made the rational business decision to refuse to provide care consistent with contemporary standards and instead defend the resulting prisoner litigation.

3.     Trenton Sildack
       6259 Hawkins Rd
       Jackson, MI 49201

Mr. Sildack will testify to his injuries, his symptoms, his interactions with health care personnel at the correctional facilities where he has been housed, and his functional impairments. He will testify to statements he made to various medical providers concerning his symptoms and the nature of the treatment he was provided, consistent

with the allegations made in his lawsuit, *Sildack v. Corizon Health, Inc.,* 11-cv-12939

(E.D. Mich.).


      4.      Melissa Sildack
             6259 Hawkins Rd
             Jackson, MI 49201

Melissa Sildack will testify concerning Trenton Sildack's continuing functional

impairment as a result of the refusal to provide back surgery while he was incarcerated

in the MDOC. She will recount her unsuccessful efforts pressure Corizon officials to

provide back surgery to Mr. Sildack. She will testify that she was told that Mr. Sildack

would not receive spinal surgery during his incarceration because litigating with Mr.

Sildack would be less expensive than providing the necessary medical treatment.


      5.      Keith Swift #202475
             Cooper Street Correctional Facility (JCS)
             3100 Cooper St
             Jackson, MI 49201

Swift will testify that he has been an inmate in the Michigan Department of Corrections

since 1989. He will testify that in 2011, he began experiencing severe constipation,

going 7-8 days between bowel movements. He was treated for several weeks with

laxatives and enemas which did not improve his condition. He was eventually taken to a

local hospital where a golf ball-sized cyst was discovered in his large intestine.

Eventually, he underwent surgery to remove the cyst and a temporary colostomy was placed. Doctors at the hospital informed Swift that his colostomy would be reversed within 2-3 months after surgery. In August 2011, his provider at the prison requested a surgical consultation for colostomy reversal. That request was denied by Corizon Utilization Management (UM) on the basis that colostomy reversal was "not medically necessary."

He was transferred to Chippewa Correctional Facility (URF). His assigned medical provider at URF also submitted a request for a surgical evaluation for colostomy reversal, on or about November 27, 2013. Again, the request was denied, because, per the UMMD, "there was no demonstration of medical necessity at this time, a colostomy is only reversed if there is a medical necessity." Due to a health problem unrelated to his colostomy, Swift was transferred from Chippewa Correctional Facility to Duane Waters Health Center, a MDOC-operated medical facility that is located inside a larger prison complex in Jackson, Michigan. There, Swift asked his medical providers at Duane Waters if they could submit a request for colostomy reversal surgery. He was told but was told that such a request would be futile, as Corizon does not reverse functional colostomies.

From Duane Waters Health Center, Swift was transferred to G. Robert Cotton Correctional Facility in Jackson, Michigan. He saw a medical provider at that facility about his colostomy bag, and the provider submitted a 407 request for a colostomy

reversal surgery. That request was denied. After a couple years at G. Robert Cotton, Swift will testify that he was transferred to Lakeland Correctional Facility in Coldwater, Michigan. His medical provider at Lakeland, P.A. Ecoe Hill, also requested approval for a surgical consult for colostomy reversal on or about September 15, 2016. Again, the request was denied, due to: "medical necessity not demonstrated at this time."

After Coldwater, Swift was transferred to the Marquette Branch Prison in Marquette, Michigan. The medical provider at that facility, Dr. Joshua Kocha, submitted yet another request for a surgical evaluation for colostomy reversal. Again, the request was denied.  In December of 2019, Swift was transferred back downstate to Muskegon Correctional Facility. Mr. Swift will testify that his treating physician at Muskegon, Dr. Dale Ashe, submitted a 407 request for a colostomy reversal surgery in June 2020. That request was denied by Dr. Keith Papendick. About a week later, Dr. Ashe informed Swift that he had submitted a second 407 request for a consult with a general surgeon to determine if reversal was still feasible, given the length of time that Swift's rectal stump had been de-functional. That request was also denied.

On or about September 22, 2020, Swift submitted a healthcare kite to address bleeding from the bottom of his stoma and painful open sores that were being exposed to feces. He was seen by a visiting doctor from another facility the next day. That visiting doctor submitted a 407 request for a consult with a general surgeon to address his bloody sores. This request was approved.

23

On November 5, 2020, Swift was transported to the Mercy Health Mercy Campus in Muskegon, Michigan, where Dr. Theodore Vanderkooi, a general surgeon, performed a colonoscopy. Dr. Vanderkooi removed several polyps from his colon. The doctor instructed him to cut smaller holes in his colostomy bag wafer, so that the wafer would be right up at the edge of the stoma and cover the area with the bloody sores. Dr. Vanderkooi also determined: "it does appear that he could undergo a colostomy takedown. Ideally he would lose 30 to 40 pounds to make postoperative care easier and decrease operative risk."

Swift sent a healthcare kite sometime in the week after his appointment with Dr. Vanderkooi to request a colostomy reversal surgery. P.A. Hoover told him that she had requested a "chart review" for colostomy reversal. On January 21, 2021, he had a telemedicine chronic care visit with a Dr. Sahdir and asked Dr. Sahdir if she could check the status of the "chart review" to see if they had approved or denied the colostomy reversal surgery. She told him there was no need to check, since, "that's just something they are not going to do. They don't do reversals of functional colostomies."

Mr. Swift will testify that he lived with a colostomy bag for over ten years. He sought a surgical consult for colostomy reversal every time he has been transferred to a new prison. Except for Duane Waters, medical staff at every prison have put in requests for a surgical consult for colostomy reversal, and all of those requests were denied by Corizon Utilization Management. Over the years, Mr. Swift often developed inflamed

polyps on his stoma. They cause horrible itching but cannot be scratched because any contact will cause them to bleed. If he touched or bumps his stoma, the bag will fill up about a quarter to half-way full of blood. This happened approximately 4-5 times a week, usually because he bumps into something while working in the prison kitchen. His stoma also prolapses on a daily basis. He regularly has a half-inch to an inch of intestine outside his body. Mr. Swift will testify that his colostomy bag caused him to have numerous fights with other inmates who object to him emptying or cleaning his bag in the cell he's forced to share with them. Occasionally his bag would come off while he was sleeping, and will wake up with wet feces all over his clothes, bedding, and body. He has experienced nearly a decade of unnecessary pain, suffering, ostracization and humiliation due to being forced to live with a colostomy that was intended to be temporary and is reversible.

Swift filed a pro-se lawsuit against a Corizon UMMD in 2017, complaining of the repeated denials of his providers' requests to schedule him for colostomy reversal. While Swift's complaint survived PLRA screening, he lost on statute-of-limitations grounds because he sued former Utilization Management Medical Director for Michigan, Dr. Adam Edelman, rather than the individual UMMD who denied the requests between 2014 and 2017, Dr. Keith Papendick. Mr. Swift did not know that Dr. Papendick had succeeded Dr. Edelman as Corizon's UMMD for Michigan. Mr. Swift's lawsuit did not prompt Corizon to stop denying requests for his colostomy reversal surgery.

After Corizon lost the MDOC healthcare contract and was replaced by a new contractor in the fourth quarter of 2021, Swift finally received his long-overdue colostomy reversal surgery.

Mr. Swift's testimony is offered for several reasons. First, it serves as evidence of Corizon's custom or policy of denying care to save money. Second, it is evidence of "a pervasive pattern of such conduct that affected inmates other than Plaintiff himself," which is required to sustain a *Monell* claim. *See, e.g. Northington v. Abdellatif,* 2018 U.S. Dist. LEXIS 130512 at *32 (E.D. Mich. 2018). But perhaps most importantly, it also shows that the observed pattern of gratuitous denials of care <u>was unique to Corizon.</u> The fact that Mr. Swift received his long-delayed surgical procedure when the current MDOC healthcare contractor, Wellpath, took over the contract demonstrates both that the denials of care were not driven by an MDOC policy and that not all prison healthcare contractors provide woefully inadequate care.

      6.     Larry Cowan #487990
             Muskegon Correction Facility (MCF)
             2400 S. Sheridan Dr.
             Muskegon, MI 49442

Larry Cowan will testify that in February of 2012, he suffered multiple gunshot wounds, including one gunshot wound to his anus and another through his neck. That he was given a temporary colostomy to allow his injuries time to heal. He entered the custody of

the Michigan Department of Corrections in late 2012 and has remained in MDOC custody since that time. After the traumatic injuries to his rectum and anus had healed, he made repeated requests to various prison doctors and nursing staff about undergoing colostomy reversal surgery. Medical staff always informed him that he would not receive a reversal surgery because it was too expensive. He was routinely discouraged by prison doctors, nurses, corrections officers and at times inmates, that reversal surgery was not done in the MDOC. Mr. Cowan will testify that over the next several years, he gradually developed polyps and bloody discharge from his stoma.

One day in August of 2017, Mr. Cowan began bleeding profusely from his stoma. When his colostomy bag was filled about half way up with blood, he went to the healthcare area without permission. He was told to return to his unit and that the bleeding was a result of dehydration. Afraid he would bleed out, he went to the control center without permission. There he told lieutenant Quinn, he needed an ambulance because he was bleeding heavily into his colostomy bag. Quinn yelled at him for coming to the control center without a pass and ordered another guard to take him to "the Hole." After approximately twenty minutes, Sgt. Montgomery, came to his disciplinary segregation cell to inquire why he was there. Sgt. Montgomery immediately escorted Cowan to healthcare after observing his colostomy bag filled with blood. Healthcare staff stated that they had already seen him and told Cowan to return to his unit. Cowan then called his father to inform him that he was bleeding heavily and concerned he

27

might die. Cowan's father began calling the prison, Michigan State Police and the MDOC headquarters in Lansing, in an effort to get him medical attention.

Following the phone calls, healthcare began checking Mr. Cowan's vitals every half hour and he was transported to a local hospital. Doctors there were astonished by the condition of his stoma. A few weeks later, he was sent for a colonoscopy at Allegiance Hospital in Jackson, MI. The doctor who saw him, told him that he would attempt colostomy reversal surgery before the year was out. On or about December 7, 2017, Mr. Cowan finally received a colostomy reversal surgery. That he seriously doubts that he would have ever received the reversal surgery if he had not developed continuous heavy bleeding from his stoma.

Mr. Cowan will testify that he lived with a colostomy bag in Michigan prisons for over five years. For the first two and a half years, while one of his arms was paralyzed, he had to clean and change his bag with one hand. His stoma regularly prolapsed, and his large intestine would hang six-to-eight inches out of his body. For years, he had polyps and bloody sores on and around his stoma. Mr. Cowan will testify that living with a stoma in MDOC custody for over five years was a disgusting, traumatic, humiliating, and painful experience, which  could have been avoided if he had received the reversal surgery when his rectum and anus had fully healed, instead of over five years later and only after he had developed serious complications at the stoma site.

28

During his time spent in the MDOC he has witnessed countless others with serious medical problems denied similarly healthcare.

Mr. Cowan's testimony is offered to show a Corizon custom or policy of delaying and denying expensive medical care for prisoners, like surgeries, in order to cut costs.


7.     Keith Papendick, M.D.
       C/O Chapman Law Group

Dr. Keith Papendick will testify regarding Corizon's utilization-management process, its restrictive internal definition of "medically necessary" care, his prior statements in various depositions, and the manner in which he performed his duties. Dr. Papendick's testimony is offered to show that Corizon had a custom or policy of delaying and denying medical care to save money.


8.     P.A. Cristin Rettler

       Multnomah County Jail
       1120 Southwest 3rd Ave
       Portland, OR 97204

Cristin Rettler will testify that she was a Physician Assistant employed by Corizon for approximately 18 months, quitting in the latter part of 2013. She left over concerns about the level of care being offered to patients at the Washington County Jail and the fear she would lose her medical license if she continued to practice medicine as directed

29

by her Corizon supervisors. During her tenure at the Washington County Jail, Ms. Rettler was under constant pressure from supervisors, particularly Corizon's Regional Manager, Dr. Ivor Garlick, to minimize emergency room visits and referrals to outside physicians for specialty consultations. Ms. Rettler was required to participate in weekly calls with Dr. Garlick, who made it clear that virtually every medical situation could and should be handled within the confines of the jail. She can not remember a single occasion when Dr. Garlick agreed that an ER referral was appropriate. She will testify that she was encouraged to delay care necessary medical care to patients pending their release from jail or transfer to prison. This was openly touted as a cost savings measure. Ms. Rettler witnessed multiple "near-miss" medical emergencies where detainees avoided death or debilitating injury due to sheer luck. Each of these potentially-catastrophic situations was brought about by Corizon's efforts to avoid hospitalizing patients for as long as possible and to delay the provision of specialty care until the detainees were released or transferred.

Ms. Rettler will testify that she attended seminars at Corizon's corporate headquarters. These meetings were almost exclusively focused on cost savings. Among the topics highlighted was limiting emergency room visits. She recalls little discussion regarding patient care and safety from the meetings; virtually everything was devoted to cost containment and profit maximization.

30

In 2013, Rettler took the step of meeting on two occasions with Washington County Sheriff Pat Garrett. She also had multiple discussions with a representative of the Washington County Auditor's staff, Latham Stack, and summarized all of her concerns regarding patient safety at the jail. She specifically told Sheriff Garrett about the critical nursing shortage at the jail. She detected no changes following these meeting. She told Sheriff Garrett the level of care was very concerning from a medical ethics standpoint and it was only a matter of time until there was a bad outcome. When the jail took no action to improve the quality of care, Rettler quit.

Cristin Rettler now works as a P.A. at the Multnomah County Jail, a correctional facility that uses county employees to provide treatment to detainees, rather than contracting out jail health care to a for-profit company. Ms. Rettler will testify that the quality of care provided at her current county-operated facility is a world apart from the care provided at the Corizon-operated facility. She will testify that her current jail is safer for patients and achieves better outcomes because it is not understaffed and it does not excessively restrict the provider's ability to refer the patient to the ER or to a specialist.

9.     Scott Holmes, M.D.
       Mason County Jail
       302 N. Delia St.
       Ludington, MI 49431

31

Dr. Scott Holmes will testify that he began working in correctional medicine in the late 1990's for Correctional Medical Services (CMS) which later merged with Prison Health Services (PHS) to form Corizon Health, Inc. Dr. Holmes now works for several county jails in West Michigan. Dr. Holmes will testify that he attended annual Corizon meetings in Michigan, where presentations on cost-cutting and the elimination of unnecessary ER runs was often the topic of conversation. Holmes remembers that the company was watching costs "like a hawk."

Dr. Holmes will testify that Corizon kept track of the number of monthly ER runs per site and showed comparison graphs, comparing the number of ER visits across facilities. Dr. Holmes will testify that his knowledge of this tracking made him a "little bit nervous" about sending guys out to the ER, for example when they presented with chest pain, and that there was always a "little pressure to watch the costs." Dr. Holmes will testify that the whole 407 process was designed to control costs. Holmes was at one point made aware that the company kept track of each individual provider's ATP rate and was told his personal ATP rate. Dr. Holmes will testify that if a provider "got like a 50% you felt kinda bad." The inference was "you were wasting everyone's time" submitting requests for care that Corizon did not want to provide. Dr. Holmes will testify that he learned what kinds of care were likely to be denied. It was rare for Utilization Management to ever call with questions; "most of the time you just got an ATP that you would have to go over with the patient."

32

Dr. Holmes will testify that it was very difficult to get Corizon to approve any kind of orthopedic surgery or imaging studies related to orthopedic injuries, such as an MRI for a knee or back injury. Dr. Holmes will testify that Corizon's Utilization Management Medical Director for Michigan, Dr. Keith Papendick, was known as "Dr. No" among providers. His nickname, of course, stemmed from the fact that he often said "No" to the medical care they requested. Dr. Holmes will testify that he does not prescribe unnecessary treatment, and has never submitted a request to Utilization Management that was not "medically necessary."

9.     Janice Watson, M.D.
       2030 W. Baseline Rd
       Phoenix, AZ 85041

Dr. Janice Watson will testify that from May 2017 until October 2017, she worked as a primary care physician at the Eyman complex in Forence, Arizona, a Corizon facility.

Watson was required to submit requests to Utilization Management for any off-site specialist referrals. These requests could be approved, given an alternative treatment plan, (ATP) or more information could be requested by Utilization Management. Dr. Watson learned that Utilization Management issued ATP's for services they felt could be handled at the prison. Her requests for infectious disease consults, cardiology consults, neurology consults, and orthopedic consults were frequently denied, even though the

33

prison had no such specialists on-site. Watson estimates that roughly 50% of her requests for off-site services were ATP'd.

One patient with a displaced fracture, the bone easily visible poking up against the skin, was denied a consultation with an orthopedic surgeon. To Dr. Watson's knowledge, the patient never saw an orthopedic surgeon. Another patient with an undiagnosed and uncontrolled seizure disorder, who experienced approximately fourteen seizures a day, was denied a neurology consult. Watson remembers her Corizon supervisor telling her that this patient could not receive a neurology consult because "it costs too much." Instead, he recommended a helment, to protect the patient's head.

Dr. Watson will testify that her request for a patient with cerebral palsy to be seen by a physical medicine specialist to address gait issues resulting in falls, was mysteriously canceled by someone other than her. The patient was sent for physical therapy, and to Watson's knowledge never seen by a physical medicine doctor. A radiation oncology request she submitted for a 77 year old man with invasive bladder cancer was also denied.

After a patient with a heart condition returned from a week long stay in the hospital, Dr. Watson's Corizon supervisor advised her that if the patient returned with chest pain, she should not send him back to the hospital. Instead, she was to "just keep him comfortable and let him die because none of his arteries are bypassable." Dr. Watson later learned that was not true. In fact, the patient's hospital records indicated

that he was a candidate for bypass surgery. Watson will testify that in over 40 years of practicing medicine she had never faced as much difficulty getting patients the necessary specialty-care and consultations, as she did working under the direction of Corizon.


10.   Charles M. Pugh, Jr., M.D.
      5210 Paulsen Street,
      Savannah, GA 31405


Dr. Pugh will testify by reading of portions of his deposition transcript into the record. The deposition was taken in *Maley v. Corizon Health, Inc.,*Case No. 4:16-cv-00060 (S.D. Ga.) on December 14, 2016 and is available on PACER. Defendant was a party to the *Maley* case and was present at this deposition.


10.   Dr. Albert Maier, M.D.
      358 County Road 207A
      East Palatka, Florida, 32131

Dr. Maier will testify by reading of portions of his deposition transcript into the record. The deposition was taken in *Hoffer v. Jones,* Case No. 4:17-cv-214-MW/CAS (M.D. Fl.) on September 1, 2017 and is available on PACER.


10.   Paul LaHaye, M.D.
      580 W. College Ave
      Marquette, MI 49855

Dr. Paul LaHaye will testify that Thompson suffers from Spinal Stenosis with neurogenic claudication. That Thompson's MRI from March 2020, showed bilateral neural foraminal stenosis at L5-S1 and central canal stenosis at L4-L5 secondary to ligamentum flavum and facet hypertropy, and disc herniation. Dr. LaHaye will testify that Thompson's EMG in August 2020 confirmed nerve compression at L5-S1. He will testify that he believed Thompson was a good candidate for surgical intervention and recommended lumbar decompressive laminectomy at L4-L5-S1 with fusion from L4-S1, and that this procedure would have alleviated his symptoms and improved his quality of life with minimal post-operative risk.

Dr. LaHaye will also testify about his treatment recommendations for Trenton Sildack, which also were not followed by Corizon. He will testify that treating these patients only with NSAIDS and intramuscular steroid injections was totally ineffective given their medical conditions.

11.         Anthony E. Chiodo, M.D. **(retained expert)**
            University of Michigan Health System
            Department of Physical Medicine and Rehabilitation
            325 East Eisenhower Parkway
            Ann Arbor, MI 48108

Dr. Chiodo will testify consistent with the expert report he submitted in this matter. His testimony concerns the treatment that should have been provided to Plaintiff for his condition and why the care provided by Corizon was woefully inadequate.

36

    11.    Jaquine Castillo
            Michigan Department of Corrections
            Grandview Plaza
            P.O. Box 30003, Lansing, MI 48909

Ms. Castillo is an MDOC employee to be called solely for the purpose of authenticating records. Her testimony will only be necessary if Defendant does not stipulate to the authenticity of the relevant records and the Court does not find that the records are self-authenticating.

    12.    Andrew Phelps
            Michigan Department of Corrections
            206 E Michigan Ave,
            Lansing, MI 48933

Mr. Phelps is an MDOC employee to be called solely for the purpose of authenticating records. His testimony will only be necessary if Defendant does not stipulate to the authenticity of the relevant records and the Court does not find that the records are self-authenticating.

    13.    Tamara J. Cooper
            Asst FOIA Coordinator & State Administrative Board Claims Analyst,
            Knowledge Center
            Central Procurement Services – Customer Experience
            State of Michigan
            517-388-5773

CooperT7@michigan.gov

Mr. Phelps is a DTMB employee to be called solely for the purpose of authenticating records. Her testimony will only be necessary if Defendant does not stipulate to the authenticity of the relevant records and the Court does not find that the records are self-authenticating.

**Whether there was a conviction in connection with this case:**

No.

/s/ Ian T. Cross
Ian T. Cross (P83367)
Laurence H. Margolis (P69635)
Attorneys for Plaintiff
402 W. Liberty St
Ann Arbor MI
734-994-9590
ian@lawinannarbor.com
larry@lawinannarbor.com

38